UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TETRA TECHNOLOGIES INC., GEOFFREY M. HERTEL and JOSEPH M. ABELL III,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br><br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF FEDERAL SECURITIES LAWS**

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by TETRA Technologies, Inc. ("TETRA" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of TETRA between January 3, 2007 and October 16, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

6.　　Plaintiff City of Livonia Employees' Retirement System, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of TETRA at artificially inflated prices during the Class Period and has been damaged thereby.

7.　　Defendant TETRA is incorporated in Delaware and maintains its headquarters at 25025 Interstate 45 North, Suite 600, The Woodlands, TX 77380. The Company operates as an oil and gas services company worldwide. It manufactures integrated calcium chloride and brominated products, and supplies feedstocks to energy and other markets.

8.　　(a)　　Defendant Geoffrey M. Hertel ("Hertel") is, and was at all relevant times, President and Chief Executive Officer ("CEO") of TETRA.

　　　　(b)　　Defendant Joseph M. Abell III ("Abell") is, and was at all relevant times, Senior Vice President and Chief Financial Officer ("CFO") of TETRA.

　　　　(c)　　Defendants Hertel and Abell are referred to herein as the "Individual Defendants."

9.　　During the Class Period, the Individual Defendants, as senior executive officers and/or directors of TETRA, were privy to confidential and proprietary information concerning TETRA, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to materially adverse non-public information concerning TETRA, as discussed in detail below. Because of their positions with TETRA, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in

- 2 -

connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of TETRA's business.

11.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

12.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to TETRA's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become

- 3 -

materially misleading or untrue, so that the market price of TETRA's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of TETRA's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding TETRA's business, operations and management and the intrinsic value of TETRA's securities; (ii) enabled Defendant Hertel and other Company insiders to sell 1,472,912 shares of their personally-held TETRA common stock for gross proceeds in excess of $39.3 million; and (iii) caused Plaintiff and members of the Class to purchase TETRA's common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased the common stock of TETRA between January 3, 2007 and October 16, 2007, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TETRA common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified

from records maintained by TETRA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal laws complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

     (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

     (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of TETRA;

     (c)     whether the price of TETRA common stock was artificially inflated during the Class Period; and

     (d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.     Defendant TETRA describes itself as an "oil and gas services company, including an integrated calcium chloride and brominated products manufacturing operation that supplies feedstocks to energy markets, as well as other markets."

21.     The Company operates in three divisions: Fluids, Well Abandonment and Decommissioning, and Production Enhancement.

22.     The Fluids division manufactures and markets clear brine fluids, additives, and other associated products and services to the oil and gas industry for use in well drilling, completion, and workover operations. The Fluids division also markets various fluids and dry calcium chloride for markets outside the energy industry.

23.     The Well Abandonment and Decommissioning ("WA&D") division provides services for the abandonment of depleted oil and gas wells, as well as the decommissioning of platforms, pipelines, and other associated equipment. The WA&D division also offers diving, marine, engineering, electric wireline, workover, and drilling services. In addition, the WA&D division produces oil and gas from wells and conducts development and exploitation operations on certain of its oil and gas properties.

24.     The Production Enhancement division provides production testing services to the markets in Texas, New Mexico, Louisiana, and offshore Gulf of Mexico, as well as certain international markets. The Production Enhancement division is also involved in the design, fabrication, sale, lease, and service of wellhead compression equipment primarily used for production from mature, low pressure natural gas wells located principally in the mid-continent, mid-western, western, Rocky Mountain, and Gulf Coast regions of the United States, as well as in western Canada and Mexico. The Production Enhancement division also provides the technology

- 6 -

and services for the separation and recycling of oily residuals generated from petroleum refining operations.

25.     The Class Period begins on January 3, 2007.  On that date, TETRA issued a press release announcing its 2006 and 2007 earnings guidance. For 2007, the Company announced that earnings would be between $1.80 and $2.15 per diluted share and revenue would be between $1,118 and $1,240 million.  Defendant Hertel, commenting on the earnings guidance, stated, in pertinent part, as follows:

> 2006 earnings would have been even higher, if not for three factors: none of our three modified Dive Support Vessels were available for work in the fourth quarter (they are all scheduled to commence operations in January); we continued to work on a downed Maritech platform through December (deferring a portion of Well Abandonment & Decommissioning (WA&D) Services' profits until insurance payment is made in 2007); and, we incurred substantial costs "waiting on weather" on turn-key platform decommissioning contracts (this work was essentially completed in December). We estimate these factors cost us as much as $0.10 per diluted share in the fourth quarter of 2006.

> As has been the case for many years, a significant portion of our estimated 2007 growth reflects investments made in prior years. This particularly reflects expansion in WA&D Services (new equipment, the EPIC Diving acquisition, new service offerings, additional engineering resources and more crews), Maritech (further exploitation activities), Compressco (geographic expansion domestically and new international business), and Testing (the Beacon acquisition and new international contracts). Similarly, we believe that certain expenditures in 2007 will be a platform for continuing growth in 2008 and beyond. Significant 2007 expenditures that are expected to benefit the future are: Fluids – the Arkansas CBF plant, domestic onshore and international expansion; Compressco – an increase in its fleet under lease; Testing – equipment expansion for new and anticipated international contracts; and, Maritech's further development of properties. Even with these growth initiatives, TETRA should generate substantial free cash in 2007, in the absence of any currently unplanned acquisitions. To be able to achieve record earnings and still build for the future is our continuing goal, which we strive to attain every year. Our 2007 guidance meets this goal.

26.     On February 28, 2007, the Company issued a press release announcing its financial results for the fourth quarter and year end of 2006, the period ended December 31, 2006.  For the quarter, the Company reported earnings of $1.37 per share, consolidated revenues of $209.7 million

and net income, including discontinued operations, of $23.7 million.  Defendant Hertel, commenting

on the results, stated, in pertinent part as follows:

> All of our divisions contributed to the record year in 2006. Much of this improvement was created through investments made in 2004 and 2005. This is in keeping with our philosophy of "building toward the future." A portion of each year's capital expenditures are for projects that will not mature until later years. This gives TETRA the ability to partially structure future growth.

> TETRA experiences significant seasonality in some of its business areas, particularly in Well Abandonment and Decommissioning Services (WA&D Services). This seasonality leaves us with much higher activity and profits in the second and third quarters of the year (versus the first and fourth quarters). This pattern was reflected in 2006 earnings and should again be the case in 2007, especially as WA&D Services continues to grow. As we indicated in our January 3, 2007 press release, fourth quarter 2006 earnings would have been higher, if not for three factors: (1) none of our three modified Dive Support Vessels were available for work in the fourth quarter; (2) we continued to work on a downed Maritech platform through December (deferring a portion of WA&D Services profits until insurance payment is made in 2007); and, (3) we incurred substantial costs "waiting on weather" on certain turn-key platform decommissioning contracts (this work was essentially completed in December). Additionally, we continued to invest in scarce infrastructure (primarily people and vessels) that won't go to work until late in the first quarter of 2007. The combination of these factors moderated fourth quarter earnings growth.

> Looking forward, TETRA has forecast 2007 earnings guidance of $1.80 – $2.15 per share (an increase of 31% – 57% above 2006 levels). This growth is forecast in spite of a reduction in potential Maritech earnings of just under $20 million due to lower anticipated commodity prices, and in spite of a similar order of magnitude drop in potential Fluids earnings due to higher near-term inventory costs during the transition to the new Chemtura agreements (see the January 3, 2007 press release for more details).

> As has been the case for many years, a significant portion of our estimated 2007 growth reflects investments made in prior years. This particularly reflects expansion in WA&D Services (new equipment, the EPIC Diving acquisition, new service offerings, additional engineering resources and more crews), Maritech (further exploitation activities), Compressco (geographic expansion domestically and new international business), and Testing (the Beacon acquisition and new international contracts). Similarly, we believe that certain expenditures in 2007 will create a platform for continuing growth in 2008 and beyond. Significant 2007 expenditures that are expected to benefit the future are: Fluids – the Arkansas CBF plant, and domestic onshore and international expansion; Compressco – an increase in its fleet under lease; Testing – equipment expansion for new and anticipated international contracts; and, Maritech's further development of properties. Even after funding

- 8 -

these growth initiatives, TETRA should generate substantial free cash in 2007, in the absence of any currently unplanned acquisitions. To be able to achieve record earnings and still build for the future is our continuing goal, which we strive to attain every year.

A number of recent events bode well for 2007. In WA&D Services, we have secured additional sub-sea work for 2007. We continue to work toward signing additional contracts that would generate revenues as early as the second quarter of 2007. All three of the EPIC Dive Support Vessels (DSVs) that were being modified late in 2006 through early 2007 are now available for work. These DSVs have recently begun to generate revenues and should be more fully utilized in our second quarter, as a number of jobs are expected to commence. Also, our Coast Guard inspection and associated modifications of the Arapaho heavy-lift vessel were completed within the last week. The Arapaho should again be generating profits this week. It had been scheduled to be out of service through January and most of February.

On February 22, 2007, Maritech hedged 20,000 MMBtu/D (approximately two-thirds of the remainder of 2007's average production) of natural gas production at $8.13/MMBtu. This hedge encompasses March through December of 2007. While the hedge price is significantly less than hedged prices in 2006, it is above the budgeted levels previously reported. We also have 3,000 B/D (a little less than half of our anticipated oil production) hedged for 2007 at an average price of $68.41/barrel. We prefer to eliminate portions of the commodity risks associated with our Maritech production whenever possible. In addition to generating anticipated cash flow in excess of capital expenditures for 2007, Maritech and its working interest partners are expected to generate approximately $50 million of well abandonment and decommissioning work for WA&D Services in 2007.

Maritech serves three distinct functions within TETRA: it generates positive cash flow (above its internal needs) for reinvestment into our oil service businesses; it helps baseload our WA&D Services business unit; and, it adds to our growing profits. Maritech has been able to improve both its cash flow and earnings, in part, by finding and efficiently extracting additional oil and gas from mature properties. Once again in 2006, Maritech was able to grow. At the beginning of 2006, Maritech had approximately 90 BCFE (billion cubic feet equivalent – oil barrels converted to natural gas MCFs at one barrel to six MCFs) of proven reserves. During 2006, Maritech produced almost 16 BCFE of these reserves. Without purchasing any meaningful amount of reserves in 2006, Maritech finished the year with approximately 93 BCFE of proven reserves. This ability to generate incremental reserves out of older, mature properties is the primary reason that we are projecting improving profits for Maritech in 2007, even while it experiences a $20 million profit reduction caused by lower commodity prices. Maritech's production was about 44 MMCFE/D in 2006. Currently, Maritech's production is about 58 MMCFE/D. Our expectation is for 2007 average production to be between 66 – 73 MMCFE/D.

As we progress through the year, we expect to see some sequential improvement in our Fluids profits, as higher cost inventories begin to be blended with lower cost

- 9 -

product manufactured from raw materials obtained under our Chemtura agreements (however, 2007 annual earnings are projected to be lower than 2006 earnings, for this Division). Most of the Chemtura benefits should be reflected in earnings in 2008 and 2009. Also, our Production Enhancement Division profits should improve throughout 2007 as new international testing revenues (second quarter) and an increasing Compressco lease fleet, generate incremental revenues.

While we do not give specific earnings guidance for individual quarters, due to the earnings volatility of our businesses, we need to emphasize the seasonal profit swings created by some of our business units (particularly WA&D Services). We expect roughly 16% of our 2007 earnings to occur in the first quarter, 29% in the second quarter, 29% in the third quarter and 26% in the fourth quarter. These numbers should only be used as directional estimates. The impressive potential increase over our estimated first quarter profits reflects: the seasonality of WA&D Services; recent hedges and increasing production from Maritech; the gradual decrease in brominated product costs in Fluids; new international business in Testing; and, a growing lease fleet in Compressco.

27.     On May 7, 2007, TETRA issued a press release announcing its financial results for the first quarter of 2007, the period ended March 31, 2007. For the quarter, the Company reported earnings of $0.28 per share, consolidated revenues of $247.7 million and net income of $20.7 million. Defendant Hertel, commenting on the announcement, stated, in pertinent part as follows:

The first quarter results were impacted by four primary factors that we believe will continue to create differences between profit levels in 2007 and those reported in 2006. These factors will continue to affect Fluids, WA&D Services, Maritech, and Production Enhancement for much, if not all of 2007.

We project that our Fluids business could experience as much as a $30 million reduction in pretax profits in 2007, due to the direct and indirect results from entering into certain previously announced supply arrangements, and the absence of inventory gains experienced in 2006. Counteracting this, could be a partially offsetting $15 million pretax increase generated from expanding sales in our onshore and international Fluids operations. The first quarter 2007 Fluids earnings directly reflect the netting of these various items. We expect this trend to continue for the remainder of the year. These results are consistent with our 2007 guidance.

First quarter WA&D Services pretax profits were up 712% over pretax profits generated in the first quarter of 2006. This reflected a ramp-up in activity, particularly in the Gulf of Mexico (GOM). These dramatically higher profits came in spite of significant costs associated with people, equipment, and third-party services that were incurred for much, if not all, of the quarter, and were only partially offset by revenues generated late in the quarter on various projects. As a result, pretax profits in WA&D Services in March were much improved versus January or

February. This profitability is expected to improve again in both the second and third quarters.

First quarter 2007 Maritech pretax profits were lower than those experienced in the first quarter of 2006. We had previously indicated that the difference in profits caused by the reduction in hedged natural gas prices would equate to approximately $18 to $20 million on an annualized basis (about $2.50/MMBtu on 20,000 MMBtu/D). Also, as a result of premium increases during 2006, our insurance costs for the first quarter of 2007 were approximately $5.0 million, versus about $1.0 million in the first quarter of 2006. This direct $4.0 million cost increase is reflected in our 2007 first quarter earnings. We had incorporated both the lower commodity prices and the increased insurance costs into our guidance. The major offset to the lower commodity prices in 2007 is expected to be increased production volumes. A discussion of the timing of production increases is incorporated into this press release.

The Production Enhancement Division showed continued quarterly profit improvement, both year over year and sequentially. The major factors impacting subsequent 2007 quarters are expected to be new international contracts and the continued growth of Compressco.

On April 16, 2007, TETRA expanded its domestic onshore fluids business by acquiring a company that provides fluids delivery services in parts of Oklahoma, Arkansas, and Texas. The business was complementary to and expands on TETRA's existing total fluids management service. The TETRA fluids management service includes fluids, filtration, engineering, specialty equipment, additives, and associated delivery systems and services. The purchase price was $8.5 million, with another $2.5 million contingently payable, depending on future results. The business generated approximately $19.0 million in revenues in 2006. Net of the interest associated with the funds used to acquire the entity, it is anticipated that the acquisition will be accretive in 2007. However, it should be significantly more accretive to TETRA in 2008. This is another example of a bolt-on acquisition which expands upon an existing business area.

Even though the WA&D Services business unit showed great improvement in the first quarter versus last year's first quarter, it was a quarter of contrasts. In this seasonally weakest quarter, added costs can have a very negative effect on earnings. As WA&D Services geared up for higher activity in the second and third quarters, we incurred substantial costs that did not generate offsetting revenues. As we moved into the latter portions of the quarter, we began to put our spreads of equipment and EPIC's DSVs (dive support vessels) to work. Consequently, over 55% of WA&D Services first quarter earnings were generated in March. Within the group, the Inland Waters business generated 59% of its earnings in March. The EPIC and Heavy Lift businesses each generated over 100% of their respective quarterly profits in March.

The WA&D Services group recently signed a new contract to work on hurricane destroyed platforms. This work will start on or about May 15. At that time, we

- 11 -

should have two spreads working on downed platforms, as we have finished work under one of our previous contracts. Similarly, we have two spreads working standing platforms. We are currently negotiating with potential customers and equipment suppliers, and hope to have additional downed and standing platform work for this summer. One of the prospective customers is Maritech. Also, our three large DSVs should be adding to our activity levels and associated revenues during the second and third quarters.

Maritech's first quarter earnings reflected higher insurance premiums, lower natural gas prices, and increased production. Production averaged between 57 to 58 MMCF/D in the first quarter of 2007, versus the storm reduced approximate 37 MMCF/D in the first quarter of 2006. Currently, production volumes are lower than those forecasted in Maritech's 2007 guidance. The most significant shortfall is from two properties that were drilled in 2006 and early 2007. We had anticipated that completion activities would have been finished and the wells producing by now. However, completion rig availability and weather delays prevented timely completions. Much of this production is forecast to start late in the second quarter. Recognizing the potential shortfall to production, Maritech is now attempting to accelerate forward exploitation activities originally planned for late 2007 or early 2008. If Maritech is successful in this endeavor, it may offset any near-term production shortfall with increased production from this escalated activity in the fourth quarter.

Maritech has continued to hedge production volumes to mitigate the commodity risk of its business strategy. During the first 100 days of 2007, Maritech significantly increased its hedged position. Currently, the Company has the following hedges in place:

2007 (remainder of the year)
• 3,000 B/D of oil at an average price of $68.41/barrel
• 20,000 MMBtus/D of gas at an average price of $8.13/MMBtu

2008 (full year)
• 2,500 B/D of oil at an average price of $63.95/barrel
• 7,500 MMBtus/D of gas at an average price of $8.462/MMBtu

2009 (full year)
• 2,000 B/D of oil at an average price of $68.21/barrel

TETRA gave earnings guidance on January 3, 2007. By the end of the second quarter, we should have further clarity regarding the margins in the WA&D Services business and the magnitude of its increased summer activity. Also, we should have a better picture of the magnitude and timing of the increased volumes for Maritech. We therefore plan to modify, up or down, our previous earnings guidance when we report second quarter profits.

We continue to build for the future, while simultaneously attempting to set annual records at TETRA. In particular, our current investments in Fluids, Maritech, Testing, and Compressco should yield positive results for a number of years. Reinforce these positives with the current strength in WA&D Services (stimulated by previous investments), and you see why we are optimistic regarding TETRA's future.

28. On June 28, 2007, the Company issued a press release announcing that it "intends to form a Master Limited Partnership (MLP) into which it will place the majority of its Compressco, Inc. (Compressco) subsidiary assets, and expects to file a registration statement with the Securities and Exchange Commission for the initial public offering (IPO) of common units representing limited partner interests." In that regard, Defendant Hertel stated, in pertinent part, as follows:

Creating an MLP out of Compressco is a continuation of our ongoing strategy to unlock and create value for our stockholders, from our assets.

29. The statements referenced above in ¶¶25-28 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a) that the Company's WA&D division was not performing according to internal expectations;

(b) that the Company failed to timely take a charge for insurance receivables which remain uncollected; and

(c) as a result of the foregoing, the Company's earnings were artificially inflated. Moreover, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects.

30. On August 3, 2007, TETRA issued a press release announcing its financial results for the second quarter, the period ending June 30, 2007. For the quarter, the Company reported earnings of $0.30 per share, consolidated revenues of $258.1 million and net income of $22.9 million.

- 13 -

Moreover, the Company revised its 2007 earnings guidance to a range of $1.30 – $1.50 per share.

Defendant Hertel, commenting on the results and the Company's reduced earnings guidance, stated, in pertinent part as follows:

> Our second quarter earnings were significantly below what we had hoped for and were materially affected by events during June. There are a number of reasons for this weaker than expected performance. ***Fortunately, many of these reasons are transitory.***

> There can be significant volatility to our 2007 quarterly earnings. The primary reasons were spelled out in earlier press releases. During the year, we have to overcome about $50 million in pretax profit reductions (about $0.42 per share, after tax) that were not present in 2006. This is a combination of the roughly $30 million impact on our fluids business from 2007's higher cost inventories, and about $20 million from lower natural gas prices for Maritech. Because of this "earnings hole," the earnings from testing, WA&D Services and onshore fluids become even more important in attaining 2007 profits. A reduction in any of these other businesses therefore can cause significant volatility to quarterly corporate earnings. ***During the quarter, and particularly in June, all three of these business areas experienced situations that negatively impacted their profitability.***

> ***During the quarter, our Fluids Division continued to be impacted by the higher inventory costs created by our decision to fully integrate our bromine operation.*** The series of events we precipitated in 2005 and 2006 left us with high cost inventories (versus today's costs for the same inventory) and an obligation to buy additional high cost inventories to terminate an existing purchase contract. Once our obligations with respect to these high cost inventories have been satisfied and the high cost inventories have flushed through the system, we will begin to be benefited by our Chemtura agreements. Given the amount of product that we now hope to sell during the first three quarters of 2007, we believe a portion of the positive impact of the Chemtura agreements may begin to be seen as early as the fourth quarter of 2007. This means that we expect to generate a significant positive impact from these agreements in 2008.

> During 2007, we expected that a partial offset to the high cost Fluids inventories would come from our growing domestic onshore fluids service business. Unfortunately, in the second quarter, much of this business was located in Texas and southern Oklahoma. The exceptional rainfall in these areas during parts of May, June, and portions of July caused some of this activity to come to a standstill. We did not experience the activity and associated earnings in the second half of the quarter that had previously helped to offset the high cost inventory situation.

> As we documented in previous press releases, we did not expect our Maritech production to attain the originally budgeted volumes during the second quarter. This was due to the delay in production from two offshore platforms. Both of these

platforms are anticipated to essentially be on-stream for much of August. During the second quarter, net production averaged approximately 5,200 B/D of oil and 26 MMCF/D of natural gas. This totaled about 57.2 MMCFE/D (at 6 MCF per barrel conversion). This was slightly less than the first quarter of 2007 (about 58 MMCFE/D) and appreciably less than original budgeted volumes. This shortfall was primarily caused by the delay referred to above. It is expected that mid-August net daily volumes should approach 6,600 B/D and 33.0 MMCF/D or an average of 72.6 MMCFE/D, as these two platforms begin sustained production.

To help offset this volume shortfall, Maritech has undertaken an escalated development program for the second half of 2007. While we expect that this program will help offset some of the production deferral, it is unlikely that it will make up the entire shortfall. However, pricing of unhedged production volumes has, to-date in 2007, been above plan. Therefore, when including all of these variables (but excluding unique items), total profits from Maritech in 2007 may approach budgeted levels. Maritech had a unique item during the second quarter: the write-off of disputed insurance proceeds from work performed on assets damaged in the 2005 hurricanes. We remain committed to the recovery of all these amounts. Should Maritech ultimately receive insurance payments for these damages, the funds will flow to income in the period they are received.

*During the second quarter of 2007, we attempted to dramatically ramp-up activity in our WA&D Services business. We learned a lot in the process, but generated substantially less profits than anticipated.* Our downed structure work was very efficient during the quarter. Unfortunately, because we finished certain aspects of these jobs in a shorter time, we had idle capacity for portions of the quarter. On heavy-lift projects above water, we worked off the majority of our remaining fixed price contracts at nominal profits, due to abnormally poor weather conditions. We were also unable to begin major offshore plugging work for three clients, until the third quarter. In addition, one of our three DSVs experienced start-up problems and worked only periodically (it is expected to be fully operational in about three weeks). What does all of this tell us? It says that we need to include some of these factors in our ongoing estimates, until we become more efficient. Instead of trying to dissect each WA&D Services contract separately, I believe a better approach will be to estimate gross segment profitability on a quarterly basis. Only when we materially add or subtract equipment or enter into significant new contracts should we modify this consolidated profit estimate. At today's level of activity, WA&D Services is expected to generate pretax profits of $10 – $13 million in its first and fourth quarters and $15 – $21 million in the second and third quarters, on a go-forward basis.

While our Production Enhancement Division showed increased profits, our testing business was affected by wet weather, particularly in Texas. Our testing service prices have increased this year, but the effects of weather-related lower utilization and increasing costs reduced gross margins during the quarter. Fortunately, the market remains robust for these services. TETRA expects to continue its domestic geographic expansion throughout this year. A major impetus for our testing business

- 15 -

in 2007 is our international expansion. We began work in the Middle East in late July and should begin operations under a new contract in a Latin American country within a week. Our previously existing international testing business continues to grow. These areas, as well as other international work later in the year, should materially augment testing profitability throughout the remainder of 2007 and into 2008.

Compressco's operations remained strong during the second quarter. Profits continued to grow, both year-to-year and sequentially.

***Clearly the second half of 2007's profits should exceed the first half, due, in part, to: lower Fluids product costs; fewer weather disruptions; increasing Maritech volumes; increasing international testing revenues; and, a more efficiently run WA&D Services operation.*** Given our first half results and the improving second half of 2007, we believe earnings of $1.30 – $1.50 per share are realistic for all of 2007. This is certainly not the earnings that we had hoped for, but even these earnings show our ability to grow. If we had suffered the same Fluids inventory costs and lower natural gas prices in 2006, as we have experienced them in 2007, we believe that our projected earnings for 2007 would compare very favorably with the earnings that would have been realized under those circumstances in 2006. With no similar "holes" anticipated for 2008, we look forward to significant earnings growth next year.

[Emphasis added.]

31.     In response to this announcement, the price of TETRA common stock fell $6.64 per share, or approximately 25%, to close at $19.77 per share, on extremely heavy trading volume.

32.     Then, on October 16, 2007, TETRA issued a press release announcing that it is withdrawing its previously estimated 2007 earnings guidance of $1.30 – $1.50 per share. In that regard, Defendant Hertel stated, in pertinent part, as follows:

During portions of 2006 and during the first three quarters of 2007, TETRA has been impacted by a number of issues. Some of these issues manifested themselves in the last six to nine months and are of a current operational nature. As previously disclosed, these issues impacted earnings negatively during the first two quarters and are expected to do so in the third quarter. We have been addressing these types of issues and believe that many of them were resolved by the end of the third quarter. However, we also have a number of issues related to prior events. An example of this is where historical costs are currently represented as insurance receivables. Almost all of these types of issues have involved charges that impacted reported earnings, but which did not effect cash flow, in the then current period. As we have previously disclosed, some of these issues have already negatively impacted earnings in 2007, and will also impact the third quarter. ***Such items included additional repairs made***

***to Maritech properties for the 2005 storm damages that are unresolved with TETRA's insurance providers.*** The Company is continuing to work diligently with its underwriters to provide additional information and to resolve all outstanding issues in order to secure payment under the policies. ***During the third quarter the Company will also record impairments of certain Maritech oil and gas properties in accordance with the successful efforts accounting method.***

Separately, we have signed a non-binding Letter of Intent to sell certain assets in one of our non-core business units (not associated with the prospective Compressco MLP). We do not intend to sell these assets unless the terms of the sale reflected in the definitive agreement will generate a substantial gain and cash proceeds. If the sale anticipated in the Letter of Intent occurs, it should be prior to year end.

The myriad of potential combinations from these various factors makes an earnings estimate for 2007 difficult to predict, at this time. Therefore, we are withdrawing our previously announced $1.30 – $1.50 earnings guidance range for 2007.

Two general factors make up the largest portion of possible negative adjustments to income. ***By far the largest item is insurance coverage, and by far the largest factor here involves storm damage from hurricanes Rita and Katrina.*** As outlined in great detail in our financial reports, TETRA experienced material damage from the two storms. Since 2005, we have been repaid in excess of $90 million for storm related costs and charges. At June 30, 2007 we had $35.7 million for all insurance accounts receivable, and management estimates that as of September 30, 2007, we had $27.8 million for all insurance accounts receivable. We are currently attempting to set up meetings with our insurers later this year, regarding unresolved issues, with the hope of resolving all remaining issues and collecting the full amount of the insurance receivables. If this meeting creates irreconcilable differences regarding claims, TETRA may be required to charge these amounts against income in the then current period. This would in no way diminish our attempts to collect the full amount owed to TETRA by the insurers. We remain confident that we will ultimately prevail on these issues. Should payment occur after we have written off any costs, the proceeds may be reflected as income, in the period collected.

A second charge periodically affects our Maritech subsidiary. Unlike many independent oil and gas producers, Maritech uses the more conservative successful efforts accounting. Generally, each of our producing properties is its own "cost center." Many companies of our size with E&P operations employ full cost accounting as opposed to successful efforts. This allows those companies to aggregate all of their properties together to determine if they have an impairment. Under this method, successes and failures are lumped together and if the successes are greater than the failures, no impairment is recorded. Under Maritech's property-by-property accounting, we are exposed to the risk that the value of a particular property (field) would have to be written-down or written-off if an impairment were present, with no offset from successes in other fields. This approach could yield more impairments, and the associated reductions in reported earnings. Under this accounting method, Maritech (TETRA) should periodically have write-offs or write-

- 17 -

downs. The law of averages makes these periodic charges very likely, even if Maritech is generally successful and has increased its aggregate gross reserve values. ***During the third quarter, Maritech will incur impairment charges for certain of its oil and gas properties.***

***Prior to year end, TETRA could experience earnings impacts from any of the following items: insurance related issues; changes in asset retirement obligations; asset sales; and, successful efforts impairments.*** Most, if not all, of the potential charges discussed in this press release would be charges against current period operations. On the other hand, the anticipated sale of assets should generate not only a gain, but substantial cash proceeds in the current period.

[Emphasis added.]

33.      In response to this announcement, the price of TETRA common stock fell an additional $1.76 per share, or approximately 8%, to close at $19.86 per share, on heavy trading volume.

34.      The market for TETRA common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, TETRA's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired TETRA's common stock relying upon the integrity of the market price of TETRA's common stock and market information relating to TETRA, and have been damaged thereby.

35.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of TETRA's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and its operations, as alleged herein.

36.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about TETRA's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of TETRA and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

37.     As alleged herein, Defendants acted with scienter in that Defendants: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding TETRA, their control over, and/or receipt and/or modification of TETRA's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning TETRA, participated in the fraudulent scheme alleged herein.

- 19 -

38.     Defendants were further motivated to engage in this course of conduct in order to allow Defendant Hertel and other Company insiders to sell 1,472,912 shares of their personally-held TETRA common stock for gross proceeds in excess of $39.3 million. The following chart sets forth the insider trading:

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BEN CHAMBERS | 5/16/2007 | 13,266 | $27.04 | $358,713 |
| | 5/16/2007 | 8,504 | $26.59 | $226,121 |
| | 5/16/2007 | 5,000 | $26.57 | $132,850 |
| | 5/16/2007 | 3,500 | $27.10 | $94,850 |
| | 5/16/2007 | 3,500 | $27.07 | $94,745 |
| | | 33,770 | | $907,279 |
| | | | | |
| BRUCE COBB | 5/15/2007 | 19,300 | $27.60 | $532,680 |
| | 5/15/2007 | 6,300 | $27.65 | $174,195 |
| | 5/15/2007 | 4,300 | $27.64 | $118,852 |
| | 5/15/2007 | 3,600 | $27.67 | $99,612 |
| | 5/15/2007 | 3,400 | $27.66 | $94,044 |
| | 5/15/2007 | 2,500 | $27.68 | $69,200 |
| | 5/15/2007 | 2,400 | $27.62 | $66,288 |
| | 5/15/2007 | 1,800 | $27.61 | $49,698 |
| | 5/15/2007 | 1,400 | $27.63 | $38,682 |
| | | 45,000 | | $1,243,251 |
| | | | | |
| PAUL COOMBS | 5/22/2007 | 8,000 | $28.26 | $226,080 |
| | 5/29/2007 | 25,000 | $27.20 | $680,000 |
| | 5/29/2007 | 8,300 | $27.21 | $225,843 |
| | 5/29/2007 | 3,500 | $27.23 | $95,305 |
| | 5/29/2007 | 3,300 | $27.22 | $89,826 |
| | 5/29/2007 | 1,500 | $27.24 | $40,860 |
| | 5/29/2007 | 1,400 | $27.26 | $38,164 |
| | 5/29/2007 | 1,400 | $27.30 | $38,220 |
| | 5/29/2007 | 1,300 | $27.27 | $35,451 |
| | 5/29/2007 | 800 | $27.25 | $21,800 |
| | 5/29/2007 | 800 | $27.31 | $21,848 |
| | 5/29/2007 | 600 | $27.29 | $16,374 |
| | 5/29/2007 | 600 | $27.34 | $16,404 |
| | 5/29/2007 | 400 | $27.28 | $10,912 |
| | 5/29/2007 | 400 | $27.32 | $10,928 |
| | 5/29/2007 | 400 | $27.35 | $10,940 |
| | 5/29/2007 | 300 | $27.33 | $8,199 |
| | 5/30/2007 | 13,500 | $27.80 | $375,300 |
| | 5/30/2007 | 6,900 | $27.81 | $191,889 |
| | 5/30/2007 | 5,800 | $27.83 | $161,414 |
| | 5/30/2007 | 5,100 | $27.86 | $142,086 |
| | 5/30/2007 | 2,500 | $27.84 | $69,600 |
| | 5/30/2007 | 2,500 | $27.85 | $69,625 |
| | 5/30/2007 | 2,000 | $27.87 | $55,740 |

| | | | | |
|---|---|---|---|---|
| | 5/30/2007 | 1,400 | $27.82 | $38,948 |
| | 5/30/2007 | 300 | $27.88 | $8,364 |
| | 5/31/2007 | 8,075 | $27.81 | $224,566 |
| | 5/31/2007 | 7,800 | $27.80 | $216,840 |
| | 5/31/2007 | 7,400 | $27.88 | $206,312 |
| | 5/31/2007 | 5,500 | $27.83 | $153,065 |
| | 5/31/2007 | 5,300 | $27.84 | $147,552 |
| | 5/31/2007 | 5,100 | $28.01 | $142,851 |
| | 5/31/2007 | 4,800 | $27.82 | $133,536 |
| | 5/31/2007 | 4,500 | $28.00 | $126,000 |
| | 5/31/2007 | 4,300 | $28.03 | $120,529 |
| | 5/31/2007 | 3,800 | $28.12 | $106,856 |
| | 5/31/2007 | 3,300 | $27.85 | $91,905 |
| | 5/31/2007 | 2,900 | $28.13 | $81,577 |
| | 5/31/2007 | 2,800 | $27.95 | $78,260 |
| | 5/31/2007 | 2,400 | $27.86 | $66,864 |
| | 5/31/2007 | 2,300 | $28.10 | $64,630 |
| | 5/31/2007 | 2,000 | $27.96 | $55,920 |
| | 5/31/2007 | 2,000 | $28.04 | $56,080 |
| | 5/31/2007 | 2,000 | $28.14 | $56,280 |
| | 5/31/2007 | 1,300 | $27.89 | $36,257 |
| | 5/31/2007 | 1,200 | $28.02 | $33,624 |
| | 5/31/2007 | 800 | $27.90 | $22,320 |
| | 5/31/2007 | 700 | $28.09 | $19,663 |
| | 5/31/2007 | 500 | $28.11 | $14,055 |
| | 5/31/2007 | 400 | $28.06 | $11,224 |
| | 5/31/2007 | 300 | $27.87 | $8,361 |
| | 5/31/2007 | 300 | $28.05 | $8,415 |
| | 5/31/2007 | 300 | $28.07 | $8,421 |
| | 5/31/2007 | 300 | $28.15 | $8,445 |
| | 5/31/2007 | 225 | $27.92 | $6,282 |
| | 5/31/2007 | 200 | $27.91 | $5,582 |
| | 5/31/2007 | 200 | $28.16 | $5,632 |
| | 5/31/2007 | 100 | $27.93 | $2,793 |
| | 5/31/2007 | 100 | $27.94 | $2,794 |
| | 5/31/2007 | 100 | $28.19 | $2,819 |
| | 5/31/2007 | 100 | $28.21 | $2,821 |
| | 6/1/2007 | 11,634 | $28.00 | $325,752 |
| | 6/1/2007 | 11,100 | $27.84 | $309,024 |
| | 6/1/2007 | 9,100 | $27.80 | $252,980 |
| | 6/1/2007 | 3,134 | $28.02 | $87,815 |
| | 6/1/2007 | 2,900 | $28.01 | $81,229 |
| | 6/1/2007 | 2,500 | $27.86 | $69,650 |
| | 6/1/2007 | 1,100 | $28.03 | $30,833 |
| | 6/1/2007 | 732 | $27.88 | $20,408 |
| | 6/1/2007 | 704 | $27.81 | $19,578 |
| | 6/1/2007 | 500 | $28.04 | $14,020 |
| | 6/1/2007 | 100 | $27.85 | $2,785 |
| | 6/1/2007 | 100 | $27.87 | $2,787 |
| | | 225,004 | | $6,246,112 |
| | | | | |
| RALPH CUNNINGHAM | 4/4/2007 | 3,200 | $24.99 | $79,968 |

| | | | | |
|---|---|---|---|---|
| | 4/4/2007 | 2,000 | $24.96 | $49,920 |
| | 4/4/2007 | 1,900 | $24.98 | $47,462 |
| | 4/4/2007 | 900 | $24.97 | $22,473 |
| | | 8,000 | | $199,823 |
| | | | | |
| TOM DELIMITROS | 1/8/2007 | 11,300 | $22.65 | $255,945 |
| | 1/8/2007 | 3,600 | $22.71 | $81,756 |
| | 1/8/2007 | 900 | $22.70 | $20,430 |
| | 1/8/2007 | 800 | $22.72 | $18,176 |
| | 1/8/2007 | 700 | $22.66 | $15,862 |
| | 1/8/2007 | 500 | $22.69 | $11,345 |
| | 1/8/2007 | 200 | $22.68 | $4,536 |
| | | 18,000 | | $408,050 |
| | | | | |
| GARY HANNA | 6/5/2007 | 5,300 | $28.46 | $150,838 |
| | 6/5/2007 | 4,111 | $28.60 | $117,575 |
| | 6/5/2007 | 2,700 | $28.27 | $76,329 |
| | 6/5/2007 | 2,500 | $28.26 | $70,650 |
| | 6/5/2007 | 1,306 | $28.40 | $37,090 |
| | 6/5/2007 | 1,300 | $28.43 | $36,959 |
| | 6/5/2007 | 1,300 | $28.45 | $36,985 |
| | 6/5/2007 | 1,100 | $28.42 | $31,262 |
| | 6/5/2007 | 1,000 | $28.41 | $28,410 |
| | 6/5/2007 | 800 | $28.29 | $22,632 |
| | 6/5/2007 | 500 | $28.44 | $14,220 |
| | 6/5/2007 | 436 | $28.31 | $12,343 |
| | 6/5/2007 | 400 | $28.28 | $11,312 |
| | 6/5/2007 | 400 | $28.30 | $11,320 |
| | 6/5/2007 | 300 | $28.25 | $8,475 |
| | | 23,453 | | $666,400 |
| | | | | |
| GEOFFREY HERTEL | 5/9/2007 | 55,469 | $26.40 | $1,464,382 |
| | 5/9/2007 | 22,684 | $26.38 | $598,404 |
| | 5/9/2007 | 19,400 | $26.42 | $512,548 |
| | 5/9/2007 | 18,703 | $26.45 | $494,694 |
| | 5/9/2007 | 17,206 | $26.37 | $453,722 |
| | 5/9/2007 | 16,900 | $26.41 | $446,329 |
| | 5/9/2007 | 13,869 | $26.35 | $365,448 |
| | 5/9/2007 | 9,700 | $26.44 | $256,468 |
| | 5/9/2007 | 8,864 | $26.39 | $233,921 |
| | 5/9/2007 | 5,477 | $26.36 | $144,374 |
| | 5/9/2007 | 4,700 | $26.49 | $124,503 |
| | 5/9/2007 | 4,400 | $26.46 | $116,424 |
| | 5/9/2007 | 4,323 | $26.47 | $114,430 |
| | 5/9/2007 | 4,305 | $26.43 | $113,781 |
| | 5/9/2007 | 4,300 | $26.55 | $114,165 |
| | 5/9/2007 | 4,296 | $26.51 | $113,887 |
| | 5/9/2007 | 3,600 | $26.50 | $95,400 |
| | 5/9/2007 | 2,100 | $26.48 | $55,608 |
| | 5/9/2007 | 1,000 | $26.52 | $26,520 |
| | 5/9/2007 | 1,000 | $26.53 | $26,530 |
| | 5/9/2007 | 204 | $26.54 | $5,414 |

| | 5/10/2007 | 18,400 | $26.40 | $485,760 |
|---|---|---|---|---|
| | 5/10/2007 | 12,400 | $26.35 | $326,740 |
| | 5/10/2007 | 11,700 | $26.32 | $307,944 |
| | 5/10/2007 | 7,000 | $26.42 | $184,940 |
| | 5/10/2007 | 6,800 | $26.34 | $179,112 |
| | 5/10/2007 | 5,500 | $26.33 | $144,815 |
| | 5/10/2007 | 5,100 | $26.41 | $134,691 |
| | 5/10/2007 | 2,385 | $26.37 | $62,892 |
| | 5/10/2007 | 2,200 | $26.36 | $57,992 |
| | 5/10/2007 | 1,306 | $26.38 | $34,452 |
| | 5/10/2007 | 1,200 | $26.43 | $31,716 |
| | 5/10/2007 | 1,200 | $26.45 | $31,740 |
| | 5/10/2007 | 309 | $26.39 | $8,155 |
| | 5/11/2007 | 19,210 | $26.48 | $508,681 |
| | 5/11/2007 | 12,900 | $26.45 | $341,205 |
| | 5/11/2007 | 12,000 | $26.30 | $315,600 |
| | 5/11/2007 | 10,500 | $26.43 | $277,515 |
| | 5/11/2007 | 10,300 | $26.46 | $272,538 |
| | 5/11/2007 | 10,100 | $26.54 | $268,054 |
| | 5/11/2007 | 9,800 | $26.65 | $261,170 |
| | 5/11/2007 | 9,703 | $26.53 | $257,421 |
| | 5/11/2007 | 9,600 | $26.40 | $253,440 |
| | 5/11/2007 | 8,700 | $26.47 | $230,289 |
| | 5/11/2007 | 7,900 | $26.68 | $210,772 |
| | 5/11/2007 | 5,797 | $26.52 | $153,736 |
| | 5/11/2007 | 5,395 | $26.41 | $142,482 |
| | 5/11/2007 | 4,700 | $26.66 | $125,302 |
| | 5/11/2007 | 4,500 | $26.70 | $120,150 |
| | 5/11/2007 | 4,000 | $26.67 | $106,680 |
| | 5/11/2007 | 3,900 | $26.49 | $103,311 |
| | 5/11/2007 | 3,700 | $26.51 | $98,087 |
| | 5/11/2007 | 3,500 | $26.81 | $93,835 |
| | 5/11/2007 | 3,200 | $26.90 | $86,080 |
| | 5/11/2007 | 2,990 | $26.50 | $79,235 |
| | 5/11/2007 | 2,600 | $26.85 | $69,810 |
| | 5/11/2007 | 2,500 | $26.39 | $65,975 |
| | 5/11/2007 | 2,500 | $26.86 | $67,150 |
| | 5/11/2007 | 2,300 | $26.44 | $60,812 |
| | 5/11/2007 | 2,000 | $26.84 | $53,680 |
| | 5/11/2007 | 1,500 | $26.55 | $39,825 |
| | 5/11/2007 | 1,500 | $26.80 | $40,200 |
| | 5/11/2007 | 1,400 | $26.69 | $37,366 |
| | 5/11/2007 | 1,200 | $26.83 | $32,196 |
| | 5/11/2007 | 800 | $26.73 | $21,384 |
| | 5/11/2007 | 700 | $26.56 | $18,592 |
| | 5/11/2007 | 205 | $26.42 | $5,416 |
| | 5/11/2007 | 200 | $26.71 | $5,342 |
| | 5/11/2007 | 100 | $26.72 | $2,672 |
| | 5/11/2007 | 100 | $26.82 | $2,682 |
| | | 480,000 | | $12,696,586 |
| | | | | |
| DENNIS MATHEWS | 6/1/2007 | 12,166 | $28.00 | $340,648 |

| | 6/1/2007 | 1,166 | $28.02 | $32,671 |
|---|---|---|---|---|
| | 6/1/2007 | 1,000 | $28.01 | $28,010 |
| | 6/1/2007 | 800 | $28.03 | $22,424 |
| | 6/4/2007 | 9,000 | $28.22 | $253,980 |
| | 6/4/2007 | 7,456 | $28.21 | $210,334 |
| | 6/4/2007 | 7,400 | $28.00 | $207,200 |
| | 6/4/2007 | 6,000 | $28.04 | $168,240 |
| | 6/4/2007 | 5,850 | $28.23 | $165,146 |
| | 6/4/2007 | 3,800 | $28.05 | $106,590 |
| | 6/4/2007 | 3,700 | $28.01 | $103,637 |
| | 6/4/2007 | 2,100 | $28.02 | $58,842 |
| | 6/4/2007 | 1,900 | $28.03 | $53,257 |
| | 6/4/2007 | 1,900 | $28.19 | $53,561 |
| | 6/4/2007 | 1,900 | $28.20 | $53,580 |
| | 6/4/2007 | 1,600 | $28.18 | $45,088 |
| | 6/4/2007 | 1,400 | $28.16 | $39,424 |
| | 6/4/2007 | 1,300 | $28.24 | $36,712 |
| | 6/4/2007 | 1,062 | $28.15 | $29,895 |
| | 6/4/2007 | 1,000 | $28.14 | $28,140 |
| | 6/4/2007 | 600 | $28.17 | $16,902 |
| | 6/4/2007 | 400 | $28.06 | $11,224 |
| | 6/4/2007 | 400 | $28.09 | $11,236 |
| | 6/4/2007 | 400 | $28.25 | $11,300 |
| | 6/4/2007 | 300 | $28.10 | $8,430 |
| | 6/4/2007 | 200 | $28.12 | $5,624 |
| | 6/4/2007 | 100 | $28.08 | $2,808 |
| | 6/4/2007 | 100 | $28.13 | $2,813 |
| | | 75,000 | | $2,107,716 |
| | | | | |
| GEORGE MCCARROLL | 5/30/2007 | 6,900 | $27.09 | $186,921 |
| | 5/30/2007 | 500 | $27.10 | $13,550 |
| | 5/30/2007 | 100 | $27.11 | $2,711 |
| | 9/19/2007 | 6,900 | $21.51 | $148,419 |
| | 9/19/2007 | 1,700 | $21.54 | $36,618 |
| | 9/19/2007 | 900 | $21.52 | $19,368 |
| | 9/19/2007 | 500 | $21.53 | $10,765 |
| | | 17,500 | | $418,352 |
| | | | | |
| ALLEN MCINNES | 5/16/2007 | 33,200 | $27.00 | $896,400 |
| | 5/16/2007 | 2,200 | $27.02 | $59,444 |
| | 5/16/2007 | 600 | $27.01 | $16,206 |
| | | 36,000 | | $972,050 |
| | | | | |
| KENNETH MITCHELL | 1/19/2007 | 7,519 | $23.32 | $175,343 |
| | 1/19/2007 | 6,800 | $23.36 | $158,848 |
| | 1/19/2007 | 5,400 | $23.37 | $126,198 |
| | 1/19/2007 | 2,941 | $23.31 | $68,555 |
| | 1/19/2007 | 2,100 | $23.33 | $48,993 |
| | 1/19/2007 | 1,500 | $23.34 | $35,010 |
| | 1/19/2007 | 1,100 | $23.38 | $25,718 |
| | 1/19/2007 | 700 | $23.39 | $16,373 |
| | 1/19/2007 | 700 | $23.41 | $16,387 |

| | 1/19/2007 | 640 | $23.30 | $14,912 |
|---|---|---|---|---|
| | 1/19/2007 | 300 | $23.40 | $7,020 |
| | 1/19/2007 | 200 | $23.35 | $4,670 |
| | 1/19/2007 | 100 | $23.42 | $2,342 |
| | | 30,000 | | $700,369 |
| | | | | |
| LINDEN PRICE | 6/5/2007 | 28,880 | $28.50 | $823,080 |
| | | 28,880 | | $823,080 |
| | | | | |
| RAYMOND SYMENS | 3/7/2007 | 80,200 | $23.00 | $1,844,600 |
| | 3/7/2007 | 6,100 | $23.01 | $140,361 |
| | 3/7/2007 | 1,800 | $23.02 | $41,436 |
| | 3/7/2007 | 1,300 | $23.03 | $29,939 |
| | 3/7/2007 | 600 | $22.99 | $13,794 |
| | 5/11/2007 | 56,500 | $26.85 | $1,517,025 |
| | 5/11/2007 | 54,983 | $26.84 | $1,475,744 |
| | 5/11/2007 | 43,700 | $26.90 | $1,175,530 |
| | 5/11/2007 | 20,900 | $26.89 | $562,001 |
| | 5/11/2007 | 13,000 | $26.88 | $349,440 |
| | 5/11/2007 | 10,000 | $26.86 | $268,600 |
| | 5/11/2007 | 6,200 | $26.83 | $166,346 |
| | 5/11/2007 | 4,800 | $26.87 | $128,976 |
| | 5/11/2007 | 2,800 | $26.80 | $75,040 |
| | 5/11/2007 | 2,300 | $26.84 | $61,732 |
| | 5/11/2007 | 2,100 | $26.93 | $56,553 |
| | 5/11/2007 | 2,000 | $26.92 | $53,840 |
| | 5/11/2007 | 1,300 | $26.91 | $34,983 |
| | 5/11/2007 | 700 | $26.95 | $18,865 |
| | 5/11/2007 | 700 | $26.96 | $18,872 |
| | 5/11/2007 | 600 | $26.81 | $16,086 |
| | 5/11/2007 | 200 | $26.97 | $5,394 |
| | 5/11/2007 | 100 | $26.82 | $2,682 |
| | 5/11/2007 | 100 | $26.94 | $2,694 |
| | 5/23/2007 | 12,200 | $28.09 | $342,698 |
| | 5/23/2007 | 9,200 | $27.90 | $256,680 |
| | 5/23/2007 | 9,024 | $28.08 | $253,394 |
| | 5/23/2007 | 8,200 | $28.00 | $229,600 |
| | 5/23/2007 | 6,100 | $28.15 | $171,715 |
| | 5/23/2007 | 5,400 | $28.05 | $151,470 |
| | 5/23/2007 | 4,500 | $27.94 | $125,730 |
| | 5/23/2007 | 4,200 | $28.10 | $118,020 |
| | 5/23/2007 | 3,000 | $28.14 | $84,420 |
| | 5/23/2007 | 2,900 | $29.07 | $84,303 |
| | 5/23/2007 | 2,700 | $28.13 | $75,951 |
| | 5/23/2007 | 2,300 | $28.06 | $64,538 |
| | 5/23/2007 | 2,200 | $28.01 | $61,622 |
| | 5/23/2007 | 1,500 | $28.02 | $42,030 |
| | 5/23/2007 | 1,300 | $27.91 | $36,283 |
| | 5/23/2007 | 1,200 | $28.12 | $33,744 |
| | 5/23/2007 | 1,100 | $28.03 | $30,833 |
| | 5/23/2007 | 700 | $28.11 | $19,677 |
| | 5/23/2007 | 400 | $28.04 | $11,216 |

| | | | | |
|---|---|---|---|---|
| | 5/24/2007 | 18,200 | $27.18 | $494,676 |
| | 5/24/2007 | 1,200 | $27.19 | $32,628 |
| | 5/24/2007 | 900 | $27.20 | $24,480 |
| | 5/24/2007 | 300 | $27.21 | $8,163 |
| | 5/24/2007 | 800 | $27.22 | $21,776 |
| | 5/24/2007 | 100 | $27.23 | $2,723 |
| | 5/24/2007 | 1,100 | $27.24 | $29,964 |
| | 5/24/2007 | 100 | $27.30 | $2,730 |
| | 5/24/2007 | 100 | $27.31 | $2,731 |
| | 5/24/2007 | 100 | $27.34 | $2,734 |
| | 5/24/2007 | 2,300 | $27.35 | $62,905 |
| | 5/24/2007 | 900 | $27.36 | $24,624 |
| | 5/24/2007 | 600 | $27.37 | $16,422 |
| | 5/24/2007 | 500 | $27.39 | $13,695 |
| | 5/24/2007 | 8,400 | $27.40 | $230,160 |
| | 5/24/2007 | 3,400 | $27.41 | $93,194 |
| | 5/24/2007 | 2,400 | $27.42 | $65,808 |
| | 5/24/2007 | 900 | $27.43 | $24,687 |
| | 5/24/2007 | 200 | $27.44 | $5,488 |
| | 5/24/2007 | 100 | $27.45 | $2,745 |
| | 5/24/2007 | 400 | $27.48 | $10,992 |
| | 5/24/2007 | 200 | $27.50 | $5,500 |
| | 5/24/2007 | 100 | $27.52 | $2,752 |
| | 5/24/2007 | 1,200 | $27.53 | $33,036 |
| | 5/24/2007 | 600 | $27.54 | $16,524 |
| | 5/24/2007 | 200 | $27.55 | $5,510 |
| | 5/24/2007 | 300 | $27.57 | $8,271 |
| | 5/24/2007 | 100 | $27.58 | $2,758 |
| | 5/24/2007 | 200 | $27.60 | $5,520 |
| | | 437,007 | | $11,507,653 |
| | | | | |
| BASS WALLACE | 5/15/2007 | 6,198 | $27.45 | $170,135 |
| | 5/15/2007 | 2,900 | $27.47 | $79,663 |
| | 5/15/2007 | 2,600 | $27.44 | $71,344 |
| | 5/15/2007 | 1,200 | $27.43 | $32,916 |
| | 5/15/2007 | 1,100 | $27.50 | $30,250 |
| | 5/15/2007 | 900 | $27.48 | $24,732 |
| | 5/15/2007 | 300 | $27.46 | $8,238 |
| | 5/15/2007 | 100 | $27.49 | $2,749 |
| | | 15,298 | | $420,027 |
| | Total: | 1,472,912 | | $39,316,748 |

## Loss Causation/Economic Loss

39.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of TETRA's common stock and operated as a fraud or deceit on Class Period purchasers of TETRA's common stock by

- 26 -

failing to disclose to investors that the Company's WA&D division was not performing according to internal expectations and that the Company failed to timely take a charge for insurance receivables, which remain uncollected. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of TETRA's common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of TETRA's common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

40.     By failing to disclose to investors that the Company's WA&D division was not performing according to internal expectations and that the Company failed to timely take a charge for insurance receivables, which remain uncollected, Defendants presented a misleading picture of TETRA's business and prospects. Defendants' false and misleading statements had the intended effect and caused TETRA's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $30.14 per share on July 12, 2007.

41.     As a direct result of Defendants' disclosures on August 3, 2007 and October 16, 2007, the price of TETRA common stock fell precipitously, falling by a collective $8.40 per share, or 33%. These drops removed the inflation from the price of TETRA common stock, causing real economic loss to investors who had purchased TETRA common stock during the Class Period.

42.     The 33% decline in the price of TETRA common stock after this disclosure came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in TETRA common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and

the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of TETRA common stock and the subsequent significant decline in the value of TETRA common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

43.     At all relevant times, the market for TETRA's common stock was an efficient market for the following reasons, among others:

(a)     TETRA common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, TETRA filed periodic public reports with the SEC and the NYSE;

(c)     TETRA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     TETRA was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

44.     As a result of the foregoing, the market for TETRA common stock promptly digested current information regarding TETRA from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of TETRA

- 28 -

common stock during the Class Period suffered similar injury through their purchase of TETRA

common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

45.      The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements"

when made.  To the extent there were any forward-looking statements, there were no meaningful

cautionary statements identifying important factors that could cause actual results to differ materially

from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are

liable for those false forward-looking statements because at the time each of those forward-looking

statements were made, the particular speaker knew that the particular forward-looking statement was

false, and/or the forward-looking statement was authorized and/or approved by an executive officer

of TETRA who knew that those statements were false when made.

**COUNT II**

**Violation of Section 10(b) of
the Exchange Act Against and Rule 10b-5
Promulgated Thereunder Against All Defendants**

46.      Plaintiff repeats and realleges each and every allegation contained above as if fully set

forth herein.

47.      During the Class Period, Defendants disseminated or approved the materially false

and misleading statements specified above, which they knew or deliberately disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary

- 29 -

in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

49.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TETRA common stock.  Plaintiff and the Class would not have purchased TETRA common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

50.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of TETRA common stock during the Class Period.

## COUNT III

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

51.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.    The Individual Defendants acted as controlling persons of TETRA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of TETRA, and their ownership of TETRA stock, the Individual Defendants had the power and authority to cause TETRA to engage in the wrongful conduct complained of

herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.       Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.       Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.       Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.       Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  March 27, 2008                        Respectfully submitted,

SCHWARTZ JUNELL GREENBERG &
OATHOUT, LLP


                                                       /s/ Roger B. Greenberg
                                              ROGER GREENBERG
                                              Texas State Bar No. 08390000
                                              Two Houston Center
                                              909 Fannin , Suite 2700
                                              Houston, Texas  77010
                                              Telephone:  713/752-0017
                                              713/752-0327 (fax)

- 31 -

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Attorneys for Plaintiff*

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Choraz v. Avaya, Inc., et al.*, No. 3:05-cv-02319-MLC-TJB (D.N.J.)
*In re Sunterra Corp. Sec. Litig.*, No. 2:06-cv-00844-BES-RJJ (D. Nev.)
*In re GMH Communities Trust Sec. Litig.*, No. 2:06-cv-01444-PBT (E.D. Pa.)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Margaret K. Hill, Trustee of Kelk Irrevocable Trust v. Tribune Company, et al.*, No. 1:05-cv-02602 (N.D. Ill.)
*City of Livonia Employees' Ret. System v. Wyeth, et al.*, No. 1:07-cv-10329-RJS (S.D.N.Y.)

TETRA TECHNOLOGIES

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this *19* day of *March*, 2008.

CITY OF LIVONIA EMPLOYEES'
RETIREMENT SYSTEM

By: _____

Its: _____

- 2 -

TETRA TECHNOLOGIES

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 06/28/2007 | 407 | $27.65 |
| 06/28/2007 | 844 | $27.75 |
| 07/19/2007 | 408 | $29.55 |
| 07/19/2007 | 576 | $29.55 |
| 07/27/2007 | 371 | $28.00 |
| 07/30/2007 | 134 | $27.79 |