**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE TETRA TECHNOLOGIES, INC. ) | |
| SECURITIES LITIGATION                ) | **Civil Action No. 4:08-CV-00965** |
| ) | |
| ) | **JUDGE KEITH P. ELLISON** |
| ) | |
| ) | |
| ) | |
| ) | |

**AMENDED CONSOLIDATED COMPLAINT**

Lead Plaintiff Fulton County Employee's Retirement System ("Lead Plaintiff"), for its amended consolidated complaint, alleges based upon personal knowledge as to the allegations about the Lead Plaintiff and upon information and belief as to all matters, based on the extensive investigation conducted by and through Lead Plaintiff's counsel. Lead Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein.

**NATURE OF THE CASE**

1.      This is a securities class action on behalf of all persons or entities who purchased the publicly traded common stock of TETRA Technologies, Inc. ("TETRA" or the "Company") from November 3, 2006 through October 16, 2007, inclusive (the "Class Period"), exclusive of Defendants, all officers and/or directors of TETRA or its affiliates, members of Defendants' families, and any entity in which any Defendant has a controlling interest (the "Class"). The Defendants are TETRA, Geoffrey M. Hertel ("Hertel"), George McCarroll ("McCarroll") and Raymond Symens ("Symens"). This securities class action arises out of Defendants' scheme to artificially inflate the price of TETRA stock through a series of false and misleading statements

- 1 -

about TETRA's accounting and earnings guidances for the profitability of its oil and gas properties, its insurance reimbursements for hurricane-related repairs, and its Fluids Division revenues and inventories, in order to dump their stock at inflated prices.

2.      Throughout the Class Period, Defendants managed earnings and inflated TETRA's stock price by failing to recognize current expense and misrepresenting the viability of economically unproductive oil and gas wells that had been purchased at or near the end of their useful lives.  Most of these properties were in the Gulf of Mexico and had been acquired in 2005 in "packages" shortly before hurricanes Katrina and Rita devastated the area.  TETRA purchased these properties in the name of its subsidiary Maritech Resources, Inc. ("Maritech"), intending to develop and exploit certain of the wells, and a large part of the consideration paid for the properties consisted of its assumption of the obligation to "decommission" all the wells when they were finally abandoned.  The decommissioning work was to be performed by TETRA's Well Abandonment and Decommissioning ("WA&D") Services group.

3.      Many of the wells purchased by Maritech in 2005 never had sufficient accessible or "proven" reserves to warrant the costs of development and drilling.  Some of the wells became uneconomical to exploit as a result of the 2005 hurricanes (absent substantial additional payments by TETRA's insurer which were not forthcoming).  By 2007 the best of the wells had been worked by TETRA and largely depleted -- as Hertel explained in earnings conferences conducted *after* the close of the Class Period and *after* he had sold $12 million of his stock at inflated prices:

> Maritech produces profits by actively exploiting properties that it acquires.  The last packages … of properties purchased by Maritech were pre Rita and Katrina.  The inventory of exploitable operations in these older purchases has dwindled during the last 29 months. (Nov. 5, 2007 Earnings Call)

*      *      *

> Since we try and exploit the most attractive properties first, the remaining exploitable opportunities after three years are generally quite lean in the economic area.  (January 14, 2008 Earnings Call)

By the end of 2007, TETRA reported an "impairment" charge for the abandonment of the properties purchased in 2005 of more than $70 million -- causing Maritech to report a total 2007 loss of $71 million as a result.

4.      Throughout the Class Period, Defendants falsely represented to the market that the oil and gas reserves and productivity of its wells purchased in 2005 had actually *increased* as a result of TETRA's exploitation activities in 2006, and that the Company estimated that these properties would generate cash flows for years into the future.  Under the accounting methods Defendants used in their financial reporting, these false assumptions caused virtually every significant line item on TETRA's financial statements to be materially misstated.

5.      Defendants also manipulated and misstated the financial performance of TETRA's "Fluids" division, by inflating revenues, "writing up" inventories and falsifying guidances.

6.      Hertel continued the charade of reporting improving profits and prospects through the May 7, 2007 announcement and earnings conference for TETRA's first quarter 2007 financial report.  Within the next four days, Hertel sold off 480,000 shares of his TETRA stock for $12.7 million.  Between May 11th and May 24th, Raymond Symens, the vice-president in charge of Fluids, sold about 350,000 shares for almost $10 million.

7.      On August 3, 2007, with the announcement of TETRA's Second Quarter 2007 financial results, Defendants began to leak out the truth, and TETRA's stock price plummeted by 25%.  The Class Period ends on October 16, 2007 with another 8% stock drop as Defendants reveal that they were withdrawing TETRA's 2007 earnings guidance.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this litigation pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act").  The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act.  The Defendants transact business in this District and its headquarters are located in this District.

10.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

11.     Lead Plaintiff Fulton Country Employee's Retirement System purchased common stock of TETRA at artificially inflated prices during the Class Period and has been damaged thereby.

12.     Defendant TETRA is incorporated in Delaware and maintains its headquarters at 25025 Interstate 45 North, Suite 600, The Woodlands, Texas 77308.

13.     TETRA operates as an oil and gas services company worldwide.  Through its "Fluids" division, TETRA manufactures integrated calcium chloride and brominated products, and supplies feedstocks to energy and other markets.  Through its subsidiary, Maritech Resources, Inc. ("Maritech"), TETRA purchases and operates mature oil and gas wells in the Gulf of Mexico.

14.     Defendant Hertel is and was at all relevant times the President and Chief Executive Officer ("CEO") of TETRA.  Before becoming CEO, Hertel served as TETRA's

Executive Vice-President-Finance and Administrator, and then its Chief Operating Officer ("COO").  Hertel received a B.A. and M.B.A. from Michigan State University.  In his capacity as CEO, Defendant Hertel oversaw all aspects of the Company's operations, including its improper accounting schemes.  In addition, Defendant Hertel signed and certified TETRA's financial reports and participated in conference calls with analysts during the Class Period in which he made a host of false and misleading statements about the Company's financial performance and business prospects.

15.     In three days during the Class Period -- May 9, 10, and 11, 2007-- Defendant Hertel sold 480,000 shares of TETRA common stock for net proceeds of $12,696,586.  These sales were within days of the May 7, 2007 Company announcement of "record" earnings.  Hertel wrongfully engaged in "earnings management" throughout the Class Period.

16.     Defendant George M. McCarroll ("McCarroll") was, at all relevant times during the Class Period, the President of Maritech Resources, Inc.  Due to this position, McCarroll was privy to confidential and proprietary information concerning TETRA (in particular Maritech) and had access to materially adverse non-public information concerning the Company.  Furthermore, because of his position at Maritech within TETRA, McCarroll had access to non-public information about the business, finances, products, markets and prospects via access to internal corporate documents, conversation with other corporate officers and employees, and regular meetings of Maritech employees.

17.     During the Class Period, McCarroll sold 17,500 shares of Company stock for a profit of $418,352.

18.     Defendant Raymond D. Symens ("Symens") was, at all relevant times during the Class Period, a Senior Vice President ("VP") at TETRA who, upon information and belief,

specifically oversaw the Fluids Division.  Due to this position, Symens was privy to confidential and proprietary information concerning TETRA (in particular the Fluids Division) and had access to materially adverse non-public information concerning the Company.  Furthermore, because of his position at TETRA, Symens had access to non-public information about the business, finances, products, markets and prospects via access to internal corporate documents, conversation with other corporate officers and employees, and regular meetings within the Fluids division.

19.     During the Class Period, Symens sold 437,007 shares of Company stock for a profit of **$11,507,653**.

20.     Hertel, Symens and McCarroll (the "Individual Defendants") are liable as direct participants in the wrongs complained of herein.  In addition, by reason of their positions and authority, the Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of TETRA's business, and the preparation and issuance of its financial reports and earnings guidances.

21.     The Individual Defendants controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  Hertel personally made many of the false statements to analysts on earnings conference calls and in press releases, and signed the Company's quarterly and annual reports filed with the Securities and Exchange Commission ("SEC").  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and therefore had the ability and opportunity to

prevent their issuance or cause them to be corrected. Thus, the Individual Defendants clearly had the opportunity to, and did, commit the fraudulent acts alleged herein.

22.     The Individual Defendants, as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, had a duty to promptly disseminate accurate and truthful information with respect to TETRA's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of TETRA's common stock would be based upon truthful and accurate information. The misrepresentations and omissions made during the Class Period violated these specific requirements and obligations.

23.     The Individual Defendants are liable as participants in the fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of TETRA's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding TETRA's business, operations, and financial performance and the intrinsic value of TETRA's securities; (ii) enabled Defendant Hertel and other Company insiders to sell 472,912 shares of their personally-held TETRA common stock for gross proceeds in excess of $39.3 million; (iii) caused TETRA's shareholders to approve incentive pay plans for Hertel and TETRA's other senior officers; and (iv) caused Lead Plaintiff and members of the Class to purchase TETRA's common stock at artificially inflated prices, and then, when the truth became revealed, caused Plaintiff and the Class to suffer damages.

## SUBSTANTIVE ALLEGATIONS

### The Scheme To Manage TETRA's Earnings

24.     TETRA is composed of three distinct divisions: the Fluids Division ("Fluids"), Wells Abandonment & Decommissioning ("WA&D"), and Product Enhancement.  This Action involves two of the three divisions:  Fluids and WA&D.

The Fluids Division

25.     The Fluids division manufactures and sells clear brine fluids ("CBF"s) for use in drilling wells in the Gulf of Mexico and in other parts of the world.  CBFs are solids-free, clear salt solutions that, like conventional drilling "muds," have high specific gravities and are used as weighting fluids to control pressures during oil and gas completion and workover activities. CBFs are sold directly to major oil and gas drilling companies such as Anadarko, Chevron and Shell, among others.

26.     Throughout the Class Period, the Defendants misrepresented Fluids sales and profitability, as well as its sales prospects and trends in product costs.  Throughout the Class Period, Fluids sales and operations units would prepare monthly sales estimates, by customer, that would be altered by Fluids management to reach arbitrarily selected sales targets.

27.     The actual reported sales, cost of goods sold ("COGS"), gross profit and net income of the Fluids division were misstated pursuant to its "buy back program."  This program entailed a widespread practice in which sales were inflated by the failure to create sales returns allowances for TETRA's customer agreements to "buy-back" unused, and also used, CBF's from its Fluids customers, at pre-arranged rates, usually 40-60% of the original sales price of the CBF's.  To avoid the costs of running out of CBF's in deep-water wells far off-shore, the major oil producers often over-purchased the CBF's with the understanding that excess CBF's could be

returned.  When CBF's were returned, the credits provided to TETRA's Fluids customers were used to write up and "revalue" Fluids' inventory asset, rather than to reduce sales or income.

28.     When used CBF's were returned by TETRA's customers, they needed to be reworked and recycled before they could be resold.  These rework costs were higher than repurchasing new and unused materials, so that during the Class Period, the returned materials were stored rather than reworked and resold.  Defendants falsely attributed TETRA's high Fluids inventories to a historically high cost supplier, while concealing its inventory write-ups (and inflated sales) attributable to its buy-back program.

WA&D Services and Maritech

29.     WA&D itself is actually comprised of two distinct sub-units:  WA&D Services and Maritech.  The WA&D Services unit provides a broad array of services required for the abandonment of depleted oil and gas wells and the decommissioning of platforms, pipelines and related equipment.  WA&D Services operates primarily in the onshore U.S. Gulf Coast region and the inland and offshore markets of the Gulf of Mexico.  The work performed by WA&D Services was provided using two different business models:  "turn-key" contracts where TETRA agreed to perform wells abandonment and/or decommissioning jobs at a fixed price, and "time and materials" contracts.  For turn-key contracts, TETRA assumed the risk of cost overages, including for weather-related delays.

30.     For its "turn-key" contracts, TETRA reported income on a "percentage of completion" method.  In 2005 and 2006, TETRA entered into large "turn-key" contracts that resulted in large losses to TETRA, as a result of cost over-runs, including for weather delays. The WA&D Services unit experienced high costs for "weather delays" for work it performed on

Maritech hurricane-damaged properties, costs which TETRA's insurance provider refused to reimburse.

31. Maritech, whose operations are reported as part of the WA&D division operating segment, purchases, leases, explores, develops and operates end-of-life oil and gas wells in the Gulf of Mexico. Maritech's oil and gas property acquisitions were made primarily to support and provide a "baseload" of business for the WA&D Services unit. Often Maritech purchased oil and gas properties jointly with other owners. Therefore, Maritech, and its own subsidiaries and unrelated joint purchasers would purchase the mature oil and gas properties, often from other oil and gas companies, and assume the related well abandonment and decommissioning liabilities as part of the purchase price of the properties. Ultimately, the WA&D Services unit would "decommission," or dismantle, the wells when they were depleted or abandoned.

32. In 2005, Maritech experienced large acquisition growth—during that year alone, it conducted three separate purchases of "packages" of oil and gas properties.

33. Specifically, in July 2005, Maritech acquired oil and gas producing properties located in the offshore Gulf of Mexico, in exchange for the assumption of the associated decommissioning obligations estimated as involving $32.6 million of future costs to be incurred by the WA&D Services unit. The previous property owner agreed to pay $19.5 million of this liability when the decommissioning work was completed and therefore the purchase price for the properties was $11.4 million.

34. Subsequently, in August, 2005, Maritech acquired properties in the inland waters of Louisiana by paying net cash of $39.3 million, with decommissioning liabilities estimated to be $15.5 million. Thus, the total recorded cost for this package of properties was $55.2 million.

The next month, Maritech acquired more properties in the inland waters of the Gulf of Mexico. This time, the decommissioning liabilities were estimated to be $67.9 million.

35.     Therefore, in 2005, Maritech acquired a number of oil and gas properties in exchange for an aggregate of $23.1 million in cash up-front and the assumption of associated decommissioning liabilities at a value of approximately $94.6 million, total.

36.     Unlike most other operators of its size, TETRA, when recording the oil and gas property purchases as assets on its books, for capitalizing exploratory and development costs and forsetting schedules for the depreciation, depletion and amortization ("DD&A") for expensing the purchase price and other capitalized costs, purported to use the "successful efforts" method of accounting.  Although Defendants described this method as "more conservative," because the costs of non-productive or uneconomic wells were supposed to be immediately expensed, rather than capitalized and included in the total amounts for DD&A for all oil and gas properties, Defendants manipulated and abused the cost allocation provisions of this method to improperly park the acquisition costs of uneconomic wells, including the estimated abandonment and decommissioning costs, and thereby delay Maritech's recognition of expenses.  Rather than either immediately recognizing these costs as expenses, or increasing the quarterly and annual reported DD&A expense to reduce net income for the revenues earned on those few oil and gas properties that were productive and drilled, these costs were first written off as "impairments" only after the Class Period ended.  At the end of the Class Period, the costs allocated to unproductive wells were expensed en masse through Defendants' decision to declare them "abandoned" at that time.  Thus, during the Class Period, TETRA reported inflated earnings and presented an unfounded appearance of profitability of its overall oil and gas operations.

37.     As TETRA described in its Form 10-K's, each purchased field was set up as a separate "cost center," to which the field's purchase price (including its expected decommissioning costs) were deposited.  Under the successful efforts method, the costs would be expensed on a unit-of-production basis as the wells in the cost center were worked.  However, in purchasing the "packages" of properties in 2005, only a few of the properties had accessible oil and gas reserves that could be economically exploited, *i.e.*, had "proven" reserves.[1]  TETRA had agreed to have its WA&D Services unit perform the future decommissioning work on the depleted and uneconomical properties as part of the purchase price for the other properties with extractable reserves in the "package."  Thus, *e.g.*, in its 2006 Form 10-K, TETRA reported owning 89 "active" gross oil wells, and leasing 66 active oil wells from the federal government, as well as owning 30 gross active gas wells and leasing 116 active gas wells.  TETRA, however, reported participating in the drilling of only 10 gross productive wells in all of 2006, and even these were being quickly depleted.  In addition, the costs to abandon and decommission wells purchased in 2005 continued to grow as time passed, and as a result of the 2005 hurricanes.

38.     Although Defendants, in setting up their cost centers and reporting Maritech's "proved" oil and gas reserves, and in providing "guidance" to analysts and the market for Maritech's 2007 earnings, represented that the proven reserves for the 2005 acquired properties had actually ***increased*** as a result of TETRA's development and exploitation activities in 2006, TETRA, by early 2007, had largely exhausted the economically exploitable oil and gas deposits in the packages of properties purchased in 2005.  In 2006 and during the Class Period, TETRA did not purchase significant new oil and gas properties, so Defendants, despite their

---

[1] Regulation S-X Rule 4-10 (17 CFR § 210.4-10) states that, "Proved oil and gas reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, *i.e.*, prices and costs as of the date the estimate is made."

representations to the contrary, fully knew that TETRA's 2007 production and profitability would drop sharply in 2007.

39.     That Defendants had purposely selected and exploited the most advantageous properties in the 2005 packages prior to 2007 -- so that 2007 production was fully expected to drop, was confirmed by a post-Class Period, January 14, 2008 press release:

> ***To stabilize or grow production, Maritech must exploit properties after they are acquired.  The most attractive opportunities are exploited first.  This meant that by 2007, most exploitation projects, generated out of 2005 acquisitions, had diminishing return potential.   This is one of the primary reasons that Maritech's DD&A grew more rapidly than did its operational pretax profits in 2007.***  Maritech needed to acquire new properties.

> \*      \*      \*

> We anticipate using Maritech's recent acquisitions to create growth opportunities for 2008 through 2010.  ***To do this, in late 2007, we cancelled plans for the development of some of the previously held, less attractive exploitation properties.***

As described below, former TETRA employees confirmed that Defendants well knew that the value of continuing to work the 2005 oil and gas properties was quickly coming to an end at the time of Defendants' sunny reports of TETRA's 2007 prospects.

40.     Also, in 2005, the destruction caused by hurricanes Rita and Katrina severely affected Maritech in that a majority of its offshore oil and gas producing properties were damaged and three offshore platforms were completely destroyed by the hurricanes.  Although TETRA insured its properties with Lloyd's of London, TETRA's estimates for repairs, removing the three destroyed platforms and decommissioning the damaged wells far exceeded its insurance coverage.  Moreover, by mid-2006, TETRA's insurer had advised TETRA that its claims for reimbursement had been disallowed.  This advice was described by several former employees of Maritech.  Defendants also admitted on August 9, 2007, when they filed TETRA's second

quarter 2007 Form 10-Q, that they knew **before June 30, 2007** that TETRA's insurance claims had been disallowed; as the Form 10-Q stated:

> During **the second quarter of 2007**, after reviewing additional documentation provided by the Company, **the underwriters repeated their position** that certain wells did not qualify for coverage and that certain well intervention costs for covered wells do not qualify as covered costs.

41.    The extensive unreimbursed hurricane damage reinforced the lack of economic viability of TETRA's marginal oil and gas properties.  Nonetheless, TETRA failed to recognize expense for the costs allocated to these properties, either as "impairment" charges, or through increased DD&A charges as the remaining viable wells were drilled.

42.    The WA&D Services unit performed certain repairs and the decommissioning services for the Maritech wells damaged by the 2005 hurricanes, as well as certain of the debris removal activities for the damaged platforms.  When the WA&D Services unit performed these services on the Maritech properties in 2006 and early 2007, it incurred and paid substantial costs attributable to the work.  Rather than reporting these costs as expenses on TETRA's Class Period income statements, TETRA reversed out the incurred and/or paid expenses on its books and recorded the costs as part of "accounts receivable" on its published balance sheet -- as amounts due from TETRA's insurer.  These costs included millions of dollars of charges attributable to "weather delays" which were not covered by the insurance policies.

43.    By mid-2006, Maritech's president and TETRA's other senior officers realized their error in claiming reimbursement for the WA&D Services unit's weather delay costs, but still refused to recognize these costs as expense, or write off the insurance accounts receivables as bad debts, thereby improperly inflating the WA&D division's 2006 reported earnings.

44.    Each of the accounting manipulations described above were performed for a simple purpose -- to wrongfully inflate TETRA's published earnings and create a false

impression of TETRA's future prospects long enough for Hertel and TETRA's other senior officers to dump their stock at inflated prices -- which they did within days of the public announcement of TETRA's supposedly "record" first quarter 2007 earnings.  This scheme had the added benefit of increasing their compensation through the May 2007 shareholder vote approving additions to TETRA's management incentive compensation plans.

### The Confidential Informants Explain the Details of the Earnings Management Schemes

**Maritech's Oil and Gas Properties and The Dispute With Lloyd's**

Confidential Witness #1

45.     Witness #1 was formerly the vice president of operations for Maritech from April 2006 through March 2008.  He had reported to the president of Maritech, Defendant George McCarroll, who hired him.  This witness stated that because the WA&D Services division did work on Maritech properties and Maritech used Fluids Division products, he also knew "everyone on the other side of the hall."

46.     This witness explained that a number of the Maritech properties purchased in 2005 were not performing well.  The one example that immediately came to his mind was the property known as "Sabine 12."  He stated:  "That was a dog from the get go."  As this witness described, it was his view that this property should have been written off "years ago"; he further stated that it had a "bad, bad reservoir" from the beginning.  The witness said that a number of people agreed with him about that property, including the vice president for production, Van Goff, and the "reservoir guy," Edgar Anderson.  (Anderson is now the president of Maritech). According to Witness #1, McCarroll repeatedly said (in 2006 and 2007) that they were not going to write off the property, without providing any basis for his position.

47.     The witness explained that there were other properties that he thought had been "over estimated" and that the reserves had been reported higher than they should have been.  In providing this view, the witness referred to East Cameron 305 and others at the Vermillion locations.  The witness explained that the original reserves had been calculated "years ago" and that new engineers at Maritech had reviewed the work in late 2006 and early 2007 and they determined that the reserves had been overestimated.  The witness further noted that the outside firm of Ryder Scott did not actually audit all the oil and gas properties, but merely sampled reserve calculations for the top five to ten Maritech properties, or producers.

48.     Witness #1 was also knowledgeable about the 2005 hurricane damage and the dispute with Lloyd's for reimbursement.  When questioned with regard to the insurance claim problems at Maritech, Witness #1 said that there were two properties that he knew to be huge problems:  East Cameron 195 and Ship Shoal 269.  The witness was also aware that there had been a lot of damage to the property at Ship Shoal 219, but work there had not been started due to the ongoing issues with the insurance companies.

49.     Witness #1 said that the work on East Cameron 195 started in March 2006 -- just prior to his arrival at Maritech.  The insurance company had initially told Maritech to go ahead and begin repairs, as one of the wells was "out of control" and bubbling.  However, the insurance company later said that it would only pay for the repairs, and it wouldn't pay for the P&A ("plug and abandon") work that was done on the property.

50.     Witness #1 further explained that, as they started to do the work on that property in the spring of 2006, there was a lot of "weather downtime."  According to the witness, it was not surprising that there would be a number of days lost to weather downtime for work during the months of March, April and May.  Maritech quickly learned that the insurance company

would only cover the first $1 million of weather time incurred and so Maritech and TETRA had to cover the "considerable" amount of weather time on top of that.  The witness estimated that the weather downtime on the East Cameron 195 project alone was approximately $10-12 million.

51.     With regard to the Ship Shoal 269 property, Witness #1 explained that the repair work was originally estimated at only a few million dollars, but it quickly rose to be a $26 million job.  The problem with that property was that the government wanted it fixed quickly due to the fact that it was "spurting oil" and had become an environmental problem.  Witness #1 explained that the invoices were almost immediately submitted to the insurance adjuster, and so Maritech knew no later than late 2006 that there were going to be problems in the coverage of the East Cameron 195 work.  There was still work to be done on the East Cameron 195 property, and Maritech stopped working on it when the adjusters "balked" at paying any additional claims around December 2006 or January 2007.

52.     Witness #1 explained that starting in late 2006, Maritech started to receive computer print outs from the adjusters indicating that various claims submissions were "not allowed."   In December 2006, McCarroll spoke with the insurance company about the claims issues and tried unsuccessfully to get some of the payment problems resolved.

53.     With regard to the accounting at Maritech and TETRA, Witness #1 explained that he had a very limited role and only saw it from the "fringes."   He said, however, that the executives at Maritech and TETRA were closely involved in the numbers, and that McCarroll, Hertel, Stu Brightman, and Sandra Trammell were very involved in the accounting.

<u>Confidential Witness #2</u>

54.     Witness #2 was an operations manager at Maritech for approximately four years, from about November 2002 to November 2006.  Initially, Witness #2 reported to Maritech's

former president, McCarroll, and after Van Goff, the vice president for reservoir engineering was hired in 2003, Witness #2 reported to him.   Witness #2's responsibilities included project oversight with respect to platform repair, production monitoring and regulatory reporting.

55.     Witness #2 explained that Maritech was a "bottom feeder" in that the company buys properties that have generally reached a "reserve-over-production ratio" of 1.5 or less.   He said that when Maritech is looking to purchase a property, TETRA reviews the potential property packages and determines the estimated costs for abandonment, production and maintenance.   It was Maritech's practice to put together packages of properties for acquisition.   Thus, *e.g.*, the package may have several properties with a reserve over production ratio of 2 or 2.5 (which means that there are enough reserves for production) and several properties with a very low ratio (meaning that it is non-producing).

56.     Witness #2 said that the post-hurricane repair work on the Maritech properties was done by TETRA and that he was not allowed to use any company other than TETRA for the work.   By the time that the witness left Maritech in November 2006, the company had already spent $27 million on the East Cameron 195 repairs.   The witness stated that for the Ship Shoal 269 property, he knew that the work done by TETRA was costing much more than the insurance company would ever pay Maritech on the claims.

57.     Witness #2 also said that sometime in August or September 2006, the insurance contracts were reviewed and the Company realized that the policies had been "misread."   The contracts only provided for up to $1 million in "weather time."   The witness explained "weather time" as costs associated with downtime due to inclement weather.   Thus, *e.g.,* the Company may have to pay for employees and equipment to be at a property and ready to work, though because of the weather, no significant work can actually be done to further the completion of the

project.  During this time, some smaller, legitimate tasks may be performed that relate to the project (*e.g.,* planning, small repairs, etc.), but it is not significant work.  The witness further explained that when the company figured this out, it had already put in approximately $15-16 million in weather costs on the East Cameron 195 property.

58.     Witness #2 stated that the instruction from McCarroll going forward (from August/September 2006 on), was to limit the weather costs on all projects.  The witness explained that he knew this to be the case specifically with respect to the Ship Shoal 269 property (well #A13 in particular) where he was working.  Witness #2 said that he was told by McCarroll that they could have any legitimate billable work done during weather down time on the invoices, but that the TETRA invoices (*i.e.*, those submitted to the insurance company) shouldn't have any references to weather downtime.  The witness further stated that McCarroll and a TETRA employee, Perry Hamburger, were the primary two people to deal with the insurance companies.  Those two men traveled to London at least annually, usually in February, to meet with personnel at Lloyd's of London.

Confidential Witness #3

59.     Witness #3 was a lead operator for Maritech.  He started with the Company in 2005, immediately after the hurricanes and worked there until January 2008.  Witness #3 was in charge of operations on five Maritech platforms:  Chandeleur 25 and four Main Pass properties (223, 250, 242 and 162).  The witness was based on a platform at Main Pass 223, about a 45-minute flight from the mainland.  Witness #3's responsibilities included inspections, monitoring well production on each platform, reviewing costs for materials and supplies, overseeing repair work and coordinating work by third parties and service companies.

60.     Witness #3 explained that each property had an annual inspection by the U.S. Minerals Management Service ("MMS").  He described the agency as "like the policemen of offshore" who can shut down an operation or force repairs.  According to Witness #3, most of the properties purchased in 2005, including the five he supervised, were "very rusty" and were a "huge cost" just to get them up to government standards.  This cost, combined with the fact that the properties were not producing much the entire time that Witness #3 worked for Maritech (late 2005 to January 2008), led him to think that they probably should have been written off sooner than they were.  The Witness explained that other larger companies that he had worked for previously (*e.g.,* BP, Exxon, etc.) would have shut those platforms down well before Maritech did so.

61.     Asked about the production on each of the five platforms he supervised, Witness #3 said that all were actively producing during the time he was with the company, but that they were producing "very little."  He said that the Main Pass 223 platform where he was stationed was the only one that seemed to be making money.  The rest were making so little that if you "put pencil on paper" the maintenance costs versus what they could produce was extremely small.  The witness further stated his view that it was not cost effective for Maritech to continue to try to produce on those platforms, but they did.

Confidential Witness #4

62.     Witness #4 was formerly a senior joint interest billing accountant for Maritech from December 2005 through September 2007.  She handled the billing of costs for Maritech joint interest property owners, accounts receivable work and other accounting matters.  When she was initially hired, she reported directly to David Henzey, Maritech's controller.

63.     Witness #4 explained that Maritech suffered "large losses" as a result of Hurricane Katrina and Hurricane Rita.  The two hurricanes caused damage to a number of properties held by Maritech either individually or as part of a joint ownership agreement. Witness #4 explained that joint ownership of properties is not unusual in that industry, and that a number of Maritech's properties were owned jointly with either other companies or even individual investors.  She gave the example of a man named Dr. Granbury who owned part of several properties.

64.     According to Witness #4, almost all of the Maritech properties east of the Sabine River (border between Texas/Louisiana near the Gulf) were affected by the two hurricanes. Many of those properties were acquisitions that Maritech closed on at the beginning of 2005, but did not take over operations on the properties until September 1, 2005 -- right as Hurricane Katrina hit.

65.     Witness #4 explained that not all work performed on Maritech properties was performed by TETRA.  TETRA handled all of the plug and abandonment ("P&A") work, however, much of the repairs for the hurricane damage was performed by outside companies.

66.     Witness #4 said that from the time that she started in December 2005, she was told to set up all claims as "receivables," whether they had been paid or not.  She was unsure who first made the decision to record the claims in that manner, and she said simply that her manager told her to "book out expenses and do it as a receivable."  She said that there were no receipts allocated specifically to any of the individual properties.  This directive initially came from Dave Henzey, and the practice continued through as new managers came and went (*e.g.,* Leahy, Heffner, etc.).

67.     Witness #4 further explained the booking process for hurricane repair work.  She stated that whenever there was an invoice for repair work done by an outside company, Maritech would create an AFE ("authority for expenditure").  The AFE would be booked to expense and then the appropriate portion would be billed to the joint owners.  Maritech would then reverse only its share of the expense and book it to insurance receivables for the portion to be claimed from the insurance company.  All of this booking/reversing/etc. would be done in the same month.  She confirmed that Maritech only reversed to receivables *its own share* of the expenses to insurance receivables.  She explained that with only a few exceptions, all of the joint owners were required to have their own insurance for their portion of any damage.  They generally used the same adjuster as Maritech, however.  She explained that McCarroll micromanaged the entire process.  In fact, all AFE's over $50,000 were personally approved by McCarroll prior to being paid by Maritech.

68.     Witness #4 further explained that TETRA's management team kept a close involvement with regard to the insurance claims, and there were weekly meetings involving McCarroll, Estis, Hamburger, and Chapman from Maritech, and Hertel, Joseph Abell (CFO), and Stu Brightman (WA&D Operations) from TETRA.  Witness #4 stated that she compiled a monthly report of the insurance receivables and that information was put into a report that went to the Maritech executives, all of the upper TETRA management, and the audit group at TETRA.

69.     Witness #4 explained that the "successful efforts" accounting method meant that non-performing properties were written off immediately and performing properties were capitalized.  According to Witness #4, however, Maritech did not have many properties that were being drilled.  The only "big drill" was at Timbalier Bay, and she thought that there was some drilling at another location with three wells.  Another location, Eastern Cameron 328, had a well,

70.     Witness #4 attributed the problems of non-performance to the fact that, as an abandoned well ages, the costs go up "exponentially" and the company is less likely to recoup on that property.  She stated that she didn't think Maritech was keeping up with the FAS 143 accounting regulations and the company didn't keep up with their P&A ("plug and abandon") costs that continued to rise each year that the company held onto a property.  Witness #4 further stated her view that the company was not properly accounting for those costs.

Confidential Witness #5

71.     Witness #5 was an accounting manager at Maritech from April 2006 to June 2007.  He reported directly to Rufis Estis, Maritech's CFO.  This witness was in charge of the accounting for joint interest billing, accounts payable and property.

72.     Witness #5 described weekly staff meetings run by Estis in which concern was expressed that Maritech had large asset retirement obligations for abandoned and decommissioning of wells.  This witness knew that the costs exceeded the liability on the Company's books.

73.     Witness #5 reported that Estis had regular monthly meetings with Abell and Brightman.  He stated that he and other Maritech accounting managers/staff contributed to parts of Estis's monthly reports that he presented at the meetings.  He also noted that TETRA had access to Maritech's accounting system called "OGSYS" (Oil and Gas System).

74.     Witness #5 confirmed Maritech's practice for accounting for insurance-related costs, particularly for converting the costs each month to receivables through a monthly journal entry.

**Fluids Performance and the "Buy-Back" Program**

Confidential Witness #6

75.     Witness #6 had been the regional Fluids sales manager for southern Texas ("STX") from May 2006 through May 2007.  Fluids sales were split into two primary groups - onshore and offshore.  According to the witness, the STX region comprised the bulk of the "onshore" sales.  However, the largest amount of the sales for the Fluids group was offshore, because more fluids were utilized offshore.

76.     Witness #6 said that one of the areas within the Fluids Division that he saw as extremely problematic was its forecasting.  The witness began by explaining that in 2006, the division had a "record year."  His understanding, from information disclosed by Hank Reeves, the regional operations manager, was that sometime in mid-2006 (right around the time that the witness started with the company), the fluids inventory was "revalued."  To further explain what had occurred in late 2006, Witness #6 produced a report, apparently prepared in or about November 2006, reflecting a line item for the Fluids "COGS" (Cost of Goods Sold) showing a reduction in COGS (an expense) for "2006 actual" of $4,301,250 for "variance/revaluation."

77.     Witness #6 said that because the 2006 numbers had been "inflated" they made 2006 look like a good year and TETRA management wanted the forecasting for 2007 done based on those numbers.  He explained that in late 2006 (November or December), he worked on the forecasting for his region.  He would get information from "the field" (*i.e.*, the sales representatives) about what each of their customers was planning in 2007.  The numbers that this witness put together for STX onshore sales were based on actual data regarding the different fluids each customer used and what types of jobs they anticipated each month.

78.     According to Witness #6, as early as November and December 2006, he knew that overall demand was going to be "flat" or even drop.  This information was relayed to Reeves and others in the Fluids Division, including Rob Short and Mark Pernik, a general manager at TETRA.  The witness said that he was told by Reeves, Short and Pernik that the budget had already been set for the year and that, with regard to the numbers, he needed to "make them work."  He said that from the beginning (*i.e.*, in late 2006), it was obvious that there was "no way to attain the numbers" that were in the 2007 budgeted forecast.

79.     Witness #6 explained that, with respect to the 2007 forecast, he didn't really know where they came up with their numbers, and he thought that at TETRA, "most forecasts were based on nothing."  He believed the 2007 forecasting was inaccurate from the beginning, and this continued through the time that he left TETRA.  He routinely told Reeves, Short and Pernik that demand was "flat."

80.     To further support his statements, Witness #6 produced a November 2006 fluids excel spreadsheet with columns for Fluids' customers, November 2006 year to date sales, by customer, projected monthly sales, by customer, for each quarter in 2007, and a column for "S&OP 2007 Rev" - *i.e.*, the number the witness had calculated as reasonably achievable.  The spreadsheet also included a column for "Proj 2007 Rev" which was "what they [his supervisors] wanted."  Finally, the spreadsheet contained a column for the monthly variances between his numbers and the desired numbers, totaling $4,053,386 for 2007.

81.     Witness #6 elaborated on the "buy back program" which Reeves and Pernik referred to as "Company 51."  The witness explained that because many of the fluids used in the industry are extremely expensive (over $300 per barrel), it is common for suppliers to have such sales arrangements.  His understanding of the program, and how it was marketed to customers,

was that TETRA would contract with customers to buy-back the fluids after they were used.  The customers were told that they would receive a 50% "credit" for the returned fluids.

82.     According to the witness, the actual computation of the buyback credits was a "big secret" and it was closely held by Hank Reeves and Paul Coombs.  Reeves once told the witness (in "early" 2007), that the way TETRA did the buyback credit was "borderline illegal."

Confidential Witness #7

83.     Witness #7 was a general manager of Fluids from August 2006 to August 2007.  He stated that in 2006 the Fluids division had significantly "written up" its inventory, which Fluids would have to "unwind" in 2007.  The witness explained that this had occurred as a result of the fluids "buyback program."

84.     Witness #7 explained that TETRA agreed to "buy-back" fluids from its customers giving them a 50% credit of the sales price.  According to Witness #7, 80% of Fluids' total profits was attributable to this inventory adjustment.

85.     Witness #7 described that "buy backs" were most often used for deep water sales for unused fluids.  He explained that what often occurred was that customers, such as Chevron, drilling in deep water a long distance from shore, would not want to risk running out of fluids so would purchase more than they needed.  When TETRA made the sale, it would record the full purchase price as a sale (*i.e.,* without an allowance for sales returns).  When the fluids were returned, the customer credit was included in the amount of the inventory reported on TETRA's balance sheet, rather than as a reduction of sales or as an expense.

86.     Witness #7 also described the "Supply and Operations Planning Process" for Fluids while he was general manager.  He stated that he saw that the demand for fluids was "not there" and that TETRA's pricing was "going soft."  Monthly, in the first week of the month, his

group would work with the sales group to plan demand based on when jobs occurred and deliveries were to be made.  Then in the second or third week of the month, he would meet with Ray Symens, TETRA's senior vice-president for Fluids, and Kim Hardin, and provide them with the projected fluids demand prepared by operations and sales.  Symens would then change the projections of demand.  Witness #7 noted that Symens was "cashing out options."  In fact, during the period from March 7, 2007 through May 24, 2007 Symens sold 437,007 shares of TETRA for proceeds of $11.5 million.

Confidential Witness #8

87.     Witness #8 was a contractor working at TETRA from October 2006 through March 2008.  He worked as an engineer at a TETRA new brine production facility in El Dorado, Arkansas.

88.     This witness knew of the "brine buyback program," whereby TETRA would buy back "dirty" brine from customers after it had been used.  TETREA was supposed to clean the dirty brine and then resell it, but found it was actually cheaper to simply make new brine and so the dirty brine was never processed.  Around October 2007, the Company used hundreds of storage tanks to store the brine.

**Defendants' False and Misleading Statements and Omissions**

89.     Throughout the Class Period, Defendants touted TETRA's "record" sales and profits which were misstated as a result of Defendants' scheme to manage earnings, and manipulated described in this complaint.  Defendants also provided arbitrary and baseless guidances to pump up TETRA's stock price in order to reap millions of dollars of illicit gains on the sales of their stock and obtain unwarranted bonus and incentive payments.

The Class Period Begins

- 27 -

Third Quarter 2006 (3Q06) Performance and 2006 Guidance

90.     On November 3, 2006, Defendants issued a press release which announced TETRA's "record" quarterly earnings and raised 2006 earnings guidance.  The release stated, in part:

> The conclusion we believe should be drawn from all of this, is that the WA&D Services segment's revenues and profits in our fourth quarter are expected to exceed those reported in the third quarter, and first quarter 2007 revenues and profits are expected to exceed the fourth quarter of 2006.  ***One additional bit of complexity to the WA&D Division's reported profits is the timing of insurance reimbursements for work performed by WA&D Services for Maritech.***  Profits for this work, in accordance with GAAP, are eliminated until the associated claims are reviewed and paid by the underwriter.  As an example, approximately $2.2 million of pre-tax earnings ($0.019 per share after tax) were eliminated from third quarter profits due to this factor.

> ***Maritech's pretax earnings increased 803% over the levels attained in the third quarter of 2005.***  One of the primary reasons for this gain was the absence of losses associated with hurricanes Rita and Katrina in 2005.  However, ***Maritech's performance also reflects production increases derived from acquired properties, reworking older wells and new drillings.  These same factors should bode well for production into 2007.***  While net production averaged approximately 22,000 MCF/D of natural gas and 3,500 B/D of oil and natural gas liquids (a combined total of 43,000 MCFE/D) during the third quarter, it was recently 25,000 MCF/D and 4,200 B/D (a combined total of 50,200 MCFE/D), and we anticipate net production at year end 2006 to reach 28,000 MCF/D and 5,400 B/D (a combined total of 60,400 MCFE/D).  One barrel equals six MCF for MCFE (MCF equivalent) calculations.

> ***Our Fluids Division generated third quarter pretax earnings that exceeded third quarter 2005 levels by 152%.  This increase mostly reflected three factors: absence of hurricane downtime; price increases; and, growth in international and domestic onshore markets.***  We had previously indicated that second half 2006 Fluids profits should drop from first half 2006 levels.  This is because a substantial portion of TCE (European fluids manufacturing) profits occur in the second quarter.  ***Additionally inventory profits (associated with price increases) should decline throughout the second half of 2006 and all of 2007.***  While these assumptions remain accurate, two factors may work to ameliorate these profit declines in 2007.  First, ***our domestic onshore business continues to grow rapidly.***

*     *     *

*2006 has been a record year for TETRA so far.  However, our mantra to "build for the future" remains a cornerstone of our philosophy.  Clearly, the expansion we are currently involved in speaks well for our potential earnings growth in 2007.*

91.     These statements were false and/or misleading for the reasons stated in this Complaint.  Specifically, the statements about "record" earnings and an increase in earnings guidance for 2006 were false and misleading because the reported numbers and forecasts were not the result of the Company's legitimate business operations, but were instead the direct result of Defendants' scheme to manage earnings in the Fluids and WA&D divisions by:

(i)     manipulating TETRA's "successful efforts" accounting method to avoid recognizing costs associated with decommissioning the non-productive wells as current expense;

(ii)     failing to recognize expense for weather delays and other incurred but non-reimbursable costs for hurricane damaged properties; and

(iii)     inflating Fluids revenues and writing up Fluids inventory for CBF returns pursuant to TETRA's buy-back program.

92.     Defendants' statements regarding the "timing" of insurance reimbursements were false and misleading, because Defendants had already learned that the claims had been returned as "not allowed."

93.     Defendants' statements that Maritech's earnings increased 803% in 2006 over 2005, and suggesting that 2007 production would similarly do well were misleading because Maritech's 2006 earnings had been misstated as a result of the earnings management scheme described above.

94.     Defendants' statements that Fluids' earnings exceeded third quarter 2005 levels by 152% and the stated reasons for the increase were misleading because Fluids' 2006 earnings

had been misstated by inflating sales and revaluing its inventory for the buy-back program. Defendants' statement that "onshore business" was growing rapidly was also false and misleading because, in fact, the demand for fluids for onshore customers was "flat."

Announcement of Estimated 2006 Performance and 2007 Guidance

95.     On January 3, 2007, Defendants issued a press release which announced guidance for TETRA's 2006 and 2007 earnings.  The release stated, in part:

> January 3, 2007 (The Woodlands, Texas).  TETRA Technologies, Inc. (TETRA or the company) (NYSE:TTI) today announced earnings guidelines for 2007 of $1.80 - $2.15 per diluted share.  Revenue estimates for 2007 range from $1,118 - $1,240 million.  Earnings for 2006 are estimated at $1.35 - $1.40 per diluted share, an increase of approximately 160% over the previous record for per share earnings, set in 2005.

> **Geoffrey M. Hertel**, President and Chief Executive Officer, **stated, "2006 earnings would have been even higher, if not for three factors**:  none of our three modified Dive Support Vessels were available for work in the fourth quarter (they are all scheduled to commence operations in January); **we continued to work on a downed Maritech platform through December (deferring a portion of Well Abandonment & Decommissioning (WA&D) Services' profits until insurance payment is made in 2007); and, we incurred substantial costs 'waiting on weather' on turn-key platform decommissioning contracts (this work was essentially completed in December).**  We estimate these factors cost us as much as $0.10 per diluted share in the fourth quarter of 2006."

> *       *       *

> Well Abandonment & Decommissioning Services

> "In 2007, our WA&D Services watchword is execution.  **There can be no question that the existing and potential market for WA&D Services in the GOM is dramatically larger than anything we have ever previously experienced.**  TETRA has already secured a number of contracts.  We have access to six full spreads of equipment for offshore abandonment and decommissioning (optimally three for downed structures and three for standing structures).  We acquired EPIC Diving to support our WA&D Services offering and to expand EPIC's full-service diving capabilities.  **Our dramatically improved profitability guidance for WA&D Services reflects all of the above.**

> *       *       *

Maritech

*"Operationally, Maritech anticipates it will grow appreciably in 2007.* Produced volumes are expected to average 30 MMCF/D of natural gas and 6,800 B/D of liquids (predominantly oil) net to Maritech. This exceeds 70 MMCFE/D (million cubic feet equivalent per day at one barrel equaling six MCFs). Maritech averaged about 42.7 MMCFE/D in 2006. *This volumetric increase is expected to come from bringing storm damaged production back on-stream, reworking wells and new drillings.* Much of the work on damaged wells has already been accomplished. While we are planning on significant exploitation capital expenditures for Maritech in 2007, a large portion of the associated production will only nominally be reflected in 2007. Instead, this production should materially impact 2008 and beyond. Also, we have assumed no property acquisitions in 2007. Nevertheless, we continue to review GOM property sales packages. *A rough estimate of production by quarter for 2007 would be: quarter one - 21% of annual volume; quarter two - 27% of annual volume; quarter three - 28% of annual volume; and, quarter four - 24% of annual volume.*

\* \* \*

*"We are very pleased with the projected 2007 performance for Maritech. We are estimating improved profitability*, even with a drop of over $25.3 million in pretax profits due to lower natural gas prices. The projected DD&A just about equals the assumed CapEx. *Also, Maritech and its working interest parties are expected to generate about $52 million of well abandonment and decommissioning work for our WA&D Services segment in 2007.*

Fluids

*"The basic completion fluids and associated service markets are expected to improve in 2007, as domestic onshore and international growth*, coupled with a flat to up Gulf of Mexico (GOM) market, *creates greater opportunities.* TETRA has invested and will continue to invest in the expanding domestic onshore and emerging international markets. *This bodes well for longer term Fluids profits."*

96.     These statements were false and misleading for the reasons stated in this Complaint. Specifically, Hertel's statements that, in 2006, WA&D had "deferred" profits for work performed in December 2006 until insurance payments were made in 2007 was false and misleading because TETRA's insurer had already advised that millions of dollars of these claims had been disallowed. Moreover, this statement was misleading because, while TETRA did not

report "profits" for its work on Maritech properties, it **did** eliminate from its 2006 income statements "expenses" incurred by WA&D in working on Maritech properties, through monthly journal entries reversing out incurred and paid expenses, and instead recording "accounts receivable" due from TETRA's insurer.  This practice resulted in the misstatement of both earnings on TETRA's income statement and assets on the balance sheet, because collection of the accounts receivable was not probable -- as TETRA's insurer had disallowed the claims.

97.    The statements as to WA&D Services that there was a "dramatically improved profitability guidance for WA&D Services" and that there could be "no question" that there was an existing and potential market for WA&D Services that was "dramatically larger than anything [Defendants] have ever previously experienced" were materially false and  misleading because WA&D Services, in fact, was not positioned to profit in 2007 and the majority of properties acquired in 2005 had already been exploited and would soon be abandoned, leaving no work for WA&D Services to conduct.  Furthermore, the increased market for WA&D Services was comprised of hurricane-related repair work that would result in losses to the Company rather than a "profit," due to the lack of reimbursement from the insurance companies.

98.    Defendants' statements as to Maritech that it, too, was positioned to expand in 2007, and expects a "volumetric increase" in production were materially false and misleading because Maritech's properties had already been exploited and what remained of them were uneconomical or dried up wells that needed to be abandoned.  Defendants also knew the statements of improved Maritech profitability were false and misleading because Defendants had manipulated TETRA's "successful efforts" accounting method to avoid recognizing the costs associated with decommissioning the non-productive wells as current expense.

99.   The statement that Fluids' 2006 earnings had increased "152%," for the reasons stated in the release, was false and misleading because, in fact, 80% of Fluids' profits were attributable to its wrongful accounting for its "buy-back" program, including the inflation of revenues and the "write-up" of Fluids' inventory.   The assertion of "growth" of "onshore" markets was also false and misleading because demand in these markets was "flat."

100.   On January 3, 2007, Defendants Hertel and Abell held a conference call with analysts to discuss the 2006 and 2007 guidance.   Hertel largely recounted the false and misleading statements described in the January 3, 2007 press release.   These included his statements that:

- "The three primary factors that should cost us about $.10 a share in earnings in the fourth quarter are all items that on a go forward basis will have little impact to us.   First under GAAP reporting, we cannot record earnings on storm related work performed by our Well Abandonment and Decommissioning services group for Maritech until the associated insurance proceeds have been paid."

- "In Maritech, much of the anticipated production gains in 2007 from the exploitation of properties were generated from expenditures made in 2006 and actually some that were made in 2005.   These volumetric gains should allow Maritech to post PBT gains."

These statements are false and misleading for the reasons described above.

<u>2006 Performance and 2007 Guidance</u>

101.   Defendants continued to perpetrate their fraud by, on February 28, 2007, announcing the Company's 2006 earnings to be $1.37 per share—***a number that bettered the previous all time annual earnings per share record by 163%***.   In the associated press release, the Company also announced a 31-57% increase over its 2006 earnings guidance for 2007 -- forecasting $1.80-$2.15 per share.

102.    In discussing the ramifications of the record 2006 results for 2007, Defendant Hertel commented that:

> In addition to generating anticipated cash flow in excess of capital expenditures for 2007, Maritech and its working interest partners are expected to generate approximately $50 million of well abandonment and decommissioning work for WA&D Services in 2007………***This ability to generate incremental reserves out of older, mature properties is the primary reason that we are projecting improving profits for Maritech in 2007…***

103.    These statements were false and misleading for the reasons stated in the Complaint.    Specifically, the statements about Maritech's properties and expected 2007 improved profits were false and misleading because Defendants knew that Maritech had already exploited the most attractive properties and that they had actually already been exhausted and were facing a complete write-off, thereby generating no profit but only losses to the Company. Defendants also knew they had manipulated TETRA's "successful efforts" accounting method to avoid recognizing costs associated with decommissioning the non-productive wells as current expense.  Many of these same false statements were repeated at the February 28, 2007 earnings conference with analysts, conducted by Hertel, Abell and McCarroll.

104.    There, Hertel stated, in part:

> ***[W]e completed some Maritech work for which we could not reflect the associated profits because we had not yet been paid by the insurer.***

> \*        \*        \*

> ***Maritech had an excellent 2006.***  It not only recovered from the impacts of the 2005 hurricanes, but it continued to find ways to expoit older, mature properties. ***It actually increased its proven reserves*** from about 90 Bcf equivalent at year-end 2005 to roughly 93 Bcf equivalent at the end of '06. ***This was after producing 16 Bcf equivalents, and after the fact that we essentially did not buy any reserves.*** In spite of much lower natural gas prices in 2007, which we anticipate will impact our earnings by about $20 million, ***the production from these new reserves should allow Maritech to actually increase total profits in 2007.***  Just as importantly, Maritech's properties should generate over $50 million of Well

Abandonment & Decommissioning work for our Well Abandonment & Decommissioning services in 2007.

105.    Hertel's statements that proven reserves for the 2005 acquired properties had **actually increased** in 2006, despite Maritech's exploitation of these properties, was amazingly false and misleading because, as he later admitted, Maritech had exploited the most attractive properties first and the "proven" reserves had already been largely depleted.  He also knew the statements about Maritech's 2007 profitability were false and misleading because Defendants had manipulated TETRA's "successful efforts" accounting method to avoid recognizing costs associated with the imminentdecommissioning of the non-productive wells as current expense.

TETRA's 2006 Form 10-K

106.    TETRA filed its Form 10-K for 2006 on February 29, 2008.  The following particular reported items of income and expense for 2006 (as well as the resulting summary numbers for costs, liabilities and net income, and income per share) were materially misstated in violation of generally accepted accounting principles ("GAAP"):

Balance Sheet
Assets

- Trade accounts receivable, net of allowances for doubtful accounts    $243,352

- Inventories    $118,837

- Oil and gas producing assets, net of depreciation and depletion    $284,367
($237,126)

Liabilities
- Decommissioning liabilities    $101,125

Statement of Operations
- Product sales    $388,257

- Cost of product sales    $201,279

- Cost of services and rentals    $240,427

- Depreciation, depletion, amortization and accretion $84,161

107.   Analogous items of income and expense (and net income) and certain assets, were also misstated on income reports prepared, by segment, which were included in the 2006 Form 10-K, as follows:

| | |
|---|---|
| Product sales | |
|     Fluids Division | $209,829 |
| Depreciation, depletion, amortization and accretion | $46,988 |
|     Maritech | |
| Income before taxes and discontinued operations | $60,939 |
|     Fluids Division | $51,007 |
|     WA&D Services | $55,105 |
|     Maritech | ($7,865) |
|     Intersegment elimination | $98,247 |
|         Total WA&D Division | |
| | $270,152 |
| Fluids assets | |
| | $302,381 |
| Maritech assets | |

108.   The 2006 Form 10-K explained the accounting rules that purportedly applied to TETRA's financial statements and included false and misleading statements and omissions with respect to TETRA's actual accounting practices.  These statements included:

**Critical Accounting Policies and Estimates**

In preparing our consolidated financial statements, we make assumptions, estimates and judgments that affect the amounts reported.  *We periodically evaluate these estimates* and judgments, including those *related to potential impairments of long-lived assets* (including goodwill), *the collectibility of accounts receivable, and the current cost of future abandonment and decommission obligations.*  "Note B -- Summary of Significant Accounting Policies" to the Consolidated Financial Statements contains the accounting policies governing each of these matters.  *Our estimates are based on historical experience and on future expectations, which we believe are reasonable.*

\*       \*       \*

- 36 -

*Impairment of Long-Lived Assets* -- The determination of impairment of long-lived assets, including goodwill, is conducted periodically whenever indicators of impairment are present.  Goodwill is assessed for potential impairment at least annually.  If such indicators are present, the determination of the amount of impairment is based on our judgments as to the future operating cash flows to be generated from these assets throughout their estimated useful lives.  The oil and gas industry is cyclical, and our estimates of the period over which future cash flows will be generated, as well as the predictability of these cash flows, can have significant impact on the carrying value of these assets and, in periods of prolonged down cycles, may result in impairment charges.

*Oil and Gas Properties* -- Maritech accounts for its interests in oil and gas properties using the successful efforts method, whereby costs incurred to drill and equip development wells, including unsuccessful development wells, are capitalized, and ***costs related to unsuccessful exploratory wells are expensed as incurred.  All capitalized costs are accumulated and recorded separately for each field, and are depleted on a unit-of-production basis, based on the estimated remaining proved oil and gas reserves of each field.***  The process of estimating oil and gas reserves is complex, requiring significant decisions and assumptions in the evaluation of available geological, geophysical, engineering and economic data for each reservoir.  As a result, these estimates are inherently imprecise.  Actual future production, cash flows, development expenditures, operating and abandonment expenses, and quantities of recoverable oil and gas reserves may vary substantially from those initially estimated by Maritech.  Any significant variance in these assumptions could materially affect the estimated quantity and value of proved reserves.  ***Maritech's oil and gas properties are assessed for impairment in value whenever indicators become evident, with any impairment charged to expense.***  Maritech purchases oil and gas properties and assumes the associated well abandonment and decommissioning liabilities.  The acquired oil and gas producing properties are recorded at a cost equal to the estimated fair value of the decommissioning liabilities assumed, adjusted by the amount of any cash or other consideration received or paid.  Any significant differences in the actual amounts of oil and gas production cash flows produced or decommissioning costs incurred, compared to the estimated amounts recorded, will affect our anticipated profitability.

***Decommissioning Liabilities*** -- We estimate the third party market values (including an estimated profit) to plug and abandon the wells, decommission the pipelines and platforms and clear the sites, and use these estimates to record Maritech's well abandonment and decommissioning liabilities, net of amounts allocable to joint interest owners and any contractual amount to be paid by the previous owners of the property (referred to as decommissioning liabilities).  In estimating the decommissioning liabilities, we perform detailed estimating procedures, analysis, and engineering studies.  Whenever practical, Maritech utilizes the services of its affiliated companies to perform well abandonment and decommissioning work.  When these services are performed by an affiliated

company, all recorded intercompany revenues are eliminated in the consolidated financial statements.  Any profit earned by us in performing such abandonment and decommissioning operations on Maritech's properties is recorded as the work is performed.  The recorded decommissioning liability associated with a specific property is fully extinguished when the property is completely abandoned.  Once a Maritech well abandonment and decommissioning project is performed, any remaining decommissioning liability in excess of the actual costs of the work performed is recorded as additional profit on the project and included in earnings in the period in which the project is completed.  Conversely, actual costs in excess of the decommissioning liability are charged against earnings in the period in which the work is performed.  ***We review the adequacy of our decommissioning liability whenever indicators suggest that either the amount or the timing of the estimated cash flows underlying the liability have changed materially.***  The timing and amounts of these cash flows are subject to changes in the energy industry environment and may result in additional liabilities recorded, which, in turn, would increase the carrying values of the related properties.

***Revenue Recognition*** -- We generate revenue on certain well abandonment and decommissioning projects from billings under contracts, which are typically of short duration, that provide for either lump-sum turnkey charges or specific time, material, and equipment charges which are billed in accordance with the terms of such contracts.  ***With regard to turnkey contracts,*** revenue is recognized using the percentage-of-completion method based on the ratio of costs incurred to total estimated costs at completion.  Total project revenue and cost estimates for turnkey contracts are reviewed periodically as work progresses, and adjustments are reflected in the period in which such estimates are revised.  ***Provisions for estimated losses on such contracts are made in the period such losses are determined.***

***Bad Debt Reserves -- Reserves for bad debts are calculated on a specific identification basis, whereby we estimate whether or not specific accounts receivable will be collected.***  A significant portion of our revenues come from oil and gas exploration and production companies.  If, due to adverse circumstances, certain customers are unable to repay some or all of the amounts owed us, an additional bad debt allowance may be required.

*          *          *

***Acquisition Purchase Price Allocations*** -- The accounting for acquisitions of businesses using the purchase method requires the allocation of the purchase price based on the fair values of the assets and liabilities acquired.  ***We estimate the fair values of the assets and liabilities acquired using accepted valuation methods, and in many cases, such estimates are based on our judgments as to the future operating cash flows expected to be generated from the acquired assets throughout their estimated useful lives.***  We have completed several acquisitions during the past several years and have accounted for the various assets (including

tangible assets) and liabilities acquired based on our estimate of fair values. Goodwill represents the excess of acquisition purchase price over the estimated fair values of the assets and liabilities acquired.

109.   The 2006 Form 10-K also explained how TETRA accounted for its claims for insurance reimbursement and contained false and misleading statements with respect to the collectibility of submitted claims:

The Division's Maritech segment reported gross profit of $59.5 million during 2006 compared to $8.1 million during 2005, a $51.5 million increase.  Maritech's gross profit as a percentage of revenues also increased significantly during the current year to 35.5% compared to 12.4$ during the prior year.  The significant growth in Maritech's production volumes -- primarily resulting from the acquisitions completed during the third quarter of 2005, plus the increased realized commodity prices discussed above -- was partially offset by approximately $51.2 million of increased operating expenses, including approximately $28.5 million of increased depreciation, depletion, and accretion costs primarily associated with production from the newly acquired and developed properties.  *This increase in operating expenses* also *includes* approximately $13.4 million of increased insurance premium costs and *approximately $5.2 million of well intervention costs and other hurricane damage repair costs, charged to earnings, which the Company believes will not be reimbursed under its insurance coverage.*  Such costs were either incurred during the period or have been reflected as increased decommissioning liabilities on the Company's consolidated balance sheet.  Partially *offsetting these increases, the Company included approximately $9.2 million of increased gain associated with insurance claim proceeds in excess of the net carrying value of destroyed assets.*  In addition, during 2005, Maritech reported an impairment charge of approximately $1.9 million as required under successful efforts accounting.  The Division has completed most of the required repairs to its damaged platform facilities, and has performed certain well intervention operations on wells associated with two of the three destroyed platforms.  Maritech is currently assessing the extent of the damages related to the third destroyed platform, as well as the debris removal effort for each of the destroyed platforms.  Maritech expects to continue these efforts and resume its well intervention and debris removal operations in 2007 and beyond.  *The Company believes that substantially all of the repair and well intervention and debris removal costs associated with the hurricane damage, other than the applicable deductibles and the amount charged to earnings discussed above, will be covered under the company's various insurance policies.*

110.   With respect to the Company's communications with its insurer, the 2006 Form 10-K includes the following false and misleading statements:

Approximately $72 to $96 million of the company's estimated storm related costs consists of the well intervention, debris removal, and other costs related to the three destroyed Maritech offshore platforms. The estimate of well intervention costs exceeds the maximum coverage amount for such costs provided pursuant to the Company's applicable insurance policies. During 2006, the Company increased Maritech's decommissioning liabilities associated with the three destroyed platforms by approximately $11.2 million for well intervention costs expected to be incurred in excess of maximum coverage amounts, and this increase was capitalized to the associated oil and gas properties. Primarily as a result of the above increased decommissioning liabilities, the Company charged approximately $5.2 million to operating expense during 2006. In the event that the Company's actual well intervention costs do not exceed its maximum coverage amounts, or the excess is less than the associated decommissioning liabilities recorded, the difference may be reported in income in the period in which the work is performed. ***During the last half of 2006, the Company's insurance claims adjuster advised that the underwriters did not yet have sufficient information to conclude that well intervention costs for certain of the damaged wells would qualify as covered costs. In addition, the underwriters questioned whether certain well intervention costs for qualifying wells would be covered under the policy. The Company is continuing to have discussions with its insurance adjuster and its underwriters regarding these well intervention activities, and it continues to submit documentation of the costs of these activities to the claims adjusters, as requested, in an effort to obtain reimbursement for these costs.*** As of December 31, 2006, approximately $40.5 million of such well intervention costs have been incurred, and approximately $27.9 million, net of reimbursements and intercompany profit, is included in accounts receivable as of December 31, 2006. While ***the Company believes that all well intervention costs being questioned by the underwriters will qualify for reimbursement under its insurance policies and are probable of collection***, it is possible that all or a portion of these costs may not be reimbursed.

The Company has received from underwriters the advance payment of an amount equal to the policy limit for removal of debris associated with the three destroyed platforms. ***In June 2006, the underwriters questioned whether there is additional coverage provided for the cost of the removal of these platforms in excess of the policy limit under an endorsement obtained by the Company in August 2005.*** The endorsement provides additional coverage for debris removal and other costs up to a maximum limit of $20 million per storm. The Company has provided additional requested documentation to the underwriters' claims adjusters to support the coverage under this endorsement. While the Company has yet to incur costs for the removal of the destroyed platforms, these costs, as well as other costs covered under the endorsement, could equal or possibly exceed the policy maximum limit under the endorsement. While ***the Company believes that these debris removal and other costs qualify for reimbursement*** under the endorsement, it is possible that all or a portion of these costs may not be reimbursed.

111.   The footnotes to the 2006 financial statements contained the following additional false and misleading statements and omissions with respect to the hurricane repair expenses and insurance reimbursements:

*Hurricane Repair Expenses*

The company incurred damage to certain of its onshore and offshore operating equipment and facilities during the third quarter of 2005 as a result of Hurricanes Katrina and Rita.  The hurricanes damaged or destroyed certain of the company's fluids facilities, as well as certain of its decommissioning assets, including one of its heavy lift barges.  The company's Maritech subsidiary also suffered varying levels of damage to the majority of its offshore oil and gas producing platforms, and three of its platforms and one of its production facilities were completely destroyed.  The majority of Company assets damaged during these hurricanes have been repaired and have resumed operation.  With regard to the destroyed offshore platforms, well intervention efforts on several of the wells associated with two of the destroyed platforms have been performed, and the Company is continuing to assess the extent of well intervention work required on wells associated with the third platform.  These well intervention efforts are being performed by the Company's WA&D Services segment.  In addition, the Company is also continuing to assess the removal of debris costs associated with the destroyed platforms.  Cumulative storm related costs incurred, including well intervention costs and repair costs of other damaged assets, totaled approximately $12.8 million and $102.3 million as of December 31, 2005 and 2006, respectively.  The Company estimates that total storm related costs, including debris removal costs associated with the three destroyed platforms, will range between $157 to $181 million, the remaining portion of which is expected to be incurred in 2007 and beyond.

**The significant majority of hurricane repair costs, including the well intervention and debris removal costs associated with the three destroyed Maritech platforms, is covered pursuant to the Company's various insurance policies.**  As part of the process of making claims under its insurance policies, the Company submits evidence of these repair costs, as well as relevant information and documentation requested, to the insurance claims adjusters as the costs are incurred.  During 2006, a total of approximately $57.9 million of hurricane related costs were reimbursed to the Company under its applicable insurance policies and, subsequent to December 31, 2006, an additional $12.5 million of hurricane related costs have been reimbursed.

**Uninsured assets that were destroyed during the storms have been charged to earnings.  Repair costs incurred up to the amount of deductibles are charged to earnings as they are incurred.  Repair costs incurred and the net book value of**

*destroyed assets which are covered under the Company's insurance policies are included in accounts receivable* net of reimbursements and any associated intercompany profit, and such accounts receivable amounts, including other non-storm related insurance claims, totaled $12.8 million and $64.5 million as of December 31, 2005 and 2006, respectively. *Repair costs not considered probable of collection are charged to earnings.* Insurance claim proceeds in excess of destroyed asset carrying values and repair costs incurred are credited to earnings when received. During 2005 and 2006, approximately $1.3 million and $10.6 million, respectively, of such excess proceeds were credited to earnings. Intercompany profit on repair work performed by the Company's WA&D Services segment is deferred until such time as insurance claim proceeds are received. *The Company believes that all repair costs for these damaged assets included in accounts receivable will be reimbursed under its insurance policies.*

Approximately $72 to $96 million of the Company's estimated storm related costs consists of the well intervention, debris removal, and other costs related to the three destroyed Maritech offshore platforms. The estimate of well intervention costs exceeds the maximum coverage amount for such costs provided pursuant to the Company's applicable insurance policies. *During 2006, the Company increased Maritech's decommissioning liabilities associated with the three destroyed platforms by approximately $11.2 million for well intervention costs expected to be incurred in excess of maximum coverage amounts*, and this increase was capitalized to the associated oil and gas properties. Primarily as a result of the above increased decommissioning liabilities, the Company charged approximately $5.2 million to operating expense during 2006. In the event that the Company's actual well intervention costs do not exceed its maximum coverage amounts, or the excess is less than the associated decommissioning liabilities recorded, the difference may be reported in income in the period in which the work is performed. *During the last half of 2006, the Company's insurance claims adjuster advised that the underwriters did not yet have sufficient information to conclude that well intervention costs for certain of the damaged wells would qualify as covered costs. In addition, the underwriters questioned whether certain well intervention costs for qualifying wells would be covered under the policy.* The Company is continuing to have discussions with its insurance adjuster and its underwriters regarding these well intervention activities, and it continues to submit documentation of the costs of these activities to the claims adjusters, as requested, in an effort to obtain reimbursement for these costs. As of December 31, 2006, approximately $40.5 million of such well intervention costs had been incurred, and approximately $27.9 million, net of reimbursements and intercompany profit, is included in accounts receivable as of December 31, 2006. While *the Company believes that all well intervention costs being questioned by the underwriters will qualify for reimbursement under its insurance policies and are probable of collection*, it is possible that all or a portion of these costs may not be reimbursed.

The Company has received from underwriters the advance payment of an amount equal to the policy limit for removal of debris associated with the three destroyed platforms. *In June 2006, the underwriters questioned whether there is additional coverage provided for the cost of the removal of these platforms in excess of the policy limit under an endorsement obtained by the Company in August 2005.* The endorsement provides additional coverage for debris removal and other costs up to a maximum limit of $20 million per storm. The Company has provided additional requested documentation to the underwriters' claims adjusters to support the coverage under this endorsement. While the company has yet to incur *costs for the removal of the destroyed platforms*, these costs, as well as other costs covered under the endorsement, *could equal or possibly exceed the policy maximum limit under the endorsement.* While *the Company believes that these debris removal and other costs qualify for reimbursement under the endorsement*, it is possible that all or a portion of these costs may not be reimbursed.

112.    The 2006 Form 10-K contained the following statements that were false and misleading with respect to the facts underlying the calculation of Maritech's decommissioning obligations, (*i.e.,* that there would be "cash outflow" from working the 2005 properties for several years):

The third party discounted fair value, including an estimated profit, of Maritech's decommissioning liability as of December 31, 2006 totals $134.5 million ($167.7 million undiscounted). *The cash outflow necessary to extinguish Maritech's decommissioning liability is expected to occur over several years, shortly after the end of each property's productive life. This timing of these cash outflows is estimated based on future oil and gas production and the resulting depletion of the company's oil and gas reserves.*

113.    The 2006 Form 10-K contained the following statements that were false and misleading with respect to facts underlying Maritech oil and gas asset impairments:

*The determination of impairment on long-lived assets is conducted periodically when indications of impairment are present.*

\*       \*       \*

*The assessment of oil and gas properties for impairment is based on the future estimated cash flows from the Company's proved, probable and possible reserves.*

114.    The 2006 Form 10-K contained the following statement that was false and misleading with respect to revenue recognition for Fluids revenue:

> ***Revenues are recognized*** when finished products are shipped or services have been provided to unaffiliated customers and ***only when collectibility is reasonably assured.***

115.    The 2006 Form 10-K contained the following statements about operating costs that were false and misleading as they applied to Fluids, WA&D expenses incurred on Maritech properties and Maritech's expense recognition:

*Operating Costs*

> ***Cost of product sales includes direct and indirect costs of manufacturing and producing the Company's products, including raw materials***, fuel, utilities, labor, overhead, repairs and maintenance, purchasing and receiving, transportation, warehousing, equipment rentals, ***depreciation***, insurance and taxes. ***In addition, cost of product sales includes oil and gas operating expense.  Cost of services*** and rentals ***includes operating expenses incurred by the Company in delivering its services***, including labor, equipment rental, fuel, repair and maintenance, transportation, overhead, depreciation, insurance and taxes.  The company includes in product sales revenues the reimbursements it receives from customers for shipping and handling costs.  Shipping and handling costs are included in cost of product sales.  ***Amounts incurred by the Company for "out-of-pocket" expenses in the delivery of its services are recorded as cost of services*** and rental.  Reimbursements for "out-of-pocket" expenses incurred by the Company in the delivery of its services are recorded as service revenues. ***Depreciation, depletion, amortization and accretion includes depreciation expense for all of the Company's facilities***, equipment and vehicles, ***depletion expense on its oil and gas properties, amortization expense on its intangible assets and accretion expense related to its asset retirement obligations.***

116.    The 2006 Form 10-K contained the following statement that was false and misleading with respect to asset retirement obligations, as applied to Maritech properties:

**NOTE I -- ASSET RETIREMENT OBLIGATIONS**

> ***The Company accounts for asset retirement obligations in accordance with SFAS No. 143, "Accounting for Asset Retirement Obligations."***  The associated asset retirement costs are capitalized as part of the carrying amount of the long-lived asset.  The amount of decommissioning liabilities recorded by Maritech is reduced by amounts allocable to joint interest owners and any contractual amount

- 44 -

to be paid by the previous owner of the property when the liabilities are satisfied. The Company also operates facilities in various U.S. and foreign locations in the manufacture, storage, and sale of its products, inventories and equipment, including offshore oil and gas production facilities and equipment.   These facilities are a combination of owned and leased assets.  ***The Company is required to take certain actions in connection with the retirement of these assets.  The Company has reviewed its obligations in this regard in detail and estimated the cost of these actions.  These estimates are the fair values that have been recorded for retiring these long-lived assets.  These fair value amounts have been capitalized as part of the cost basis of these assets.  The costs are depreciated on a straight-line basis over the life of the asset for non-oil and gas assets and on a unit of production basis for oil and gas properties.***  The market risk premium for a significant majority of the asset retirement obligations is considered small, relative to the related estimated cash flows, and has not been used in the calculation of asset retirement obligations.

***The changes in the asset retirement obligations during the most recent two year period are as follows:***

|  | Year Ended December 31 | |
| --- | --- | --- |
|  | 2006 | 2005 |
|  | (In Thousands) | |
| Beginning balance for the period, as reported | $136,843 | $42,874 |
| Activity in the period: | | |
| ***Accretion of liability*** | ***6,989*** | 3,412 |
| ***Retirement of obligations incurred*** | ***2,823*** | 97,468 |
| Revisions in estimated cash flows | 15,853 | 1,871 |
| Settlement of retirement obligations | (24,168) | (8,782) |
| Ending balance at December 31 | $138,340 | $136,843 |

117.    The 2006 Form 10-K contained the following false and misleading statements in

the footnotes to the financial statements, with respect to Maritech's oil and gas properties:

**NOTE R — SUPPLEMENTAL OIL AND GAS DISCLOSURES**

The following information regarding the activities of the Company's Maritech segment is presented pursuant to SFAS No. 69, "Disclosures About Oil and Gas Producing Activities (SFAS No. 69)." As part of the WA&D Division activities, Maritech and its subsidiaries acquire oil and gas reserves and operate the properties in exchange for assuming the proportionate share of the well abandonment obligations associated with such properties. Accordingly, the Company's Maritech segment is included within its WA&D Division.

*Costs Incurred in Property Acquisition, Exploration, and Development Activities*

- 45 -

*The following table reflects the costs incurred in oil and gas property acquisition*, exploration, and development activities during the years indicated. Consideration given for the acquisition of proved properties includes the assumption and any subsequent revision of the amount of the proportionate share of the well abandonment and decommissioning obligations associated with the properties.

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2006 | 2005 | 2004 |
|  | (In Thousands) | | |
| *Acquisition of proved properties* | $8,561 | *$115,795* | $9,902 |
| Exploration | – | – | – |
| Development | 78,774 | 26,185 | 9,139 |
| Total costs incurred | $87,335 | $141,980 | $19,041 |

*Capitalized Costs Related to Oil and Gas Producing Activities:*

Aggregate amounts of capitalized costs relating to the Company's oil and gas producing activities and the aggregate amounts of related accumulated depletion, depreciation, and amortization as of the dates indicated, are presented below.

|  | December 31, | | |
| --- | --- | --- | --- |
|  | 2006 | 2005 | 2004 |
|  | (In Thousands) | | |
| Properties not being amortized | $8,377 | $10,567 | $179 |
| *Proved developed properties being amortized* | *275,890* | *187,540* | 58,689 |
| Total capitalized costs | 284,267 | 198,107 | 58,868 |
| Less accumulated depletion, depreciation, and amortization | (81,709) | (41,886) | (25,121) |
| Net capitalized costs | $202,558 | $156,221 | $33,747 |

*Included in capitalized costs of proved developed properties being amortized is the Company's estimate of its proportionate share of decommissioning liabilities assumed relating to these properties, which is also reflected as decommissioning liabilities in the accompanying consolidated balance sheets.*

*Results of Operations for Oil and Gas Producing Activities:*

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2006 | 2005 | 2004 |
|  | (In Thousands) | | |
| Oil and gas sales revenues | $164,099 | $62,876 | $39,984 |
| Production (lifting) costs | 60,270 | 36,314 | 20,102 |
| Exploration expenses | 8 | 84 | 490 |
| Accretion expense | 6,825 | 3,230 | 1,444 |
| *Depreciation, depletion, and* | *38,550* | 14,878 | 8,971 |

|  | | | |
|---|---|---|---|
| *amortization* | | | |
| **Dry hole costs** | *1,145* | – | – |
| **Impairments of properties** | *[none]* | 1,907 | – |
| Pretax income from producing activities | 57,301 | 6,463 | 8,977 |
| Income tax expense | 20,605 | 1,782 | 2,460 |
| Results of oil and gas producing activities | $36,696 | $4,681 | $6,517 |

Results of operations for oil and gas producing activities excludes general and administrative and interest expenses directly related to such activities as well as any allocation of corporate or divisional overhead.

*Estimated Quantities of Proved Oil and Gas Reserves (Unaudited):*

*The following information is presented with regard to the Company's proved oil and gas reserves. The reserve values and cash flow amounts reflected in the following reserve disclosures are based on prices as of year end. Proved oil and gas reserve quantities are reported in accordance with guidelines established by the SEC.* Ryder Scott Company, L.P. prepared the estimates for the Company's reserves at December 31, 2006, 2005 and 2004, except for two producing fields (representing approximately 43% of proved reserves volumes) as of December 31, 2006 and one producing field (representing approximately 31% of proved reserves volumes) as of December 31, 2005, which were prepared by the Company. All of Maritech's reserves are located in U. S. state and federal offshore waters of the Gulf of Mexico and onshore Louisiana.

*Proved oil and gas reserves are defined as the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. Reservoirs are considered proved if economic productibility is supported by either actual production or conclusive formation tests.* The area of a reservoir considered proved includes (a) that portion delineated by drilling and defined by gas-oil and/or gas-water contacts, if any, and (b) the immediately adjoining portions not yet drilled, but which can be reasonably judged as economically productive on the basis of available geological and engineering data. Reserves which can be produced economically through application of improved recovery techniques are included in the "proved" classification when successful testing by a pilot project, or the operation of an installed program in the reservoir, provides support for the engineering analysis on which the project or program was based.

The reliability of reserve information is considerably affected by several factors. Reserve information is imprecise due to the inherent uncertainties in, and the limited nature of, the database upon which the estimating of reserve information is predicated. Moreover, the methods and data used in estimating reserve information are often necessarily indirect or analogical in character, rather than

direct or deductive. Furthermore, estimating reserve information, by applying generally accepted petroleum engineering and evaluation principles, involves numerous judgments based upon the engineer's educational background, professional training and professional experience. The extent and significance of the judgments to be made are, in themselves, sufficient to render reserve information inherently imprecise.

| *Reserve Quantity Information* | Oil (MBbls) | Gas (MMcf) |
|---|---|---|
| Total proved reserves at December 31, 2003 | 3,275 | 13,925 |
| Revisions of previous estimates | (301) | 1,223 |
| Production | (502) | (4,101) |
| Extensions and discoveries | 64 | 6,615 |
| Purchases of reserves in place | 110 | 4,986 |
| Sales of reserves in place | – | (243) |
| Total proved reserves at December 31, 2004 | 2,646 | 22,405 |
| Revisions of previous estimates | 63 | (3,421) |
| Production | (484) | (5,088) |
| Extensions and discoveries | 859 | 3,195 |
| Purchases of reserves in place | 5,703 | 29,900 |
| Sales of reserves in place | (800) | (4,717) |
| Total proved reserves at December 31, 2005 | 7,987 | 42,274 |
| Revisions of previous estimates | 732 | (44) |
| Production | (1,356) | (7,812) |
| Extensions and discoveries | 1,299 | 5,230 |
| Purchases of reserves in place | 180 | 163 |
| Sales of reserves in place | (13) | (73) |
| ***Total proved reserves at December 31, 2006*** | ***8,829*** | ***39,738*** |

| Proved Developed Reserves | Oil (MBbls) | Gas (MMcf) |
|---|---|---|
| December 31, 2004 | 1,127 | 15,356 |
| December 31, 2005 | 6,372 | 35,091 |
| December 31, 2006 | 7,872 | 36,373 |

*Standardized Measure of Discounted Future Net Cash Flows Relating to Proved Oil and Gas Reserves:*

***The standardized measure of discounted future net cash flows and changes in such cash flows are prepared using procedures prescribed by SFAS No. 69.*** As prescribed by SFAS No. 69, "standardized measure" relates to the estimated discounted future net cash flows and major components of that calculation

relating to proved reserves at the end of the year in the aggregate, based on year end prices, costs, and statutory tax rates and using a 10% annual discount rate. The standardized measure is not an estimate of the fair value of proved oil and gas reserves. Probable and possible reserves, which may become proved in the future, are excluded from the calculations. Furthermore, year end prices, used to determine the standardized measure, are influenced by seasonal demand and other factors and may not be representative in estimating future revenues or reserve data.

***The standardized measure of discounted future net cash flows relating to proved oil and gas reserves attributed to the Company's oil and gas properties is as follows:***

|  | December 31, | |
|---|---|---|
|  | 2006 | 2005 |
|  | (In Thousands) | |
| ***Future cash inflows*** | ***$752,500*** | $889,736 |
| ***Future costs*** | | |
| ***Production*** | ***244,694*** | 257,342 |
| ***Development and abandonment*** | ***196,736*** | 213,647 |
| Future net cash flows before income taxes | 311,070 | 418,747 |
| Future income taxes | (104,832) | (137,424) |
| Future net cash flows | 206,238 | 281,323 |
| Discount at 10% annual rate | (20,148) | (47,335) |
| Standardized measure of discounted future net cash flows | $186,090 | $233,988 |

*Changes in Standardized Measure of Discounted Future Net Cash Flows:*

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
|  | (In Thousands) | | |
| Standardized measure, beginning of year | $233,988 | $69,891 | $49,862 |
| Sales, net of production costs | (103,829) | (26,562) | (19,882) |
| Net change in prices, net of production costs | (143,181) | 33,495 | 5,381 |
| ***Changes in future development costs*** | ***9,127*** | 993 | (1,738) |
| Development costs incurred | 13,148 | 4,596 | 2,750 |
| Accretion of discount | 23,399 | 6,989 | 4,986 |
| Net change in income taxes | 23,835 | (79,612) | (11,811) |
| Purchases of reserves in place | 6,585 | 206,331 | 12,882 |
| Extensions and discoveries | 86,223 | 71,423 | 29,171 |
| Sales of reserves in place | 3,885 | (28,931) | (115) |
| ***Net change due to revision in quantity estimates*** | ***17,534*** | (18,813) | (2,233) |
| Changes in production rates (timing) and other | 15,376 | (5,812) | 638 |

| | | | |
|---|---|---|---|
| Subtotal | (47,898) | 164,097 | 20,029 |
| Standardized measure, end of year | $186,090 | $233,988 | $69,891 |

118.    Finally, Defendants included false Sarbanes-Oxley certifications on exhibits to TETRA's 2006 Form 10-K that was signed by Hertel on March 1, 2007 (with another signed by Abell).  In the certification, Hertel stated, in part:

> Certification Pursuant to
> Rule 13(a) - 14(a) or 15(d) - 14(a) of the Exchange Act
> As Adopted Pursuant to
> Section 302 of the Sarbanes-Oxley Act of 2003
>
> I, Geoffrey M. Hertel, certify that:
>
>    1.  I have reviewed this annual report on Form 10-K for the fiscal year ended December 31, 2006, of TETRA Technologies, Inc.;
>
>    2.  **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
>    3.  **Based on my knowledge**, **the financial statements**, and other financial information included in this report, **fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**.

119.    The highlighted portions of quotes from the Form 10-K were all false and/or misleading as a result of the schemes described in this Complaint, particularly:

(a)     With respect to the reported line items on TETRA's balance sheet, accounts receivable (*i.e*,, $253,352) was misstated as a result of improperly treating WA&D expenses for work on Maritech properties as insurance receivables; inventories were misstated as a result of recording sales returns as inventory in the amounts of sales credits provided to customers; the amounts for Maritech's reported oil and gas properties should either have been "written off" or the

"depreciation and depletion" sharply increased for the non-productive properties; as Witness #4 explained, Maritech's decommissioning liabilities were understated.

(b)    With respect to the reported line items on TETRA's income statement, product sales were inflated because Fluids failed to report customer credits as sales returns and allowances (as required under SFAS 48); COGS were understated for the Fluids inventory write-ups; costs of services were understated for WA&D Services' failure to recognize its expense for weather down time and other unreimbursable costs spent working on Maritech properties (or a bad debt expense should have been recognized); amounts included for Maritech depreciation, depletion, amortization and accretion for the 2005 oil and gas properties were understated as a result of the abuses of the "successful efforts" method of accounting, and the false assumption that cash flows for the operation of the 2005 properties would continue for several years.

(c)    These same issues caused the line item amounts in the segment reporting to be misstated.

(d)    TETRA had not properly adjusted the reported balances for Maritech oil and gas 2005 property "impairments" even though they knew virtually all of these properties were unproductive or largely depleted; for the same reason, as of December 31, 2006, Defendants had not expensed the costs of unsuccessful wells as represented in the Critical Accounting Policies and Estimates.  Nor, as Witness #4 described, were decommissioning liabilities adjusted up even though their cost had greatly increased.

(e)     Bad debt reserves had not been established for insurance receivables, even though the insurer had already disallowed the claims.

(f)     Acquisition Cost allocations for the 2005 oil and gas property purchases were improperly made to fields that did not have any proven reserves.

(g)     The statements regarding insurance reimbursement and discussions with the adjuster were false and misleading because the insurer did not merely "question" the costs; it disallowed them.  The statements are also misleading because of the omission of the facts relating to the 2006 disallowances and the amounts of the claims disallowed.  In TETRA's 2007 Form 10-K, TETRA states that $13.5 million of submitted claims were disallowed, and suggests that much of the remaining $71 million impairment is attributable to the insurer's position on reimbursement.

(h)     The decommissioning obligations were not based on Defendants' true "cash flow" assumptions.  As Defendants disclosed in post-Class Period statements, they knew the properties purchased in 2005 did not have a productive life of more than three years.  Thus, "impairments" had not, in fact, been assessed on the basis of Defendants' true "proved" reserves.

(i)     Fluids' revenues had been recognized despite the Company's agreement to provide credits pursuant to its buy-back program; therefore revenues had been recognized even though collection was not "reasonably assured."

(j)     The Company had not reported asset retirement obligations in accordance with SFAS No. 143 -- because, as Witness #4 described, the costs to decommission the Maritech properties were understated and therefore not reported at "fair value."

Nor did these reported amounts take into consideration the assets' true "useful life" -- because the oil and gas assets were exhausted. Thus, the estimated retirement obligations were also not being "depreciated in a straight-line basis over the life of" the associated oil and gas properties.

(k)     The "Supplemental Oil and Gas Disclosures" in Note R were false and misleading because they overstated the "proved" reserves as described by Witness #1, and as later admitted by the Company in its third quarter 2007 press release and Earnings Call and the January 14, 2008 Earnings Call. The cash flows were also not prepared "using procedures prescribed by SFAS No. 69" -- because there was no expectation that most of these properties would have *any* future cash flows, and none would have cash flows for several years as Defendants' financial statements assumed.

(l)     For all the above reasons, Hertel's Sarbanes-Oxley statement is false and misleading, when it states that, based on his, Hertel's, knowledge, the Form 2006 10-K did not contain "untrue" or "misleading" statements; and also that the financial condition (*i.e.,* the balance sheet) and results of operations (*i.e.,* the income statement) were presented "fairly."

<u>Defendants Announce 1Q07 Earnings</u>

120.    The height of Defendants' fraud was achieved on May 7, 2007, when the Company issued a press release and conducted an earnings conference for their First Quarter, 2007 ("1Q07") Earnings. In that press release, Defendants represented that, at $0.28 per share, *it was the highest first quarter earnings in company history*. The company exulted that, "WA&D Services profits were up 712% over the pretax profits generated in the first quarter 2006. In

discussing Maritech's lower pretax profits, Defendants assured the market that the lower-than-forecasted performance was a short term aberration that Maritech was attempting to quickly remedy through its acceleration of planned new exploitation activities.  As the May 7, 2007 press release stated:

> Maritech's first quarter earnings reflected higher insurance premiums, lower natural gas prices, and increased production.  Production averaged between 57 to 58 MMCF/D in the first quarter of 2007, versus the storm reduced approximate 37 MMCF/D in the first quarter of 2006.  Currently, production volumes are lower than those forecasted in Maritech's 2007 guidance.  The most significant shortfall is from two properties that were drilled in 2006 and early 2007.  We had anticipated that completion activities would have been finished and the wells producing by now.  However, completion rig availability and weather delays prevented timely completions.  Much of this production is forecast to start late in the second quarter.  ***Recognizing the potential shortfall to production, Maritech is now attempting to accelerate forward exploitation activities originally planned for late 2007 or early 2008***.  If Maritech is successful in this endeavor, it may offset any near-term production shortfall with increased production from this escalated activity in the fourth quarter.

121.     In the earnings conference held the same day, Hertel went further in insisting that TETRA was primed for earnings growth:

> I think it's safe to say that our first quarter was one of, if not the most, schizophrenic periods that I've ever encountered in my corporate life.  It was both exhilarating and frustrating, and it was happening simultaneously.  ***Much of this craziness occurred because of the unprecedented growth that we're experiencing.***
>
> We had to build infrastructure in front of the next tranche growth, and for a time during the quarter, it was touch and go whether any of the associated revenues would offset these growing costs.  Fortunately, during March we began to see some of the fruits of our labor.  As a final comment on this issue, for those of you who are new to TETRA, this was all occurring during our seasonally weakest quarter.
>
> Now let's talk specifics regarding the quarter and how it sets up for the rest of the year.  As we've discussed numerous times before, we have a significant amount of moving parts in 2007.  Three areas in particular need to be understood by everybody.  They are Fluids, Well Abandonment and Decommissioning Services, and Maritech.

*In Fluids, we have previously announced the construction of a new fluids plant in Arkansas and the signing of agreements with Chemtura.  These two items will significantly reduce our cost of goods for our primary completion fluids.*  The benefits of these items should start in 2008 and be fully effective in 2010 to maybe 2011, and then for decades thereafter.

*In order to help implement these changes, TETRA purchased large inventories of products in 2005 and early 2006.  Also, TETRA is currently in the process of implementing termination of its previous supply agreement for a portion of these products.  These purchases carry very high costs to TETRA.  This entire process generated some inventory gains in 2006 and also materially increases costs for 2007.*  The combined effect is the estimated 30 million of reduced pre-tax earnings alluded to in the press release.  The earnings for Fluids in the first quarter are consistent with our assumptions regarding these factors, and they correspond to the annual earnings guidance that we gave you in January.

*The performance of WAD Services in the first quarter was very heartening.*  This performance was in spite of normal seasonal weakness and the dramatic increase in costs associated with our anticipated increase in activity.  Since these costs were being experienced for most of the quarter, it was especially encouraging to begin to obtain offsetting revenues late in the quarter.  For the second quarter we should see activity and margins improve from first quarter levels for WAD Services.

\*     \*     \*

Maritech's first-quarter earnings versus year ago levels had to overcome two factors, both of which were included in our 2007 guidance estimates.  First was the significant reduction in commodity gas prices from our 2006 hedge position to the lower prices in 2007.  This was particularly relevant during January and February, prior to Maritech's new 2007 gas hedges.  This hedge is at prices that are above our 2007 guidance, although still well below 2006 levels.  Therefore, as the year goes on, we believe our average gas price should equal and then exceed our projected guidance price.

Also in the quarter, Maritech had $4 million of increased insurance premiums versus the previous year's costs.  In quarters two through four, the insurance premiums in 2007 and 2006 should be much closer in cost.  And this is because the costs began to escalate for Maritech in April of last year.  Both the reduced natural gas prices and the increased insurance premiums had previously been accounted for in our guidance, as I mentioned earlier.

*Oil and gas volumes increased dramatically over year-ago levels in the first quarter.  However, two fields that were expected to begin production in the quarter are now not expected to begin production until late in June.  Consequently, unless an offset could be found, our 2007 estimated volumes*

*from our guidance would have to be reduced.  Fortunately, Maritech has a backlog of exploitation projects.  We have recently moved a number of these projects forward in the year in an attempt to derive some 2007 production from them.*  If we can accomplish this additional exploitation in a timely manner, we may offset the production shortfall from the two previously mentioned fields. *And when I say production shortfall, I want to make sure you understand; this is not volumetric shortfall that we're talking about; it's timing shortfall.*  During the last few months, Maritech has sought to reduce the effects of significant swings in commodity prices.  It has added a number of gas and oil hedges, some for 2009.  This Maritech policy of hedging material quantities of production is consistent with our desire to reduce earnings volatility due to price, and to lock in earnings.

122.    In response to analyst questioning, Hertel assured that earnings margins at

WA&D, and Maritech production would greatly improve by third quarter 2007:

In the case of our Well Abandonment, really, with the majority of the earnings expected in second and third quarter, and with costs escalated into the fourth quarter, then again even higher into the first, you would have a tendency to draw those margins down significantly.  *Consequently, as you get into the second and third quarter, and begin to get associated revenues, those margins should improve dramatically.*

*             \*       \*       \**

*I would expect that they're going to get higher than you 20 -- I think you said 21 -- by the time you're in the third quarter, easily, if what we see is appropriate.*  Again, it's hard for us to guess at all of that until we see the work that we're doing associated with the revenues.  The problem is that when you only have the cost side and you're trying to guess at what your revenue margins are going to be, it's somewhat difficult.  But I don't see it inconsistent with what we've given you for the year.

The only area, really, that we're looking at right now and saying we have to do something to get back to the levels that we indicated *is Maritech*, and I think we're doing that in terms of trying to escalate some of this forward.  That, again, *is not an issue of them doing any worse or better than we said; it's just a function of being three or four months out of sync with some of their production.  And if we can escalate some of their exploitation activities that would have gone on later in the year and given us production in '08 into the middle of the year, giving us production in late '07, we can conceivably make up that difference.*

123.    The statements regarding first quarter 2007 performance and prospects were false and misleading for the reasons stated in this Complaint, specifically:

      (i)    Maritech's oil and gas properties were largely exhausted, so that production would not ever recover -- in fact, there *was* a permanent "volumetric shortfall";

      (ii)    WA&D expenses were increasing because TETRA's insurer was not reimbursing substantial costs incurred on Maritech properties;

      (iii)    The reasons for Fluids' high inventories were falsely stated and the impact of the buy-back program on inventories concealed.

The 1Q07 Form 10-Q

124.    On May 10, 2007 Defendants filed TETRA's Form 10-Q for 1Q07.  This report repeated the false and misleading statements contained in the 2006 Form 10-K about TETRA's communications with its insurance adjuster and stating that the underwriters merely "questioned" coverage of costs under the policy; the Form 10-Q continued to be misleading in omitting the information that Maritech's claims for reimbursement had been disallowed.  The Form 10-Q stated that the "accounting policies of the reportable segments are the same as those described in the summary of significant accounting policies."  Thus, the Form 10-Q was false and misleading with respect to these accounting policies, incorporated by reference, for the same reasons that the 2006 Form 10-K was identified as being false and misleading.  The Form 10-Q repeated the false and misleading statement that TETRA continued to expect cash flow from the 2005 acquired properties "over several years," as support for the reporting of Maritech's decommissioning liabilities.

125.   Filed with the 1Q07 Form 10-Q was Hertel's Sarbanes-Oxley Certificate, which made the same statements about the integrity of the First Quarter 2007 Form 10-Q, as he had made for the 2006 Form 10-K.   Hertel's Sarbanes-Oxley certificate was false and misleading because TETRA's financial statements in the Form 10-Q were misstated.   Each of the line items on TETRA's balance sheet and income statement for 1Q07 were misstated for the same reasons that the analogous line items on the 2006 Form 10-K have been identified in this Complaint as being false and misleading.

### THE TRUTH REGARDING DEFENDANTS' SCHEME IS SLOWLY REVEALED

**August 3, 2007: Defendants Announce 2Q 2007 Financial Results And Modify 2007 Earnings Guidance**.

126.   The first sign that Defendants' fraudulent revenue recognition and expense shielding scheme was starting to unravel came on August 3, 2007, when the Company announced a dramatic decrease in per share earnings for the Second Quarter 2007 ("2Q07").   *That price went down to $.30 per share as opposed to $.39 in the same quarter for 2006*.   Each of the three relevant sectors saw a decrease in earnings, as reported in the following chart:

|          | 2Q07       | 2Q06       |
|----------|------------|------------|
| Fluids:  | 10,265,000 | 18,310,000 |
| WAD      | 12,675,000 | 16,622,000 |
| Maritech | 8,561,000  | 11,273,000 |

127.   Defendant Hertel commented on the Company's 2Q07 financial performance by stating that:

> Our second quarter earnings were significantly below what we had hoped for and were materially affected by events during June.   There are a number of reasons for this weaker than expected performance.   *Fortunately, many of these reasons are transitory*.

Nonetheless, the press release also revealed a portion of the truth of the fraud involving the Fluids "higher inventory costs" and flat onshore customer demand, even though the true reasons for these items continued to be obscured.  The press release also revealed the insurance write-offs and reduced Maritech production from its 2005 properties.  All of these revelations partially corrected and removed the inflation in TETRA's stock price for the frauds described in this Complaint.  The press release stated, in part:

> During the quarter, our **Fluids** Division **continued to be impacted by the higher inventory costs** created by our decision to fully integrate our bromine operation. The series of events we precipitated in 2005 and 2006 left us with high cost inventories (versus today's costs for the same inventory) and an obligation to buy additional high cost inventories to terminate an existing purchase contract.  Once our obligations with respect to these high cost inventories have been satisfied and the high cost inventories have flushed through the system, we will begin to be benefited by our Chemtura agreements.  Given the amount of product that we now hope to sell during the first three quarters of 2007, we believe a portion of the positive impact of the Chemtura agreements may begin to be seen as early as the fourth quarter of 2007.  This means that we expect to generate a significant positive impact from these agreements in 2008.

> **During 2007, we expected that a partial offset to the high cost Fluids inventories would come from our growing domestic onshore fluids service business.**  Unfortunately, in the second quarter, much of this business was located in Texas and southern Oklahoma.  The exceptional rainfall in these areas during parts of May, June, and portions of July caused some of this activity to come to a standstill.  **We did not experience the activity and associated earnings in the second half of the quarter that had previously helped to offset the high cost inventory situation.**

> As we documented in previous press release, **we did not expect our Maritech production to attain the originally budgeted volumes during the second quarter. This was due to the delay in production from two offshore platforms.**  Both of these platforms are anticipated to essentially be on-stream for much of August. During the second quarter, net production averaged approximately 5,200 B/D of oil and 26 MMCF/D of natural gas.  This totaled about 57.2 MMCFE/D (at 6 MCF per barrel conversion).  This was slightly less than the first quarter of 2007 (about 58 MMCFE/D) and appreciably less than original budgeted volumes.  This shortfall was primarily caused by the delay referred to above.  It is expected that mid-August net daily volumes should approach 6,600 B/D and 33.0 MMCF/D or an average of 72.6 MMCFE/D, as these two platforms begin sustained production.

***To help offset this volume shortfall, Maritech has undertaken an escalated development program for the second half of 2007.  While we expect that this program will help offset some of the production deferral, it is unlikely that it will make up the entire shortfall.***

128.    Later that day, the Company held its Earnings Conference Call which also contained a mixture of true, corrective facts and continued false statements.  Defendant Hertel began the call with the self-serving observation (given his May 2007 stock sales), that he'd not witnessed "an uglier quarter, particularly in the month of June."  During the call he continued to leak out the truth of portions of the fraud that had inflated TETRA's stock price:

Maritech production.  We indicated in our, I believe it was May 9 or May 7 press release for the first quarter, that we had two major platforms that were not going to produce as early as we had anticipated last November.  Because of this, this deferred production would affect the second quarter, and it would also affect the full-year volumes.  ***We indicated that we were going to try to escalate some of Maritech's late 2007 and early 2008 exploitation CapEx in an attempt to make up some or all of that production shortfall.***

So where are we today?  First.  Both of the platforms are in the process of beginning sustained production.  Our average 57.2 million cubic feet a day equivalent of production for the second quarter should approach 73 million in the next few days.  ***While this will certainly improve operations in the last half of the year, it doesn't make up for the earlier deferred production, in other words, the loss production in the second quarter that won't come until later.***  However, Maritech has moved a number of projects forward as we'd attempted to do.  It also is using a couple of rigs in one field instead of the planned single rig to escalate forward some of the operations.  These items are all intended to bring new production on faster than originally scheduled.

This should cut into our production deficit.  So the company, Maritech, has actually done what they've set out to do in trying to get these moneys moved forward and the production moved forward and hopefully the associated earnings moved forward for the latter part of the year on top of the increased production that I just announced.  ***During the quarter, Maritech took a write-off related to insurance proceeds for the 2005 hurricanes.  Since this amount is in dispute with the insurance carrier, the conservative action was to write it off.***

*        *        *

***Said a different way, we had two items that created a hole in our earnings, which are well documents, the $30 million from Fluids***, and the $20 million

from the natural gas price differentials, where the hedges were.  So you had $50 million to work with.  ***To get to the growth that we needed to get to to get to the numbers that we first gave you***, there were three areas that needed to really blow and go, so to speak, and obviously well abandonment was one of those items and it was the largest of those items.  But you also had your testing operations and your ***onshore Fluids operations that had to perform very well to be able to make up those differences*** and have the growth that we experienced, and expected to experience during at least the first three quarters of the year.  ***And the issue that we had in the second quarter was you still had those negatives that we talked about, so, yes, those hadn't changed.***

129.    Therefore, the Company finally admitted, *inter alia*, both that the profits, after surging in the 1Q07, were slumping, that onshore Fluids was performing poorly, Maritech production was down and that the Company was forced to take a write-off due to uncollectible insurance recoveries.   As a consequence of this announcement, TETRA stock, which was inflated throughout the Class Period due to Defendants' false statements and omissions, plunged over 25% to close at $19.77.

130.    However, Defendants did not, at this time, fully admit to the depths of the scheme, nor did the Company take the far greater write-offs that it would in later quarters in 2007.  Instead, Defendants attempted to cover their tracks.  First of all, they went to lengths to minimize the damage by obscuring the complete truth.  Defendant Hertel, for example, stressed the "transitory" nature of the issues at the Company and stated that many of the issues had been dealt with already.  Furthermore, Defendants continuously pointed to the month of June 2007, as the month when the Company experienced these aberrational negative events.   However, as discussed in this complaint, the forced expense recognitions, write-offs, and insurance holes existed since at least early 2006 and Defendants well knew that the poor performance of the Company during 2Q07 was caused by the fact that the earnings reported for 2006 and 1Q07 were falsely inflated and the Company would eventually have to account for that.  Conveniently, the

month of June, 2007, was the month after Defendants and other key Company executives dumped massive amounts of stock.

131.    On August 9, 2007, Defendants filed TETRA's Second Quarter Form 10-Q.  It continued many of the false statements appearing in the earlier Form 10-Q and 2006 Form 10-K, but it included the following telling admission about Defendants' scienter in this case.  In this Form 10-Q, Defendants admit that the insurers had *earlier* rejected the Company's claims for work on Maritech's hurricane-damaged properties:

> During the second quarter of 2007, after reviewing additional documentation provided by the Company, ***the underwriters repeated their position that certain wells did not qualify as covered costs.***  Based on this position of the underwriters, the Company has increased its allowance for uncollectible insurance receivables and charged approximately $1.6 million to expense.

## TETRA Further Reveals Its Scheme

132.    On October 16, 2007, Defendants confirmed the wrongful accounting measures undertaken at the Company.  On that date, TETRA withdrew its previously issued 2007 earnings guidance.

133.    In explaining the change in the guidance, Defendant Hertel effectively confessed to several of the accounting manipulations discussed in this Complaint.  As to the insurance, Defendant Hertel explained that "….we also have a number of issues related to prior events.  An example of this is where ***historical costs are currently represented as insurance receivables***. Almost all of these types of issues have involved charges that impacted reported earnings, but which did not affect cash flow, in the then current period."  In this statement, Defendant Hertel thereby admitted that the Company had recorded insurance-related work as receivables rather than as costs, and that since no insurance reimbursements were received, such figures had to eventually be transferred to expenses.

134.    Defendant Hertel went on to give details to the insurance issue.  He stated that:

Since 2005, we have been repaid in excess of $90 million for storm related costs and charges.  At June 30, 2007 we had $35.7 million for all insurance accounts receivable, and management estimates that as of September 30, 2007, we had $27.8 million for all insurance accounts receivables…..  If this meeting [with insurance companies] creates irreconcilable differences regarding claims, TETRA may be required to charge these amounts against income in the then current period.

135.    This comment therefore revealed that the Company had $28 million in expense that was unlikely to be recovered.

136.    The Company likewise admitted to the consequences of its manipulations nature of the "successful efforts accounting."    It stated that "[d]uring the third quarter the Company will also record impairments of certain Maritech oil and gas properties in accordance with the successful efforts accounting method."  This statement reveals what should have occurred long ago that all capitalized costs for non-producing properties would have to be expensed -- here in one massive write off.

## POST CLASS PERIOD STATEMENTS

137.    Defendants admitted knowledge of many of the facts giving rise to a strong showing of scienter *during* and *after* the Class Period.  Particularly post-Class Period statements show that Defendants always knew that Maritech's oil and gas properties were largely depleted.

138.    In the November 5, 2007 Earnings Call Hertel stated:

Maritech produces profits by actively exploiting properties that it acquires.  The last packages … of properties purchased by Maritech were pre Rita and Katrina.  The inventory of exploitable operations in these older purchases has dwindled during the last 29 months.  (Nov. 5, 2007 Earnings Call)

139.    The January 14, 2008 press release stated:

*To stabilize or grow production, Maritech must exploit properties after they are acquired.  The most attractive opportunities are exploited first.  This meant that by 2007, most exploitation projects, generated out of 2005 acquisitions, had*

*diminishing return potential.  This is one of the primary reasons that Maritech's DD&A grew more rapidly than did its operational pretax profits in 2007.*  Maritech needed to acquire new properties.

*      *      *

We anticipate using Maritech's recent acquisitions to create growth opportunities for 2008 through 2010.  ***To do this, in late 2007, we cancelled plans for the development of some of the previously held, less attractive exploitation properties.***

140.    Hertel stated in the January 14, 2008 Earnings Call:

Since we try and exploit the most attractive properties first, the remaining exploitable opportunities after three years are generally quite lean in the economic area.  (January 14, 2008 Earnings Call)

141.    The enormous amount of the oil and gas property write-offs were disclosed in fourth quarter 2007 -- when TETRA reported an "impairment" charge for the abandonment of the properties purchased in 2005 of more than $70 million.

<h2 style="text-align:center">DEFENDANTS' FALSE FINANCIAL REPORTING</h2>

**Defendants Violated GAAP**

142.    Throughout the Class Period, TETRA represented that it was reporting revenues in accordance with Generally Accepted Accounting Principles ("GAAP").  GAAP are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.  However, in order to artificially inflate the price of TETRA's stock, Defendants knowingly and/or recklessly used improper accounting practices and made misleading and inadequate disclosures, all in violation of GAAP and SEC reporting requirements, to falsely inflate its reported earnings and to underreport its expenses during the Class Period.  In doing so, Defendants violated the following GAAP provisions.

143.    As set forth in Financial Accounting Standards Board ("FASB") Statements of

Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting

is to provide accurate and reliable information concerning an entity's financial performance

during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial
> performance during a period.  Investors and creditors often use information about
> the past to help in assessing the prospects of an enterprise.  Thus, although
> investment and credit decisions reflect investors' and creditors' expectations
> about future enterprise performance, those expectations are commonly based at
> least partly on evaluations of part enterprise performance.

144.    SEC Rule 4-01(a) of SEC Regulation S-X provides that: "Financial statements

filed with [SEC] which are not prepared in accordance with [GAAP] will be presumed to be

misleading or inaccurate."   17 C.F.R. Sec. 210.4-01(a)(1).   Management is responsible for

preparing financial statements that conform with GAAP.  As noted by the AICPA professional

standards:

> [F]inancial statements are management's responsibility….[M]anagement is
> responsible for adopting sound accounting policies and for establishing and
> maintaining internal control that will, among other things, record, process,
> summarize, and report transactions (as well as events and conditions) consistent
> with management's assertions embodied in the financial statements.  The entity's
> transactions and the related assets, liabilities and equity are within the direct
> knowledge and control of management….Thus, the fair presentation of financial
> statements in conformity with Generally Accepted Accounting Principles is an
> implicit and integral part of management's responsibility.

145.    Additionally, the SEC requires that companies make certain basic disclosures

about their finances.  In discussing results of operations, Item 303 of Regulation S-K requires the

registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant

reasonably expects will have a material favorable or unfavorable impact on net sales or revenues

or income from continuing operations."   Instructions to Paragraph 303(a) further state, "The

discussion and analysis shall focus specifically on material events and uncertainties known to

management that would cause reported financial information not to be necessarily indicative of future operating results…."

146.    In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K: "A disclosure duty exists where a trend, demand, commitment, event or uncertainty is **both presently known** to management **and is reasonably likely to have a material effect** on the registrant's financial condition or results of operations."

147.    GAAP also provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if: (i) information available…indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.  SFAS No. 5, ¶ 8.  SFAS No. 5 also requires that financial statements disclose contingencies when it is at least reasonably possible (i.e. greater than a slight chance) that a loss may have been incurred.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or a range of loss, or state that such an estimate cannot be made.  Up until 3Q07, until its third and fourth quarter 2007 financial reports, TETRA neither increased its recorded expenses for unrecoverable hurricane-related work nor did it recognize the huge "impairment" losses related to non-performing properties that would have to be abandoned and decommissioned.

148.    In addition, FASB Statement of Concepts No. 5 ("CON5") states that "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated…."  Again this requirement was violated for the above-described matters.

149.     FASB No. 48 provides the criteria for recognizing revenue when a right of return exists.   This standard required TETRA to reduce Fluid's sales for the credits it provided customers under its buy-back program.

150.     Defendants also caused TETRA's reported financial results to violate, among other things, the following provisions of GAAP for which each Defendant is necessarily responsible:

(a)      The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (FASB Statement of Concepts No. 1, ¶ 34);

(b)      The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASB Statement of Concepts No. 2, ¶ 132);

(c)      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

(d)      The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information

about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (FASB Statement of Concepts No. 1, ¶ 42);

(e)      The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting.  (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(f)      The principle of completeness, which means that no information is omitted that may be necessary to ensure that the Financial Statements validly represent underlying events and conditions, was violated (FASB Statement of Concepts No. 2, ¶ 79); and

(g)      The principle that conservatism be used as a prudent reaction to uncertainty in order to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

151.    Defendants also violated industry-specific requirements of GAAP.   These included:

(i)      FASB No. 143 - which required TETRA to recognize expense for its asset retirement obligations, at "fair value" over the useful life of the oil and gas properties.

(ii)     FASB No. 69 - which required TETRA to truthfully disclose:

(a) Proved oil and gas reserve quantities;

(b) Capitalized costs relating to oil and gas producing activities;

(c) Costs incurred in oil and gas property acquisition, exploration, and development activities;

(d) Results of operations for oil and gas producing activities; and

(e) A standardized measure of discounted future net cash flows relating to proved oil and gas reserve quantities.

(iii)   FASB No. 19 - which includes the accounting and disclosure requirements for the "successful efforts" method of accounting.

**ADDITIONAL ALLEGATIONS OF SCIENTER**

152.   Defendants acted with scienter (with knowledge and/or reckless disregard for the truth) in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  In addition to signing or approving the earnings releases and financial reports filed with the SEC, Hertel personally made the false oral statements described herein to analysts and investors about the Company's earnings for the Fluids, Maritech, and WA&D Services business segments, and either knew the true facts about the subjects they were discussing or were reckless in speaking without confirming the facts.

153.   In particular, Defendants knowledge of the illegal and improper accounting scheme can be strongly inferred from the fact that the Individual Defendants, in their ordinary and regular performance of their job responsibilities, had access to and actually used enormous amounts of highly detailed financial information that clearly revealed the fraudulent accounting scheme -- as the witnesses described in this complaint described.

154.    A strong inference of knowledge may also be inferred as a result of the enormous

and suspiciously timed insider sales by the key participants in the scheme.  These included:

| GEOFFREY HERTEL | 5/9/2007 | 55,459 | $26.40 | $1,464,382 |
|---|---|---|---|---|
| | 5/9/2007 | 22,684 | $26.38 | $598,404 |
| | 5/9/2007 | 19,400 | $26.42 | $512,548 |
| | 5/9/2007 | 18,703 | $26.45 | $494,694 |
| | 5/9/2007 | 17,206 | $26.37 | $453,722 |
| | 5/9/2007 | 16,900 | $26.41 | $446,329 |
| | 5/9/2007 | 13,869 | $26.35 | $365.448 |
| | 5/9/2007 | 9,700 | $26.44 | $256,468 |
| | 5/9/2007 | 8,864 | $26.39 | $233,921 |
| | 5/9/2007 | 5,477 | $26.36 | $144,374 |
| | 5/9/2007 | 4,700 | $26.49 | $124,503 |
| | 5/9/2007 | 4,400 | $26.46 | $116,424 |
| | 5/9/2007 | 4,323 | $26.47 | $114,430 |
| | 5/9/2007 | 4,305 | $26.43 | $113,781 |
| | 5/9/2007 | 4,300 | $26.55 | $114,165 |
| | 5/9/2007 | 4,296 | $26.51 | $113,887 |
| | 5/9/2007 | 3,600 | $26.50 | $95,400 |
| | 5/9/2007 | 2,100 | $26.48 | $55,608 |
| | 5/9/2007 | 1,000 | $26.52 | $26,520 |
| | 5/9/2007 | 1,000 | $26.53 | $26,530 |
| | 5/9/2007 | 204 | $26.54 | $5,414 |
| | 5/10/2007 | 18,400 | $26.40 | $485,760 |
| | 5/10/2007 | 12,400 | $26.35 | $326,740 |
| | 5/10/2007 | 11,700 | $26.32 | $307,944 |
| | 5/10/2007 | 7,000 | $26.42 | $184,940 |
| | 5/10/2007 | 6,800 | $26.34 | $179,112 |
| | 5/10/2007 | 5,500 | $26.33 | $144,815 |
| | 5/10/2007 | 5,100 | $26.41 | $134,691 |
| | 5/10/2007 | 2,385 | $26.37 | $62,892 |
| | 5/10/2007 | 2,200 | $26.36 | $67,992 |
| | 5/10/2007 | 1,306 | $26.38 | $34,452 |
| | 5/10/2007 | 1,200 | $26.43 | $31,716 |
| | 5/10/2007 | 1,200 | $26.45 | $31,740 |
| | 5/10/2007 | 309 | $26.39 | $8,155 |
| | 5/11/2007 | 19,210 | $26.48 | $508,681 |
| | 5/11/2007 | 12,900 | $26.45 | $341,205 |
| | 5/11/2007 | 12,000 | $26.30 | $315,600 |
| | 5/11/2007 | 10,500 | $26.43 | $277,515 |
| | 5/11/2007 | 10,300 | $26.46 | $272,538 |
| | 5/11/2007 | 10,100 | $26.54 | $268,054 |
| | 5/11/2007 | 9,800 | $26.65 | $261,170 |
| | 5/11/2007 | 9,703 | $26.53 | $257,421 |
| | 5/11/2007 | 9,600 | $26.40 | $253,440 |

| | 5/11/2007 | 8,700 | $26.47 | $230,289 |
|---|---|---|---|---|
| | 5/11/2007 | 7,900 | $26.68 | $210,772 |
| | 5/11/2007 | 5,797 | $26.52 | $153,736 |
| | 5/11/2007 | 5,395 | $26.41 | $142,482 |
| | 5/11/2007 | 4,700 | $26.66 | $125,302 |
| | 5/11/2007 | 4,500 | $26.70 | $120,150 |
| | 5/11/2007 | 4,000 | $26.67 | $106,680 |
| | 5/11/2007 | 3,900 | $26.49 | $103,311 |
| | 5/11/2007 | 3,700 | $26.51 | $98,087 |
| | 5/11/2007 | 3,500 | $26.81 | $93,835 |
| | 5/11/2007 | 3,200 | $26.90 | $86,080 |
| | 5/11/2007 | 2,990 | $26.50 | $79,235 |
| | 5/11/2007 | 2,600 | $26.85 | $69,810 |
| | 5/11/2007 | 2,500 | $26.39 | $65,975 |
| | 5/11/2007 | 2,500 | $26.86 | $67,150 |
| | 5/11/2007 | 2,300 | $26.44 | $60,812 |
| | 5/11/2007 | 2,000 | $26.84 | $53,680 |
| | 5/11/2007 | 1,500 | $26.55 | $39,825 |
| | 5/11/2007 | 1,500 | $26.80 | $40,200 |
| | 5/11/2007 | 1,400 | $26.69 | $37,366 |
| | 5/11/2007 | 1,200 | $26.83 | $32,196 |
| | 5/11/2007 | 800 | $26.73 | $21,384 |
| | 5/11/2007 | 700 | $26.56 | $18,592 |
| | 5/11/2007 | 205 | $26.42 | $5,416 |
| | 5/11/2007 | 200 | $26.71 | $5,342 |
| | 5/11/2007 | 100 | $26.72 | $2,672 |
| | 5/11/2007 | 100 | $26.82 | $2,682 |
| | | 480,000 | | $12,696,586 |
| | | | | |
| GEORGE MCCARROLL | 5/30/2007 | 6,900 | $27,09 | $186,921 |
| | 5/30/2007 | 500 | $27.10 | $13,550 |
| | 5/30/2007 | 100 | $27.11 | $2,711 |
| | 9/19/2007 | 6,900 | $21.51 | $148,419 |
| | 9/19/2007 | 1,700 | $21.54 | $36,618 |
| | 9/19/2007 | 900 | $21.52 | $19,368 |
| | 9/19/2007 | 500 | $21.53 | $10,765 |
| | | 17,500 | | $418,352 |
| | | | | |
| RAYMOND SYMENS | 3/7/2007 | 80,200 | $23.00 | $1,844.600 |
| | 3/7/2007 | 8,100 | $23.01 | $140,361 |
| | 3/7/2007 | 1,800 | $23.02 | $41.436 |
| | 3/7/2007 | 1,300 | $23.03 | $29,939 |
| | 3/7/2007 | 600 | $22.99 | $13,794 |
| | 5/11/2007 | 56,500 | $26.85 | $1,517,025 |
| | 5/11/2007 | 54,983 | $26.84 | $1,475,744 |
| | 5/11/2007 | 43,700 | $26.90 | $1,175,530 |
| | 5/11/2007 | 20,900 | $26.89 | $562,001 |

| | 5/11/2007 | 13,000 | $26.88 | $349,440 |
|---|---|---|---|---|
| | 5/11/2007 | 10,000 | $26.88 | $268,600 |
| | 5/11/2007 | 6,200 | $26.83 | $166,346 |
| | 5/11/2007 | 4,800 | $26.87 | $128,976 |
| | 5/11/2007 | 2,800 | $26.80 | $75,040 |
| | 5/11/2007 | 2,300 | $26.84 | $61,732 |
| | 5/11/2007 | 2,100 | $26.93 | $56,553 |
| | 5/11/2007 | 2,000 | $26.92 | $53,840 |
| | 5/11/2007 | 1,300 | $26.91 | $34,983 |
| | 5/11/2007 | 700 | $26.95 | $18,865 |
| | 5/11/2007 | 700 | $26.96 | $18,872 |
| | 5/11/2007 | 600 | $26.81 | $16,086 |
| | 5/11/2007 | 200 | $26.97 | $5,394 |
| | 5/11/2007 | 100 | $26.82 | $2,682 |
| | 5/11/2007 | 100 | $26.94 | $2,694 |
| | 5/23/2007 | 12,200 | $28.09 | $342,698 |
| | 5/23/2007 | 9,200 | $27.90 | $256,680 |
| | 5/23/2007 | 9,024 | $28.08 | $253,394 |
| | 5/23/2007 | 8,200 | $28.00 | $229,600 |
| | 5/23/2007 | 6,100 | $28.15 | $171,715 |
| | 5/23/2007 | 5,400 | $28.05 | $151,470 |
| | 5/23/2007 | 4,500 | $27.94 | $125,730 |
| | 5/23/2007 | 4,200 | $28.10 | $118,020 |
| | 5/23/2007 | 3,000 | $28.14 | $84,420 |
| | 5/23/2007 | 2,900 | $29.07 | $84,303 |
| | 5/23/2007 | 2,700 | $28.13 | $75,951 |
| | 5/23/2007 | 2,300 | $28.05 | $64,538 |
| | 5/23/2007 | 2,200 | $28.01 | $61.622 |
| | 5/23/2007 | 1,500 | $28.02 | $42,030 |
| | 5/23/2007 | 1,300 | $27.91 | $36,283 |
| | 5/23/2007 | 1,200 | $28.12 | $33,744 |
| | 5/23/2007 | 1,100 | $28.03 | $30,833 |
| | 5/23/2007 | 700 | $28.11 | $19,677 |
| | 5/23/2007 | 400 | $28.04 | $11,216 |
| | 5/24/2007 | 18,200 | $27.18 | $494,676 |
| | 5/24/2007 | 1,200 | $27.19 | $32,628 |
| | 5/24/2007 | 900 | $27.20 | $24,480 |
| | 5/24/2007 | 300 | $27.21 | $8,163 |
| | 5/24/2007 | 800 | $27.22 | $21,776 |
| | 5/24/2007 | 100 | $27.23 | $2,723 |
| | 5/24/2007 | 1,100 | $27.24 | $29,964 |
| | 5/24/2007 | 100 | $27.30 | $2,730 |
| | 5/24/2007 | 100 | $27.31 | $2,731 |
| | 5/24/2007 | 100 | $27.34 | $2,734 |
| | 5/24/2007 | 2,300 | $27.35 | $62,905 |
| | 5/24/2007 | 900 | $27.36 | $24,624 |
| | 5/24/2007 | 600 | $27.37 | $16,422 |

| | 5/24/2007 | 500 | $27.39 | $13,695 |
|---|---|---|---|---|
| | 5/24/2007 | 8,400 | $27.40 | $230,160 |
| | 5/24/2007 | 3,400 | $27.41 | $93,194 |
| | 5/24/2007 | 2,400 | $27.42 | $65,808 |
| | 5/24/2007 | 900 | $27.43 | $24,687 |
| | 5/24/2007 | 200 | $27.44 | $5,488 |
| | 5/24/2007 | 100 | $27.45 | $2,745 |
| | 5/24/2007 | 400 | $27.48 | $10,992 |
| | 5/24/2007 | 200 | $27.50 | $5,500 |
| | 5/24/2007 | 100 | $27.52 | $2,752 |
| | 5/24/2007 | 1,200 | $27.53 | $33,036 |
| | 5/24/2007 | 600 | $27.54 | $16,524 |
| | 5/24/2007 | 200 | $27.55 | $5,510 |
| | 5/24/2007 | 300 | $27.57 | $8,271 |
| | 5/24/2007 | 100 | $27.57 | $8,271 |
| | 5/24/2007 | 200 | $27.60 | $5,520 |
| | | 437,007 | | $11,507,653 |

155.     Scienter may also be inferred from the fact that Hertel made statements in press releases and during analyst conference calls that show that he knew how the company accounted for its revenues and earnings.  Defendants' knowledge of and/or reckless disregard for the Company's improper and premature revenue recognition scheme can also be strongly inferred from the highly specific statements regarding how the Company accounted for revenues and earnings that Defendant Hertel made in press releases and during analysts conference calls.

156.     Finally, in response to an analyst's question about cleaning out the "noise" in the financial statements to obtain better financial performance in 2008, Hertel also made statements in the third quarter 2007 earnings call that demonstrated that he well knew how to manage earnings and which suggest that that is exactly what he had been doing during the Class Period.

Analyst:

Okay.  It also seems like with all the kind of financial write-down stuff going on this quarter and maybe you're trying to bring insurance to a head before the end of the year, you're trying to get rid of all the, let's call it noise going into what you think will be a lot better year in 2008.  Am I reading that accurately?

Hertel:

Well, obviously there are things from an accounting perspective that we can't manipulate just in the quarters that we want to. They come as they come. However, I think a lot of the issues that you've seen this year and that could hurt us on a go-forward basis would be involved with the insurance situation and there we do have some control over that from the perspective of when we address or bright line some of these issues and we are going to bright line them this quarter and bring them to a head.

At least that's our intent. And consequently, yes, we ought to be able to eliminate those at least to a great degree from future issues, meaning future beyond 2007. Some of these other factors really are kind of self-correcting and those would relate to the items that you looked at in the third quarter.

There were some issues related to our diver that needed to be resolved. There were issues related to AROs that we addressed in the quarter. So, to the degree that we can get things cleaned up, I believe was the term somebody used the other day, we will do that. But do recognize that it's not like the old days.

You can't just set up reserves against something you have an issue with. You've got to make sure that there are actual things that happen in the quarters to force this. And obviously, the insurance is the biggest one and we can force that issue. That's the long answer to your question.

## LOSS CAUSATION/ECONOMIC LOSS

157. Throughout the Class Period, Defendants' false and misleading statements caused TETRA's stock to trade at artificially inflated prices.

158. As the truth became revealed beginning on August 3, 2007 and continuing through October 16, 2007, the price of TETRA shares plunged more than 33%, as the fraud-induced inflation was removed from TETRA's stock price.

159. The timing and magnitude of TETRA stock price decline negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

160.     On the days in which TETRA stock price fell as a result of aspects of Defendants' fraud being revealed, the Standard & Poor's 500 securities index was flat.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate TETRA stock price and the subsequent significant decline in the value of TETRA stock when Defendants' prior misstatements and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD-ON-THE-MARKET DOCTRINE

161.     At all relevant times, the market for TETRA securities was an efficient market for the following reasons, among others:

(a)     TETRA's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, TETRA filed periodic public reports with the SEC; and

(c)     TETRA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

162.     As a result of the foregoing, the market for TETRA's securities promptly digested current information regarding TETRA from all publicly available sources and reflected such information in TETRA's stock price.  Under these circumstances, all persons who purchased or acquired TETRA's securities during the Class Period suffered similar injury through their purchase of the aforementioned securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

163.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.

164.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of TETRA who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

165.    Lead Plaintiff brings this action on behalf of all persons or entities who purchased the publicly traded common stock of TETRA from November 3, 2006 through October 16, 2007, inclusive, exclusive of Defendants, all officers and/or directors of TETRA or its affiliates, members of Defendants' families, and any entity in which any Defendant has a controlling interest.

166.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  TETRA has millions of shares of stock outstanding, owned by hundreds if not thousands of persons.

167.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Exchange Act was violated by Defendants;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    Whether the prices of TETRA's publicly traded securities were artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

168.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

169.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

170.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

**Violation of Section 10(b) of
the Exchange Act Against and Rule 10b-5
Promulgated Thereunder Against All Defendants**

171.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

172.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

173.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

174.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TETRA common stock.  Plaintiff and the Class would not have purchased TETRA common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

175.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of TETRA common stock during the Class Period.

## COUNT II

**Violation of Section 20(a) of
the Exchange Act Against the Individual Defendants**

176.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

177.    The Individual Defendants acted as controlling persons of TETRA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of TETRA, and their ownership of TETRA stock, the Individual Defendants had the power and authority to cause TETRA to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 26, 2008                                        Respectfully submitted,


                                                             **Theodore C. Anderson III**
                                                             **KILGORE & KILGORE**
                                                             3109 Carlisle

Dallas, TX 75204
Tel: (214) 969-9099
Fax: (214) 953-0133

**Proposed Liaison Counsel**

**/s/** _____
**David R. Scott**
**Amanda Lawrence (pro hac vice)**
**SCOTT + SCOTT LLP**
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
Tel:  (860) 537-5537
Fax: (860) 537-4432
drscott@scott-scott.com
alawrence@scott-scott.com

**Attorneys for Fulton County Employees'**
**Retirement System and Proposed Lead**
**Counsel**