UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| | § | |
| | § | |
| IN RE: TETRA TECHNOLOGIES, INC. | § | CIVIL ACTION NO. 4:08-cv-0965 |
| SECURITIES LITIGATION | § | |
| | § | |
| | § | |
| | § | |

## MEMORANDUM & ORDER

Pending before the Court are Defendants' Motion to Dismiss (Doc. No. 44) and Defendants' Motion for Sanctions. (Doc. No. 61.)  Having considered the Motions, all responses and replies thereto, and the arguments of counsel at a recent motion hearing, the Court has determined that Defendants' Motion to Dismiss must be granted in part and denied in part, and Defendants' Motion for Sanctions must be denied.

## I. INTRODUCTION

This is a Securities Exchange Act class action on behalf of purchasers of TETRA Technologies, Inc. ("TETRA") common stock between November 3, 2006 and October 16, 2007 (the "Class Period"). TETRA is an oil and gas services company with three divisions: fluids; wells abandonment and decommissioning ("WA&D"); and production enhancement. The Fluids Division manufactures and markets clear brine fluids ("CBF") that are used in well drilling, completion and workover operations[1]. The WA&D Division has two operating segments: WA&D Services, which performs well abandonment and decommissioning work, and Maritech Resources, Inc. ("Maritech"), which purchases

---

[1] Operations that clean, repair, and maintain a production well to increase or restore production.

mature oil and gas wells.  The properties purchased by Maritech provide business for WA&D Services. The Production Enhancement Division is not part of this litigation.

Plaintiffs are investment funds that suffered when the price of TETRA stock fell at the end of 2007.[2] Individual Defendants[3] allegedly dumped millions of dollars of stock at inflated prices during the Class Period: Geoffrey M. Hertel received $12 million from stock proceeds in May 2007; George McCarroll received over $400,000 in stock proceeds during the Class Period; and Raymond Symens received over $11 million in stock proceeds during the Class Period.

In May 2007, TETRA announced the "highest first quarter earnings in company history" and forecast even greater earnings in later quarters. In August 2007, Tetra announced lower than expected earnings for the Fluids Division, WA&D Services, and Maritech. TETRA's CEO Hertel held a conference call in which he explained that Maritech took a write-off related to receivables from disputed insurance proceeds, the Fluids Division recorded lower than expected earnings from onshore operations and high inventory costs, and Maritech experienced a production shortfall because two offshore platforms did not produce as early as was anticipated. TETRA's stock price dropped 25 percent. On October 16, 2007, TETRA withdrew its previously issued 2007 earnings guidance, and announced more possible insurance-related write-downs, and that Maritech would record impairments for non-productive oil and gas properties purchased in 2005. Its stock dropped 8 percent.

---

[2] Fulton County was appointed lead Plaintiff in late June 2008 because it has the largest financial interest in the relief sought. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (Private Securities Litigation Reform Act, "PSLRA").
[3] The individual Defendants are: Geoffrey M. Hertel who was the President and CEO during the class period and had formerly been its Executive Vice-President Finance and Administration and COO; George M. McCarroll who was the President of Maritech, a subsidiary of TETRA,and Raymond D. Symens who was a senior VP of TETRA who oversaw the Fluids Division.

Plaintiffs' claim that Defendants committed fraud because they:

> (1) misrepresented the expected cash flow from a package of properties purchased in 2005 ("2005 properties") by understating Maritech's decommissioning liabilities, improperly allocating acquisition costs for these properties to fields without proved reserves, and failing to either "write off" the properties under the "successful efforts" method of accounting  or increase their "depreciation and depletion" expenses at the proper time;
> (2) misrepresented the profitability of Maritech's oil and gas properties by wrongly stating that oil and gas reserves of the 2005 properties had increased when TETRA was about to write the properties off;
> (3) improperly reduced the cost of goods sold and inflated revenues from the Fluids' Division "buyback" program by failing to report customer credits for returned CBFs as sales returns and allowances;
> (4) misrepresented the financial performance TETRA's Fluids Division by overstating forecasted sales for onshore operations when demand was flat; and
> (5) misrepresented the likelihood of collection of millions of dollars of insurance reimbursements for hurricane-related repairs performed by WA&D when some of the claims had already been disallowed and Defendants had already incurred costs for weather downtime that exceed those allowed under the applicable insurance policies. Defendants also failed to recognize expense for weather downtime and other reimbursable costs spent working on Maritech properties.

Because of these challenged patterns of alleged conduct, Plaintiffs contend that TETRA and individual Defendants made misleading and false statements about TETRA's expected performance and artificially inflated stock prices during the class period, thereby violating § 10(b) of the Exchange Act of 1934 and Rule 10b-5. They aver that the individual Defendants violated § 20(a) of the Exchange Act as controlling persons. Plaintiffs detail several TETRA filings that contain allegedly false and misleading statements related to the above challenged patterns of alleged conduct. Plaintiffs pray for damages, costs, and fees. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. MOTION TO DISMISS STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (May 18, 2009) (quoting *Twombly*, 550 U.S. at 570). Although the Court generally considers a motion to dismiss for failure to state a claim based on the face of the complaint, the Court may also take notice of matters of public record when considering a 12(b)(6) motion.  *See Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995); *Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir. 1994). Defendants have provided many SEC filings, and the Court may rely on them for what they say, although not for their truth, in deciding the Motion to Dismiss in addition to the complaint and documents incorporated therein. *Tellabs Inc. v. Makor Issues & Rights, Ltd.* (Tellabs I), 551 U.S. 308, 127 S.Ct. 2499, 2509 (2007).

Rule 9(b) states that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). A plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were

fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)).

## III. SECURITIES VIOLATIONS

### A. Pleading Standard

To state a claim under § 10(b) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u-4(b)(1), a plaintiff must allege, in connection with the purchase or sale of securities (1) a material misstatement or omission (2) made with scienter (3) on which plaintiff relied, (4) economic loss and, (5) "loss causation" (a causal connection between the material misrepresentation and the loss). *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238-39 (5th Cir. 2009); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (quoting *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 348 (5th Cir. 2002) (internal quotations omitted)).

The PSLRA requires plaintiffs to specify each allegedly misleading statement and the reason why it is misleading; it incorporates, at a minimum, the FED. R. CIV. P. 9(b) fraud-pleading standard. *ABC Arbitrage v. Tchuruk*, 291 F.3d at 348. "[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The Fifth Circuit has defined the PSLRA standard as requiring the plaintiffs to:

(1) specify each statement alleged to have been misleading, *i.e.,* contended to be fraudulent;

(2) identify the speaker;
(3) state when and where the statement was made;
(4) plead with particularity the contents of the false representations;
(5) plead with particularity what the person making the misrepresentation obtained thereby; and
(6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent.
(7) [for statements made on information and belief] state with particularity all facts on which that belief is formed, *i.e.,* set forth a  factual basis for such belief.

*Tchuruk*, 291 F.3d at 350, 363 n.4 (citing 15 U.S.C. § 78u-4(b)(2)); *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362-63 (5th Cir. 2004); *In re Alamosa Holdings, Inc.*, 382 F.Supp.2d 832, 842 (N.D. Tex. 2005).

The Fifth Circuit has rejected the group pleading doctrine, or the presumption that statements in group-published documents are attributable to those individuals with direct involvement with the everyday business of the company.[4] *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 531 n. 1 (5th Cir. 2008) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d at 363-65 (5th Cir. 2004)). *See also*, *In re Alamosa Holdings, Inc.*, 382 F.Supp.2d at 857 (dismissing allegations made against "defendants" because the allegations do not meet the pleading requirements for allegations of fraud). This rejection requires plaintiffs, in pleading both material misstatements and scienter, to distinguish among defendants and allege the role of each with respect to "each act or omission" in the alleged fraud. *Southland Sec. Corp.*, 365 F.3d at 365. Therefore, corporate statements can be tied to corporate officers if plaintiffs allege that these officers signed the documents in which the statements were made or plaintiffs adequately allege the officers' involvement in creating the documents.

---

[4] The Court notes that the group pleading doctrine is still accepted outside the Fifth Circuit. For example, in the Southern District of New York, one corporate document may be considered the product of a group effort and considered the responsibility of top management for 10b-5 purposes. *See, e.g.*, *In re Pfizer Inc. Securities Litigation*, 584 F.Supp.2d 621, 638 (S.D.N.Y. 2008).

*Blackwell*, 440 F.3d at 287 (citing *Southland Sec. Corp.*, 365 F.3d at 364-65). A silent defendant who knows that another's statement is false may be liable as long as the complaint identifies which defendant made the statement and which remained inappropriately silent. *Blackwell*, 440 F.3d at 288. The Circuit, however, attributes to the defendant corporation all the statements in SEC filings, reports, and releases issued in its name by individual defendants pursuant to their positions of authority within the company. *Southland Securities Corp.*, 365 F.3d at 365-66.

As to documentary evidence, the plaintiffs must "specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *Tchuruk* 291 F.3d at 356 (5th Cir. 2002) (citing *In re Scholastic Corp. Litig.*, 252 F.3d 63, 72 (2d Cir.), *cert denied sub nom*, *Scholastic Corp. v. Truncellito*, 534 U.S. 1071 (2001)). The existence of unspecified confidential corporate reports that reveal corporate information contrary to reported accounts will not defeat a motion to dismiss. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002); *Tchuruk* 291 F.3d at 355-56. That is, named reports delivered on particular dates are specific enough to support securities act claims, but unidentified "regular reports" delivered to the defendants without any detail about how frequently they were prepared or by whom, are not. *Tchuruk* 291 F.3d at 359.

### B. Materiality

Materiality is the "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *Tchuruk*, 291 F.3d at 359. The disclosure is not measured by the "literal truth"

but by the ability of the statements to accurately inform rather than mislead prospective buyers. *Lormand*, 565 F.3d at 248. "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Id.* (collecting cases). Materiality is traditionally a question of fact, but if the alleged omissions are "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality, the court may rule them immaterial as a matter of law." *See Eizenga v. Stewart Enterprises, Inc.*, 124 F.Supp.2d 967, 975 (E.D. La. 2000) (quoting *Klein v. General Nutrition Companies, Inc.*, 186 F.3d 338, 342 (3d Cir. 1999)).

The Court addresses most of the parties specific arguments in its analysis of Plaintiffs' allegations below. It pauses however on the parties' differing contentions as to the recently issued opinion in the *Skilling* case since their arguments concern the law to be applied. Likewise, when the parties' arguments relate globally to the ACC, the Court will note them in its recitation of the law to frame the analysis below.

Defendants contend that Plaintiffs have failed to plead materiality because they cite numbers and percentages without examining the total mix of information including TETRA's cautionary disclosures. Defendants contend that, in the context of TETRA's full disclosures, the allegedly omitted information would not have significantly altered the mix of information available. Plaintiffs cite the recent decision on materiality in the *Skilling* case as analogous to the facts at hand. There, Skilling held conference calls in which he claimed, *inter alia*, that all of Enron's businesses were "uniquely strong franchises with sustainable high earnings power" when there was evidence of contrary, verifiable historical facts that some of the businesses were facing a potentially enormous

loss, one business had an unsupportable cost structure and was losing money, and one company was based on unstable, speculative trading. *U.S. v. Skilling*, 554 F.3d 529, 553-54 (5th Cir. 2009). The Fifth Circuit upheld the jury's determination that those statements were material and not, as the defendant alleged, immaterial puffery. The Court explained that conclusory statements of belief may be so contrary to verifiable historical facts that they falsely misstate the speaker's true reasons and mislead the investors about the stated subject matter. *Skilling*, 554 F.3d at 553. Defendants contend that, unlike the government in *Skilling*, Plaintiffs made no allegations that any individual Defendant knew facts contrary to TETRA's public disclosures at the time they were made. Applying this standard below, the Court will conclude that, for one of the challenged patterns of alleged conduct, Plaintiffs allege that Defendants made several specific material misrepresentations or omissions in press releases, conference calls, interviews, and filings with the SEC that were purportedly contrary to verifiable historical facts.

### C. Scienter

Defendants contend that none of the confidential witnesses ("CW") provide facts that give rise to a strong inference of scienter. In addition, because Plaintiffs cite no false statement made by McCarroll or Symens, Defendants argue that, because the Fifth Circuit has rejected group pleading, Plaintiffs have failed to plead a securities violation as to Symens or McCarroll as a matter of law. Plaintiffs respond that they have demonstrated conscious misbehavior in at least four ways: (1) information provided by the confidential witnesses, (2) suspiciously timed insider stock sales, (3) statements of Defendants, and (4) the nature and extent of the GAAP violations. The Court will examine the pleading standard and the inferences that may be permissibly drawn from

9

each of these possible sources of scienter, but will reserve the specific arguments as to particular confidential witnesses, post-class statements, presumed knowledge, stock sales and alleged GAAP or SOX violations to the analysis section of the Order.

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In *Tellabs I*, the Supreme Court outlined the proper approach to evaluate scienter. First, the plaintiff's allegations must, as in federal pleadings generally, be taken as true. Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice. Third, a plaintiff must plead scienter such that it raises a "strong inference" (i.e., a powerful or cogent inference) of "fraudulent intent" and is sufficiently pled "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs I*, 127 S.Ct. 2510;[5] *Lormand*, 565 F.3d at 239. In its analysis, the court must take into account "plausible opposing inferences." *Tellabs I*, 127 S.Ct. at 2502. This strong inference, however, need not be "of the smoking-gun genre or even the most plausible of competing inferences." *Tellabs I*, 127 S.Ct. at 2510.  That is, for the scienter element only, the court must alter the 12(b)(6) rule that all reasonable inferences should be drawn in the plaintiff's favor and take into account plausible inferences opposing as well as supporting

---

[5] The Fifth Circuit has taken a holistic view of the 9(b) standard. The complaint in *Shushany v. Allwaste, Inc.* was dismissed for failure to satisfy FED. R. CIV. P. 9(b)—pre-PSLRA but the reasoning was quoted with approval by the Fifth Circuit last year. The *Shushany* court held that the plaintiffs failed to state a claim for fraud based on accounting irregularities because "the complaint did not identify who in particular was instructing the employees to make the arbitrary accounting adjustments, what particular adjustments were made, how those adjustments were improper in terms of reasonable accounting practices, how those adjustments were incorporated into [the defendant's] financial statements, and if incorporated, whether those adjustments were material in light of Allwaste's overall financial position. Although we need not identify which of these deficiencies, standing alone, might render the complaint insufficient under Rule 9(b), we hold that altogether, they do." *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.* 537 F.3d 527, 540 (5th Cir. 2008) (quoting *Shushany v. Allwaste*, 992 F.2d 517, 522 (5th Cir.1993)).

a strong inference of scienter. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (citing *Tellabs I*, 127 S.Ct. at 2510).

The facts must be evaluated collectively to determine whether a strong inference of scienter has been pled. *Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 533 (citing *Tellabs I*, at 2509-10). Each allegation of a misrepresentation or fraud must individually meet the particularity requirements of the PSLRA. *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) (citing generally *Greenberg v. Crossroads Sys.*, 364 F.3d 657 (5th Cir. 2004)). However, when considering scienter, the complaint must be considered *in toto* to discern whether its allegations create a strong inference. *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d at 552, 555 (citing *Barrie*, 397 F.3d at 260). For purposes of corporate defendants, if the plaintiff alleges only that the named individual defendants acted with scienter in issuing any of the complained of statement and no other director, officer, or employee did so, the court can simply address the allegations of the individual defendants because liability of the defendant corporation arises derivatively from the individual defendants' state of mind. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d at 367.

In the Fifth Circuit, scienter can be established with intent or severe recklessness and may be based on circumstantial evidence. *Fin. Acquisition Partners LP*, 440 F.3d at 287; *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003); *Nathenson v. Zonangen, Inc.*, 267 F.3d 400, 412 (5th Cir. 2001). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, or that present a danger of misleading buyers or sellers which is either known to the

defendant or is so obvious that the defendant must have been aware." *Nathenson*, 267 F.3d at 408. *See also Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (describing reckless indifference as an omission or misrepresentation that is "so obvious that the defendant must have been aware of it").

Motive and opportunity may support a finding of severe recklessness, but the plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible. *Nathenson*, 267 F.3d at 412 ("[M]otive and opportunity does not of itself automatically and categorically mean that the necessary strong inference of scienter is present.") The allegations that directors and officers possess motive and opportunity to keep a high stock price for their benefit or that a corporation benefits from the high price are universal goals for public companies, and cannot be used to create a strong inference of scienter. *Nathenson*, 267 F.3d at 420 (citing *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994)). Likewise, the desire to keep one's job does not satisfy the scienter requirement. *Blackwell*, 440 F.3d at 290 (citing *Melder*, at 1102).

### 1. Use of Confidential Witnesses

Defendants argue that Plaintiffs' reliance on confidential witness ("CW") statements in their Complaint is improper because Plaintiffs have not described the witnesses with sufficient particularity to support the probability that a witness in that person's position at the Company would possess the information alleged. Without their statements, Defendants aver that Plaintiffs fail to allege any other facts to support their claims or to call into question TETRA's disclosures. Defendants contend that, in general, courts must discount allegations from confidential sources. In their Reply, Defendants

specifically claim that CWs 1-3 and 6-8 do not possess personal knowledge of the facts they assert. They do not specifically address CWs 4 and 5—those related to the reporting of expected insurance payments—but contend that those statements do not establish materiality. Plaintiffs respond that the CWs are in positions to have personal knowledge of the allegations attributed to them and highlight the details provided for each CW.

Confidential sources may be used, but they must be described with "sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief." *Tchuruk*, 291 F.3d at 353.[6] *See also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005) (citing *Tchuruk*). Post-*Tellabs I*, the Fifth Circuit has explained that allegations of confidential sources must be discounted, and, at the very least, must comply with the requirement stated above—that they are identified with sufficient particularity to support the probability that the person would possess the information pleaded. *Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 535 (5th Cir. 2008) (discussing

---

[6] Confidential sources may be used, but, prior to *Tellabs I*, the Fifth Circuit adopted a Second Circuit test to determine whether they are appropriately described:

> (1) if plaintiffs rely on confidential personal sources *and* other facts, their sources need not be named in the complaint so long as the other facts, *i.e.,* documentary evidence, provide an adequate basis for believing that the defendants' statements or omissions were false or misleading;
>
> (2) if the other facts, *i.e.,* documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false, the complaint need not name the personal sources so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief;
>
> (3) if the other facts, i.e., documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false and the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name the personal sources.

*Tchuruk*, 291 F.3d at 353.

*Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753 (7th Cir. 2007) (holding that, pursuant to the PSLRA, allegations from confidential sources must be discounted, but not necessarily ignored, post-*Tellabs I*)). Recently, the Seventh Circuit distinguished *Higginbotham* and credited the testimony of confidential witnesses when:

> The confidential sources listed … consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify… The information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources… the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.* (Tellabs II), 513 F.3d 702, 712 (7th Cir. 2008) (noting that named sources would be preferable).

### 2. Presumed Knowledge

In addition, pleadings of scienter may not rely on allegations that the defendants must have known of the misstatements based on their position within the company, even if they have a "hands on" management style. *Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 535, 539-40. Likewise, allegations that the perpetrator of the fraud reported to one of the defendants are insufficient to establish scienter.[7] *Kushner v. Beverly Enters., Inc.,* 317 F.3d 820, 828 (8th Cir. 2003) (holding that an allegation that someone involved in a fraudulent scheme reported to one of the named defendants was "not specific enough to support a strong inference that [the defendant] knew of or participated in the fraudulent practice while it was occurring"); *Indiana Elec. Workers',*

---

[7] The Fifth Circuit dismissed a complaint against Bernard Ebbers of WorldCom because "the complaint here present[ed] what could best be described as allegations of mismanagement of WorldCom's accounts receivable situation, perhaps even gross mismanagement, by several individuals in charge of handling the accounts rather than severe recklessness by Ebbers and Sullivan individually…." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003).

537 F.3d at 542 (citing *Kushner*); *cf. Nathenson*, 267 F.3d at 424-25 (holding that an officer's position may create an inference of scienter when the company is a small, one product company and patent protection of the product is the source of the misstatements).

### 3. Timing of Stock Sales

Plaintiffs contend that the individual Defendants sold millions of dollars of stock within several days for the May 7, 2007 announcement of TETRA's 2007Q1 performance. (Am. Consolidated Compl. "ACC" ¶ 154.) Defendants argue that Plaintiffs ignore all of the stock sales other than those in May 2007 to create an artificial inference of scienter. Stock sales may suggest scienter, depending on their timing and amount. When a defendant makes regular stock sales or does not sell stock immediately following an alleged material misstatement, the court will not infer scienter. *Indiana Elec. Workers'*, 537 F.3d at 543-44. Only trading at suspicious times or in suspicious amounts is probative of scienter. *Abrams v. Baker Hughes, Inc.*, 292 F.3d at 434 (citing *In re Silicon Graphics Inc. Securities Litigation*, 193 F.3d 970, 987 (9th Cir. 1999)). In this context, "suspicious" means "sales that are out of line with prior trading practices or at times calculated to maximize personal profit." *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d 546, 552 (5th Cir. 2007) (quoting *Abrams v. Baker Hughes, Inc.*, 292 F.3d at 435). If the defendants sell only a small percentage of their stock during the class period, the sales do not contribute to an inference of scienter. *Cent. Laborers Pension Fund*, 497 F.3d at 553 (selling 4 percent of one's stock insufficient combined with continued ownership of a large amount of stock).

### 4. Post-class Statements

Defendants contend that Plaintiffs' post-class statements may only give rise to an inference of scienter if they are directly and cogently related, quoting *Lormand*, 565 F.3d at 254. Plaintiffs insist that several post-class statements imply that management knew of the problems with the production from reserves in the 2005 packages "from the start." *Rosenzweig v. Azurix Corp.*, 332 F.3d at 867, 868 n. 8. *Azurix* distinguished hindsight assessments from allegations that the management knew, at the time of the relevant occurrence, that the problems were already manifest. *Azurix*, 332 F.3d at 867-68 (holding that the post-class statements were insufficiently particular to satisfy the 9(b) and PSLRA pleading requirements).

### 5. GAAP and Sarbanes-Oxley violations

Defendants contend that Hertel was not on notice of any glaring irregularities or red flags such that his SOX verifications would support a strong inference of scienter. Allegations that the defendants failed to follow GAAP or published inaccurate accounting figures, without more, are not adequate to satisfy the scienter prong—such allegations must be coupled with allegations that lead to a strong inference of fraudulent intent to mislead investors. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d at 534, 534 n. 3 (collecting cases); *Fin. Acquisition Partners LP*, 440 F.3d at 290 (citing *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990)). On the other hand, securities fraud may be proved, even where improper accounting is alleged as the basis for misrepresentation, without showing violations of GAAP. *S.E.C. v. Seghers*, 298 Fed.Appx. 319, 331 (5th Cir. 2008) (not designated for publication). Similarly, Sarbanes-Oxley ("SOX") certifications do not, without allegations that the officer knew of glaring accounting violations or other red flags, establish scienter.

*Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 545 (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006) with approval). The Fifth Circuit accepted as a "plausible" interpretation of the PSLRA that a defendants' SOX certification may raise an inference of scienter "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Cent. Laborers Pension Fund*, 497 F.3d at 555.

### D. Loss causation

Defendants contend that, because there were no corrective disclosures that contradict the Company's disclosures or describe the challenged patterns of alleged conduct that Plaintiffs allege, Plaintiffs have not adequately pled loss causation. Plaintiffs respond that the Fifth Circuit does not require a confession of fraudulent misconduct to satisfy the requirement of relatedness between the false statements and the disclosures causing the stock decline. Because the purported disclosures that establish loss causation relate to all the challenged patterns of alleged conduct at once, the Court will address Plaintiffs' allegations of loss causation here rather than in the context of the challenged patterns of alleged conduct below.

The Exchange Act requires plaintiffs to plead loss causation, or a causal connection between the material misrepresentation and the loss. *Dura Pharm., Inc. v. Brodo*, 544 U.S. 336, 342 (2005); *Catogas v. Cyberonics, Inc.*, 292 Fed. Appx. 311, 314 (5th Cir. Sept. 8, 2008) (not designated for publication). The plaintiffs must allege that the market responded negatively to a corrective disclosure; confirmatory information, information already known to the market, may not constitute a corrective disclosure.

*Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004). That is, the plaintiffs must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal a "facially plausible causal relationship between the alleged fraudulent statements or omissions and plaintiff's economic loss, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss." *Lormand*, 565 F.3d at 258 (citing *Dura* and *Twombly*) (holding that statements related to churn and involuntary disconnection problems with its sub-prime credit classes were plausibly related to the alleged misstatements regarding the benefits of programs promoting sales to sub-prime credit classes). The Fifth Circuit does not prevent a plaintiff from alleging loss causation based on the partial or indirect disclosures of the truth, or disclosures by persons other than the defendants. *Lormand*, 565 F.3d at 261-63 (relying on disclosures by corporations involved in the same business, disclosures by the parent corporation, reports of expert stock analysts, and the defendant's discussion of the failures of the business program about which the defendant made material misrepresentations). Moreover, the disclosure need not reveal that previous information was fraudulent, only that it was wrong. *Alaska Electrical Pension Fund v. Flowserve Corp.*, __ F.3d __, 2009 WL 1740648, at *7-*8 (5th Cir. June 19, 2009) (distinguishing the requirements for alleging loss causation from the requirements for alleging scienter).

Specifically, as to the Fluids Division's buyback program, Defendants contend that the corrective disclosure that purportedly "corrected and removed the inflation from TETRA's stock price" actually revealed that the high Fluids Division inventory was due to the Company's decision to accelerate the purchase obligations under a high-price

contract with a bromine supplier. Likewise, as to the 2007 forecasts for the Fluids' Division, Defendants contend that none of the disclosures purportedly reveals any foreseeable losses known at the time the forecasts were issued. As to Maritech's accounting for oil and gas properties, the alleged disclosures simply state that the Company recorded impairments in accordance with the successful accounting method. As to the hurricane-related claims, Defendants argue that Plaintiffs identify no statement related to Plaintiffs' allegation that TETRA delayed writing off the insurance receivables.

Plaintiffs respond that the August and October 2007 press releases were related to the challenged pattern of alleged conduct to inflate TETRA's stock price by falsely portraying the Company's prospects in these business areas even though the reasons given for the problems in fall 2007 were not necessarily truthful or complete. On August 3, 2007, TETRA announced a decrease in per share earnings for 2007Q2 and reduced the 2007 earnings guidance to $1.30-1.50/share (from $1.80-2.15 per share), but Hertel attributed the decrease to "transitory" reasons. TETRA stock fell 25 percent. (ACC ¶ 129.) Plaintiffs contend that this release revealed a portion of the truth by disclosing flat onshore customer demand, insurance write-offs, and reduced production from the 2005 properties.

Specifically, in these releases, Hertel explained that the Fluids Division was impacted by higher inventory costs because of an existing purchase contract that the company was terminating and that earnings from the onshore fluids service business had not made up the difference because of exceptional rainfall in the Texas and southern Oklahoma markets. (ACC ¶ 127.) Also in the August 3, 2007 press release, Hertel explained that delays in production from two offshore platforms meant that Maritech's

production did not reach previously budgeted volumes. (ACC ¶ 127.) In an earnings conference call later that day, Hertel repeated some of these statements and explained that Maritech had taken a write-off for insurance proceeds related to the 2005 hurricanes because the amount was in dispute with the insurance carrier. (ACC ¶ 128.) On August 9, 2007, Defendants filed TETRA's 2007Q2 Form 10-Q that included the purported "admission" regarding the insurance claims that "the underwriters repeated their position that certain wells did not qualify as covered costs." (ACC ¶ 131.)

Later, on October 16, 2007, when TETRA withdrew its 2007 earnings guidance, Hertel purportedly admitted accounting manipulations related to the insurance reimbursements when he explained "we also have a number of issues related to prior events. An example of this is where historical costs are currently represented as insurance receivables. Almost all of these types of issues have involved charges that impacted reported earnings, but which did not affect cash flow, in the then current period." (ACC ¶ 133.) Hertel also explained that, as of October 2007, TETRA had $27.8 million in unreimbursed insurance receivables. (ACC ¶¶ 134-35.) TETRA also revealed that it would record impairments "in accordance with the successful efforts accounting method," a statement that Plaintiffs contend reveals what should have happened many quarters previously: all capitalized costs for non-producing properties would have to be expensed. (ACC ¶ 136.)

Unlike scienter, the standard for loss causation is notice pleading guided by FED. R. CIV. P. 8. *Lormand*, 565 F.3d at 266-67 (rejecting the defendants' arguments that they had a more plausible alternative inference as to the proximate cause of the plaintiffs' economic loss). Consequently, Plaintiffs allege a facially plausible causal relationship

between the purported misrepresentations as to the insurance reimbursements and their losses. Prior statements indicated that Defendants believed that most of the insurance receivables would be collected, including Misrepresentations 16-21, discussed below. Plaintiffs connect their losses to TETRA's announcement of the large write off associated with allegedly previously known but undisclosed difficulties with the insurance companies. By consistently omitting the information that the insurance receivables had already been disallowed and then revealing that the company had to write-off millions of dollars of receivables related to those insurance payments, Plaintiffs have plausibly suggested that a significant portion of the stock decline in the fall of 2007 may have been caused by a revelation of part of the truth about the collectibility of the insurance receivables. The Court need not reach the question of loss causation as to the other challenged patterns of alleged conduct because it finds that Plaintiffs have not adequately alleged facts giving rise to a strong inference of scienter.

### E. Forward Looking Statements

Defendants note that forward-looking statements accompanied by cautionary language are not actionable because they are protected by the PSLRA "safe harbor" and the "bespeaks caution" doctrine. Defendants contend that the cases upon which Plaintiffs rely to render forward-looking statements actionable are distinguishable because those cases involve particular, detailed facts available to management that demonstrate that forecasts disclosed to investors were based on false information. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003); *Griffin v. GK Intelligent Sys., Inc.*, 87 F.Supp.2d 684 (S.D. Tex. 1999); *Rubenstein v. Collins*, 20 F.3d 160 (5th Cir. 1994). *Rubinstein* involved predictions about

data about a new gas well when the defendants knew that test results should have given management reason to know that the test results were inaccurate. 20 F.3d 160 (5th Cir. 1994). *America West* and *Griffin* purportedly involve statements of current fact rather than forward-looking statements. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003) (holding that statements about the present effect of a past violation are not forward looking); *Griffin v. GK Intelligent Sys., Inc.*, 87 F.Supp.2d 684, 686 (S.D. Tex. 1999) (holding that statements about an announced agreement that, in fact, did not exist, were not forward looking). In addition, Defendants contend that the cautionary language accompanying TETRA's disclosures was meaningful and substantive. Plaintiff contends that none of the assertions was wholly forward looking. In the alternative, Plaintiffs contend that Defendants knew that the predictions were false, lacked a reasonable basis and were belied by other facts, and the cautionary language was either boilerplate or failed to provide warning of applicable risks.

No person shall be liable under the securities laws for forward looking statements. 15 U.S.C. § 78u-5(c)(1)-(2). In general, under the safe harbor clause, a "forward-looking" oral or written statement is not actionable if (1) the statement is "identified as … forward-looking … and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially …."; (2) it is "immaterial"; or (3) "the plaintiff fails to [plead] that the forward-looking statement … was made with actual knowledge … that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A)-(B). *Lormand*, 565 F.3d at 243. Well-pleaded factual allegations that defendants knew their statements were false are sufficient to bar application of the

safe harbor clause. *Lormand*, 565 F.3d at 244; *Tellabs II*, 513 F.3d at 705  (noting that "indifference to the danger that a statement is false" is insufficient, citing, inter alia, 15 U.S.C. § 78u-5(c)(1)(B)(ii)).

> A "forward looking statement" is:
>
> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission….

15 U.S.C. § 78u-5(i)(1); *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F.Supp.2d 151, 162 (N.D. Tex. 2007).

"'Meaningful cautionary language' cannot be boilerplate and must include substantive, company-specific warnings based on realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland Sec. Corp.*, 365 F.3d at 372. *See, e.g. Lormand*, 565 F.3d at 244 (holding that the following is boilerplate: statements in its documents are "not guarantees of future performance ... and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them.").[8] Meaningful cautionary language identifies "important

---

[8] The Court notes that the language identified by Defendants as "Standard 2006 Cautionary Language" is similar to this rejected language in *Lormand*. TETRA's language is: "This press release includes certain statements that are deemed to be forward-looking statements. These statements are based on certain assumptions and analyses made by the Company in light of its experience and its perception of historical trends, current conditions, expected future developments and other factors it believes are appropriate in the circumstances. Such statements are subject to a number of risks and uncertainties, many of which are beyond the control of the Company. Investors are cautioned that any such statements are not guarantees of future performances and that actual results or developments may differ materially from those projected in the forward-looking statements. Some of the factors that could affect actual results are described in the

factors that could cause actual results to differ materially from the forward-looking statements." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) (quoting 15 U.S.C. § 78u-5(c)(1)). If "reasonable minds could disagree as to whether the mix of information in the allegedly actionable document is misleading, the statutory safe harbor provision cannot provide the basis for dismissal as a matter of law." *Lormand*, 565 F.3d at 248 (internal citations omitted).

Oral statements are not actionable if they are accompanied by an "oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available [identified] written document or portion thereof." 15 U.S.C. § 78u-5(c)(2). Reasoning by analogy, federal district courts in Texas have held that incorporated language from SEC filings may protect forward-looking statements in other written statements. *See, e.g.*, *Home Solutions of Am. Investor Group v. Fradella*, No. 3:06-cv-1096-N, 2008 WL 1744588, at *6 (N.D. Tex. Mar. 24, 2008); *In re Blockbuster Securities Litigation*, No. 3:03-cv-0398-M, 2004 WL 884308, at *4 (N.D. Tex. Apr. 26, 2004). The "bespeaks caution" doctrine, similar to the PSLRA safe harbor provision, survived enactment of the PSLRA and protects optimistic projections accompanied by cautionary language. *In re Securities Litigation BMC Software, Inc.*, 183 F.Supp.2d 860 (S.D. Tex. 2001) (holding that the doctrine can protect alleged misstatements even when the cautionary language is not contained in the same document as the alleged misstatement when the cautionary language is sufficiently related in time and substance to the purported misstatements). *See*

---

section titled 'Certain Business Risks' contained in the Company's … Form 10-K for … 2005, as well as other risks identified from time to time in its reports on Form 10-Q and Form 8-K…" (Doc. No. 45, Ex. 8, at Ex. 99.1, p. 4.) As this language explicitly incorporates risk factors identified in other SEC filings, the Court considers below whether these factors may provide meaningful cautionary language.

*also Kurtzman v. Compaq Computer Corp.*, No. Civ. A H-99-779 et al., 2002 WL 32442832, at *23 (S.D. Tex. Mar 30, 2002) (citing *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122 (10th Cir. 1997) for the proposition that cautionary language that does not appear in the same document as the forward-looking statement is less effective).

### IV. Application to TETRA's Challenged Patterns of Alleged Conduct

In the following alleged misstatements[9] Plaintiffs specifically identify the speaker, when and where the statement was made, and why the statements are allegedly misstatements. The facts that purportedly render these statements are false, provided by the confidential witnesses and by post-class statements made by the individual Defendants, are discussed below. Each set of statements is provided followed by Plaintiffs' explanation as to why they are material misstatements.

1.  On November 3, 2006, Defendants issued a press release that included statements about WA&D's 2006Q4 revenues and profits and discussed the timing of insurance reimbursements as a possible source of profit, though they noted that $2.2 million in pre-tax earnings were eliminated until they were reviewed by the underwriter. (ACC ¶ 90.)

2. The same press release discussed Maritech's pretax earnings and explained that earnings increases of 803 percent over 2005Q3 levels reflected production increases from acquired properties. TETRA predicted that the same factors that raised earnings over 2006 would bode well for production in 2007. (*Id.*)

3. The same press release describes the 152 percent increase over 2005Q3 pretax earnings from the Fluids Division as a result of the absence of hurricane downtime, price increases, and the rapid increase in domestic and international onshore markets. In this release, Defendants predict that inventory profits should decline throughout 2006 and 2007, but overall, they predict earnings growth in 2007 and note that the domestic onshore business continues to grow rapidly. (*Id.*)

Plaintiffs allege these statements were materially misleading because the reports about record earnings are not the result of legitimate business operations, but instead were the direct result of Defendants' challenged pattern of alleged conduct to manage

---

[9] Because this is a Motion to Dismiss, the following are referred to throughout the Order as "misstatements" followed by the numbers assigned below.

earnings in the Fluids and WA&D Divisions (including Maritech) by manipulating

TETRA's successful efforts accounting method, failing to recognize expense for weather

delays, and inflating Fluids Division revenues and writing up inventory pursuant to

TETRA's buyback program. Furthermore, the statement about the onshore business was

purportedly misleading because demand for onshore customers was flat. In addition,

Plaintiffs contend that Defendants' statements about the timing on insurance

reimbursements was false because Defendants already knew that the claims had been

returned as "not allowed." (ACC ¶¶ 91-94.)

4. On January 3, 2007, Defendants issued a press release announcing earnings guidelines for 2007 in which Hertel explained that some WA&D profits were deferred until an insurance payment expected in 2007 and that TETRA incurred substantial costs "'waiting on weather' on turn-key platform decommissioning contracts (this work was essentially completed in December)." (ACC ¶ 95.)

5. Also in that press release, Hertel explained that the existing and potential market for WA&D Services in the Gulf of Mexico is larger than previously experienced and WA&D has acquired new equipment and secured a number of contracts. Defendants aver that the dramatically improved profitability guidance for WA&D reflects these among other factors. (ACC ¶ 95.)

6. The January 3, 2007 press release also discusses Maritech's anticipated growth from bringing storm damaged production back onstream and an expected $52 million of well abandonment and decommissioning work in 2007. The company predicted that significant exploitation capital expenditures for 2007 would materially impact 2008 and beyond but not substantially affect 2007 production. (ACC ¶ 95.)

7. The same press release repeated expectations that the Fluids Division and associated markets would improve in 2007 from investments in expanding domestic and international markets and that this growth bodes well for longer-term Fluids Division profits. (ACC ¶ 95.)

Plaintiffs contend that these statements were false and misleading for many of the

same reasons discussed above: TETRA knew that its insurer had disallowed the claims so

that deferred "profits" for WA&D would not be collectible. In addition, the statements

about WA&D were misleading because the majority of the 2005 properties had already

been exploited and would soon be abandoned. These statements were also misleading because the hurricane repair work would lead to losses rather than profits because of the lack of reimbursement from the insurance companies. As to Maritech, the statements were allegedly misleading because Maritech's properties had already been exploited and Defendants manipulated the successful efforts accounting method. Finally, the Fluids' Divisions earnings were misleading because 80 percent of Fluids Division profits were attributable to the wrongful accounting of the buy-back program including the inflation of revenues and the write-up of inventory and because the onshore market was flat. (ACC ¶¶ 96-99.)

8. On January 3, 2007, Hertel and another TETRA officer held a conference call and again stated that they could not record insurance proceeds until they have been paid and that anticipated 2007 Maritech volumetric production gains were expected from expenditures made in 2006 and 2005. (ACC ¶ 100.)

These statements are allegedly misleading for the reasons described above.

9. On February 28, 2007, Defendants announced record 2006 earnings of $1.37 per share and announced a 31-57 percent increase over its 2006 earnings guidance for 2007. (ACC ¶¶ 101.)

10. Discussing the earnings report and 2007 guidance, Hertel explained that "the ability to generate incremental reserves out of older, mature properties is the primary reason that we are projecting improving profits for Maritech in 2007…." (ACC ¶ 102.)

Plaintiffs aver that these statements were false and misleading because Defendants knew that Maritech had already exploited the most attractive 2005 properties and Defendants were facing a complete write-off of these properties. In addition, Plaintiffs contend that these statements are misleading because of the manipulation of the successful efforts accounting method through which Defendants avoided recognizing costs associated with decommissioning the wells and avoided recognizing current expense. (ACC ¶ 103.)

11. Also on February 28, 2007, Hertel and McCarroll held an earnings conference with analysts in which Hertel explained that TETRA had completed some Maritech work for which it could not reflect profits because the insurer had not yet paid. In addition, Hertel explained that Maritech had an excellent 2006, increased its proven reserves after producing 16 Bcf equivalents, and the new reserves should allow an increase in total profits in 2007. (ACC ¶ 104.)

Plaintiffs argue that these statements are misleading because Defendants later admitted that Maritech had exploited the most attractive properties first and the "proven" reserves had been depleted already. Plaintiff reiterates that Maritech's 2007 profitability was misleading because of manipulation of the "successful efforts" accounting methods. (ACC ¶ 105.)

13. On February 29, 2007[10], TETRA filed its 2006 Form 10-K that included TETRA's balance sheet and explained the accounting rules that applied to the 10-K, including that TETRA periodically evaluates its estimates including the collectibility of accounts receivable and the current cost of future abandonment and decommission obligations and basis its estimates on reasonable historical experience and future expectation. (ACC ¶¶ 106-107.)

14. The 2006 Form 10-K also describes the method by which Maritech accounts for its oil and gas properties: Maritech accounts for its interests using the successful efforts methods where costs, including those for unsuccessful development wells "are capitalized and costs related to unsuccessful exploratory wells are expensed as incurred." In addition, capitalized costs are recorded by field and depleted on a unit-of-production basis, based on the estimated remaining proved oil and gas reserves of each field. The properties "are assessed for impairments in value whenever indicators become evident and any impairment is charged to expense." The Form described decommissioning liabilities as estimates based on third-party market values to plug and abandon the wells and to generally decommission the pipelines and platforms and clear the sites. (ACC ¶ 108.)

15. The 2006 Form 10-K specifies that TETRA reviews its decommissioning liabilities "whenever indicators suggest that either the amount or the timing of the estimated cash flows underlying the liability have changed materially." The 10-K also describes procedures for revenue recognition for turnkey contracts, valuing reserves for bad debts from oil and gas exploration and production companies, and accounting for acquisitions of the TETRA businesses. (ACC ¶ 108.)

---

[10] The Complaint uses the date February 29, 2008, but the Court assumes this date is actually 2007 as it reports on 2006 year-end numbers. The 2006 Form 10-K listed its filing date as March 1, 2007. (Doc. No. 52, Ex. 1.)

Plaintiffs contend that figures associated with the 10-K were misstated in violation of GAAP and the description of the accounting rules included false and misleading statements and omissions with respect to TETRA's actual accounting practices. (ACC ¶ 108.) These challenged patterns of alleged conduct are fleshed out below in ACC ¶ 119, summarized below.

16. The 2006 Form 10-K described accounting for insurance reimbursements and reported both $5.2 million of repair costs that the Company did not believe will be reimbursed, as well as a $9.2 million gain associated with insurance proceeds in excess of the net carrying value of the destroyed assets. TETRA notes "The Company believes that substantially all of the repair and well intervention and debris removal costs associated with the hurricane damage, other than the applicable deductibles and the amount charged to earnings discussed above, will be covered under the company's various insurance policies." (ACC ¶ 109.)

17. The 2006 Form 10-K also explains that, in the last half of 2006, the insurance claims adjuster did not have enough information to conclude that the well intervention costs for qualifying wells would qualify as covered costs, but "the Company believes that well intervention costs being questioned by the underwriters will qualify for reimbursement under its insurance policies and are probable of collection."  In addition, the Company indicated its belief that debris removal costs, in excess of the policy limit for removal of debris with the three destroyed platforms, is available under an August 2005 endorsement although TETRA acknowledged that the underwriters questioned whether this endorsement provides additional coverage. (ACC ¶ 110.)

18. In the footnotes to the 2006 Form 10-K, the Company states its belief that "the significant majority of hurricane repair costs, including the well intervention and debris removal costs associated with the three destroyed Maritech platforms, is covered pursuant to the Company's various insurance policies." The Company reported that $57.9 million of hurricane related costs had already been reimbursed during 2006 and $12.5 million in the early parts of 2007. (ACC ¶ 111.)

19. These footnotes explain that the net book value of destroyed assets covered by the Company's insurance policies are included in accounts receivable and that these amounts were $12.8 million as of December 31, 2005 and $64.5 million as of the end of 2006, including non-storm related insurance claims. The company stated its belief that it will be reimbursed related to repair costs for the destroyed assets. (ACC ¶ 111.)

20. The Company also anticipated $27.9 million included in accounts receivable related to well intervention costs related to three destroyed Maritech offshore platforms. The Company stated its belief that all of the well intervention costs were probable of collection. (ACC ¶ 111.)

21. Likewise, the Company reiterated its belief that debris removal and other costs qualify for reimbursement under an endorsement obtained in August 2005 even though it noted that the underwriters questioned whether there is additional coverage provided under this endorsement for the cost of removal of the platforms. (ACC ¶ 111.)

Plaintiffs contend that these statements are misleading with respect to hurricane

repair expenses and insurance reimbursements. (ACC ¶ 111.)

22. The 2006 Form 10-K explained that the cash outflow to extinguish Maritech's total decommissioning liability would occur shortly after the end of each property's productive life. It also explained that the timing of the cash outflows is estimated based on future oil and gas production and the resulting depletion of the company's oil and gas reserves. (ACC ¶ 112.)

Plaintiffs aver that this statement is misleading because it suggests that there will

be cash outflow from the 2005 properties for several years. (ACC ¶ 112.)

23. The 2006 Form 10-K explained that determination of impairments on long-lived assets is based on the future estimated cash flows from the Company's proved, probable and possible reserves. (ACC ¶ 113.)

Plaintiffs allege that this statement was misleading with respect to the facts

underlying Maritech's oil and gas impairments.

24. The 2006 Form 10-K explained that Fluids' revenues are recognized "only when collectibility is reasonably assured." (ACC ¶ 114.)

Plaintiffs argue that this statement is misleading with respect to revenue

recognition for the Fluids' Division.

25. The 2006 Form 10-K contained statements about costs of product sales and costs of services that includes operating expenses. The Form 10-K also explains that depreciation, depletion, amortization and accretion include depreciation expense for all of the Company's facilities. (ACC ¶ 115.)

Plaintiffs contend that these statements are false and misleading as they apply to

Fluids, WA&D expenses incurred on Maritech's properties and Maritech's expense

recognition.

26. The 2006 Form 10-K describes TETRA's process for accounting for asset retirement obligations and explains that these asset retirement obligations are the estimated fair value for retiring these assets and are capitalized as part of the asset accounting. The costs are then depreciated on a unit of production basis for oil and gas properties. It then reports that TETRA acquired $6.9 million in liabilities and incurred $2.8 million in retirement of obligations during 2006. (ACC ¶ 116.)

Plaintiffs contend that this is a misleading account of asset retirement obligations as applied to Maritech properties.

27. The 2006 Form 10-K describes costs incurred in oil and gas property acquisition including $115 million in capitalized costs for proved properties acquired in 2005, and $187 million of proved developed properties being amortized in 2005. TETRA explains that the capitalized costs of properties include the properties' proportionate share of liabilities relating to these properties. It also describes the depreciation, depreciation, and amortization for 2006 as $38 million and the impairments of properties as zero for 2006. The 10-K provides the definition for "proved" oil and gas reserves. The 10-K also describes the standardized measure of discounted future net cash flows including $752 million for discounted future net cash flows relating to proved oil and gas reserves for 2006, including $244 million for production and $196 million for development and abandonment. (ACC ¶ 117.)

28. The Form 10-K includes the standard Sarbanes-Oxley certification, signed by Hertel.

Plaintiffs aver that the 2006 Form 10-K balance sheet is false and/or misleading because of the challenged patterns of alleged conduct described previously. For example, some of the WA&D expenses are improperly treated as insurance receivables, Fluids Division inventories are misstated because sales returns are recorded as inventory rather than sales credits to customers. They contend that, as the flip side of the improperly recorded Fluids inventories, the Fluids Division's income statement included inflated product sales because Fluids failed to report customer credits as sales returns and allowances and COGS were understated for Fluids inventory write-ups. Fluids revenues were recognized even though the Company agreed to provide credit for the buy-back program so revenues were recognized even though collection was not "reasonably assured."

In addition, as to WA&D, the cost of services was understated because WA&D failed to report expenses for weather downtime. In addition, Plaintiffs contend that the amounts for Maritech DD&A were understated because of abuses of the successful efforts method and the false assumption that the cash flows from the 2005 properties would continue for several years. They also contend that the insurance reimbursement statements were misleading because facts relating to the 2006 disallowances were not discussed.

Plaintiffs reiterate that TETRA had not adjusted the reported balances for Maritech's 2005 property "impairments" even though they knew the properties were unproductive or largely depleted, decommissioning liabilities were not adjusted up, and Defendants had not expensed the costs of unsuccessful wells as represented in the Critical Accounting Policies and Estimates. Plaintiffs also contend that acquisition cost allocations for the 2005 purchases were made to fields without proven reserves. Impairments were not assessed on the basis of true reserves because the 2005 properties did not have a productive life of more than 3 years. The Maritech properties did not consider the assets' "useful life" because the assets were already exhausted; they were not depreciated in a straight-line basis.

29. On May 7, 2007, TETRA issued a press release and represented that WA&D Services profits were up 712 percent over profits in 2006Q1. It also explained that production volumes for Maritech were lower than forecasted in the 2007 guidance but that Maritech is attempting to accelerate exploitation activities planned for later in the year to offset  a near-term production shortfall. (ACC ¶ 120.)

30. In an earnings conference that day, Hertel explained that TETRA was experiencing unprecedented growth because it was: constructing a new fluids plant to reduce COGS for completion fluids, terminating a supply agreement for some products, experiencing heartening WA&D performance. TETRA noted that a production shortfall for Maritech could be remedied by moving forward several projects. (ACC ¶ 121.)

31. Hertel explained that WA&D revenues should increase and Maritech production was only 3 or 4 months out of sync with the levels that were indicated previously. (ACC ¶ 122.)

Plaintiffs contend that these statements are misleading because Maritech's oil and gas properties were exhausted so there was a permanent volumetric shortfall, WA&D expenses were increasing because TETRA's insurer was not going to reimburse costs on Maritech properties and Fluids' high inventories were falsely stated and the buy-back program concealed. (ACC ¶ 123.)

32. On May 10, 2007, Defendants filed TETRA's 2007Q1 Form 10-Q and reiterated several statements of previous forms including communications from the insurance adjusters, reiterated false and misleading accounting figures, and repeated the false and misleading statement that TETRA continued to expect cash flow from the 2005 properties over several years. (ACC ¶¶ 124-25.)

Plaintiffs contend that these statements are false for the reasons described above.

**A. Successful Efforts Accounting for Oil and Gas Properties**

In 2005, just prior to Hurricanes Katrina and Rita's landfall, Maritech purchased three "packages" of economically unproductive oil and gas wells in the Gulf of Mexico, for $23.1 million cash up-front with decommissioning liabilities (the cost to dismantle the oil or gas wells when they were depleted or abandoned, known as asset retirement obligations or "AROs") of $94.6 million ("2005 properties").[11] (ACC ¶¶ 2, 33-34.) Defendants purportedly recorded the packages on their books using the "successful efforts" accounting method, which requires the immediate expensing of the cost of non-

---

[11] As this is a Motion to Dismiss, Plaintiffs' alleged facts are taken as true. To the extent that the following are consistent with Plaintiffs' explanation of TETRA's accounting conduct, the Court provides Defendants' explanation of the some of the accounting terms used throughout the Order: Defendants explain that when a well is purchased, the abandonment and decommissioning obligations are recorded as asset retirement obligations ("AROs"). Over time, these AROs are reduced as cash is spent on abandonment work and have no effect on profit or income. In addition, the portion of acquisition costs assigned to the producing fields is amortized over time and is expensed as "depreciation, depletion or amortization" ("DDA"). Low producing fields are allocated little or none of the purchase price of the field. Impairment costs are recorded against income when the Company determines that production at a particular field is no longer possible or profitable. (Def. Reply, at 5-6.)

productive or uneconomic wells.[12] (ACC ¶ 36.) Plaintiffs allege that acquisition costs and the associated abandonment and decommissioning liabilities were allocated to unproductive wells. (*Id.*) In this manner, instead of properly accounting for the wells using the "successful efforts" accounting method, Defendants allegedly delayed the recognition of depreciation, depletion, and amortization ("DDA") expenses as they worked the wells in 2006. Instead, Defendants allegedly wrote these expenses off as impairments near the end of 2007. Plaintiffs claim that Defendants misrepresented the profitability  of the WA&D Division that include Maritech. TETRA reported an "impairment" charge of $70 million for the abandonment of properties purchased in 2005 and Maritech reported a $71 million total loss in 2007. (ACC ¶ 3.)

Defendants contend that Plaintiffs misstate GAAP and TETRA's accounting methods to allege their supposed misstatements. Defendants note that TETRA accounts for its properties by field, so that the decision to write off a field is made based on the field as a whole. Consequently, even if many of the wells in the field are unproductive, the field need not yet be written off. In addition, Defendants contend that Plaintiffs misconstrue purchase price allocation under GAAP. They aver that the acquisition cost of a package of fields is allocated based on the fields' realizable reserves or production so that fields with minimal cash flow are allocated little or none of the purchase price. In this manner, Plaintiffs' contention that Defendants failed to immediately expense costs associated with low performing fields is allegedly wrong. Likewise, Defendants explain that AROs are recorded when fields are acquired and when they are reduced, they do not result in a charge against income or impact profit (unless the actual ARO costs exceed the

---

[12] Defendants contend that TETRA's accounting policy was actually to account for its properties by field rather than by well so that the decision to write off a given field is based on the whole field rather than individual wells. (Def. Reply at 4.) (citing Doc. No. 445, Ex. 29, at 26-27.)

recorded liability). Moreover, they contend that SFAS No. 143 requires AROs to be recorded at present value so that the AROs carried on the books will often understate the expected future cost.

Defendants also contend that certain of the purported misstatements related to the successful efforts accounting challenged pattern of alleged conduct are protected by the PSLRA safe harbor. For example, as related to Misstatement 2, in its 2005 10-K, TETRA explains that estimating reserves is complex, and the estimates of oil and gas reserves may be significantly incorrect. Moreover, Maritech may continue to experience significant revisions to its reserve estimates because reserve estimates are:

> to some degree subjective, each of the following items may prove to differ materially from that assumed in estimating reserves: the quantities of oil and gas that are ultimately recovered; the production and operating costs incurred; the amount and timing of future development and abandonment expenditures; and future oil and gas sales prices. Furthermore, different reserve engineers may make different estimates of reserves and cash flow based on the same available data.

(Doc. No. 45, Ex. 3, at 16.) Plaintiffs contend that the statement that Maritech's earnings increased 803 percent, a statement of past fact, is false and therefore cannot be protected by the safe harbor. As to the part of Misstatement 2 in which TETRA avers that 2007 production would do similarly well in the future, Defendants' purported meaningful cautionary language does not warn that revenues and earnings may be significantly revised because the company was improperly allocating acquisition costs to non-producing fields or intentionally understating AROs in order to manage the reporting of expenses (see also Misstatement 5). While the language notes that reserve engineers' estimates may reasonably differ as to reserves, taking all inferences in favor of Plaintiffs, if, as Plaintiffs allege, Defendants knew that the fields would have to be written off well

before they were, the PSLRA safe harbor provides no protection. Misstatements 14, 15, and 26 are related to how TETRA performs its accounting rather than predictions of future results. Likewise, Misstatements 5 and 13 are not protected to the extent that Plaintiffs have adequately alleged that Defendants knew that recorded AROs were too low and depreciation expenses were written off too slowly. The Fifth Circuit has clarified that, in cases where defendants knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable. *Lormand*, 565 F.3d at 244 (citing 15 U.S.C. § 78u-5(c)(1)(A)-(B)); *Tchuruk*, 291 F.3d at 359.

Even though the analysis of scienter requires courts to find a strong inference of scienter, this weighing is not appropriate when addressing whether Plaintiffs have alleged misstatements. Assuming that the successful efforts accounting method does require the cost of non-productive wells to be immediately expensed and that, as Plaintiffs allege, costs were allocated to unproductive wells and fields without reserves and then expensed en masse in 2007 in an action called an "impairment," Defendants may have materially misstated the revenues, profits and assets of WA&D in several of its disclosures by failing to expense these non-productive wells and by under-booking the AROs for these fields not in accordance with SFAS 143. (ACC ¶ 119.) The $70 million impairment, purportedly related to the misstatements regarding the accounting of non-productive wells and underbooking AROs, is plausibly material because an investor would have considered that this omission altered the basic mix of information—the impairment equaled Maritech's revenues for the previous year. Plaintiffs allege the connection between the $70 million restatement and the allegedly improper accounting practices.

Assuming that Plaintiffs have pled a material misstatement, and leaving aside some problems with Plaintiffs' failure to plead the fraudulent scheme with particularity that are addressed below, the Court now turns to the scienter prong. As to whether Plaintiffs have adequately alleged scienter as opposed to only negligent or innocent misrepresentations, Plaintiffs provide the statements of the CWs, post-class statements, the individual Defendants' stock sales, and purported GAAP and SOX violations.

CW 5 is described as an accounting manager from April 2006 until June 2007 who reported to Maritech's CFO. (ACC ¶ 71.) CW 5's allegations relate to the challenged patterns of alleged conduct at WA&D including the write-offs of the 2005 properties, the purported successful accounting method flaws, and the insurance reimbursements. Based on the job description provided, it is probable that CW 5 had personal knowledge of the concern expressed by staff at the CFO's weekly meetings regarding the asset retirement obligations for abandoned and decommissioned wells. CW 5 contends that he knew that ARO costs exceeded the liability on the books, but the alleged fact that Maritech's CFO knew that the ARO costs were "large" does not suggest that he knew that they were recklessly or intentionally underbooked or how they were underbooked. Although one could infer that the CFO heard these concerns about AROs, CW 5 does not contend that the CFO shared these concerns. The CFO allegedly participated in meetings with two other high level TETRA officials, but it is not clear that, if he shared the concerns with the AROs, he repeated them to these TETRA officials. CW 5 also does not allege that any individual Defendants who made alleged misstatements knew of the alleged problems with the non-productive wells that were allocated part of the purchase price, but not expensed.

CW 4 is described as a senior joint interest billing accountant from December 2005 until September 2007 who handled billing of costs, accounts receivable, and other accounting. (ACC ¶ 62.) She reported to Maritech's controller. (*Id.*) CW 4 alleges that Maritech did not have many properties being drilled and that the successful efforts accounting method meant that non-performing properties were written off immediately. Based on CW 4's position as a billing accountant during most of the Class Period, the Court finds it probable that she was in a position to know this information firsthand. CW 4 does not, however, allege that anyone at the company knew that other properties should have been written off.[13] In addition, she asserts her own belief that Maritech was not keeping up with FAS 143 or that its plug and abandon costs, but she does not explain how that accounting was improper and does not aver that she shared these concerns with others such that her allegations may allow a strong inference of scienter about these supposed problems.

CW 1 is described as the vice president of operations at Maritech who reported to the president of Maritech, then McCarroll. (ACC ¶ 45.) Defendants contend that Plaintiffs do not plead that CW 1 held a position that allowed him personal knowledge of the accounting decisions and particularities involved in writing off a well. CW 1 describes a property, Sabine 12, that was allegedly not performing well, and claims that "new engineers" had determined that the reserves of other properties were overestimated, specifically East Cameron 305 and others at the Vermillion locations. Plaintiffs concede that CW 1 was only involved with accounting for Maritech and TETRA from the "fringes." (ACC ¶ 53.)

---

[13] The end of ACC ¶ 69 appears to have been cut off.

Defendants contend that CW 1's statements about reserves are speculative because CW 1 is not a reserve engineer. *See, e.g.*, *Wieland v. Stone Energy Corp.*, No. 05-2088, 2007 WL 2903178, at *5 (W.D. La. Aug. 17, 2007) (holding that statements from a production manager and reservoir engineers who had knowledge regarding the way proved reserves were calculated, and how and why the reports deviated from SEC requirements, were sufficient to conclude that they would possess the information they allege). CW 1 does not assert that he is familiar with the reserve process, but instead relies on reports by the new engineers. On one hand, he is described as a vice president who speaks to McCarroll. On the other hand, even if he did have personal knowledge of the information, the purported fraud is not described with particularity—CW 1 does not specifically allege that the reserves were intentionally overestimated or by how much they were overestimated. Plaintiffs also do not plead that McCarroll or other officers knew of the overestimation. Even if CW 1 had responsibilities or job descriptions suggesting that he would understand the accounting problems at a particular well or field, CW 1 explains that reserves were overstated but does not provide the alleged discrepancy between actual and underreported reserves.

Defendants aver that Hertel's post-class statements are not an admission that he previously knew that the properties written off had already been largely exhausted. They also contend that the statement that TETRA exploits the most attractive properties first, suggests only that TETRA accesses the most attractive properties first, not that these same properties were largely exhausted.  Plaintiffs suggest that the post-class statements imply that Hertel knew, at least by February 28, 2007, that his statements that Maritech had actually increased its proven reserves for the 2005 packages and that the new

reserves should allow Maritech to increase total profits in 2007, were false and misleading.

In the November 5, 2007 earnings call, Hertel explained:

Maritech produces profits by actively exploiting properties that it acquires. The last packages … of properties purchased by Maritech were pre-Rita and Katrina. The inventory of exploitable operations in these older purchases has dwindled during the last 29 months.

(ACC ¶ 138.) Defendants explain that "develop" and "exploit" are synonyms. That is, developing a field is not the same as "exhausting" its reserves.

In an earnings call in January 14, 2008, Hertel stated that the company attempts to exploit the most attractive properties first and that "the remaining exploitable opportunities after three years are generally quite lean in the economic area." (ACC ¶140.) Likewise, in that press release, Hertel explained that "by 2007, most exploitation projects, generated out of 2005 acquisitions, had diminishing return potential. This is one of the primary reasons that Maritech's DD&A grew more rapidly than did its operational pretax profits in 2007." (ACC ¶ 139.) Then, in 2007Q4, TETRA allegedly reported an "impairment" charge for the abandonment of the 2005 package of more than $70 million. (ACC ¶ 141.)

Acknowledging a diminishing return potential is not the same as acknowledging that the field is largely exhausted. Acknowledging a diminishing return potential is also not inconsistent with a belief that new reserves would allow Maritech to increase total profits. Likewise, acknowledging that there are fewer operations to develop is not an admission that the fields are largely exhausted. Likewise, in *Barrie v. Intervoice-Brite, Inc.*, even though the plaintiffs pled that the defendant contended that the company was focusing on its sales momentum while, in fact, sales were slowing, this was insufficient

to plead a misrepresentation (much less a post-class admission of scienter) because a diminishing sales force is not inconsistent with a focus on sales momentum. 397 F.3d at 260. Consequently, these statements do not appear to allow an inference of scienter as to Hertel or TETRA. In addition, Hertel's other post-class statements do not add much to the analysis of scienter. Hertel stated that he would like to address the ARO issues to the extent that "we can get things cleaned up" even though he recognized "it's not like the old days…. You can't just set up reserves against something you have an issue with." (ACC ¶ 156.) The phrases describing cleaning up the AROs or addressing issues do not suggest that Hertel knew that officers within his company were committing intentional or severely reckless fraud sufficient to create a strong inference of scienter. Drawing that inference is not equally plausible as Defendants' theory that Hertel was accurately describing the business or even that he was providing hindsight analysis of problems that had occurred.

Lastly, Defendants contend that Hertel's stock sales do not permit a strong inference of scienter. They argue that his sales in May occurred well before the alleged partial disclosure of the "fraud" in August and October 2007 and, therefore, the sales were not suspiciously timed. In addition, Hertel allegedly sold his options before they were set to expire in September and October 2007 and while they were well in the money. Defendants aver that the May 7, 2007 Form 8-K disclosed several pieces of bad news, including a $30 million reduction in Fluids Division's profits and delayed production at two Maritech properties. Moreover, Defendants contend that Hertel owned more stock after the Class Period than he did when the period began. Hertel's stock sales as provided to the SEC suggest that each year, he chose a specific month to exercise his

stock sales, although not always the same month. That he conducted a large amount of activity in one month, therefore, appears nonsuspicious. The month he choose, however, does allow some suggestion of scienter. The options Hertel exercised were set to expire in the fall of 2007 not in the summer. The magnitude of his sales in 2007, over $12 million, was about $3 million more than the year before which was, in turn, more than $2 million more than the prior year. This increase does not seem particularly suspicious. Lastly, his stock ownership increased over the Class Period.

Plaintiffs aver that both Hertel and Symens dumped tens of millions of dollars of stock within days of the May 7, 2007 announcement of the 2007Q1 performance, which was the last group of laudatory comments about TETRA's earnings growth and prospects in general. In addition, Plaintiffs contend that one may infer scienter because Hertel identified June 2007 as the month in which TETRA's fortunes turned—therefore the insiders sold before the market learned of TETRA's reversal.  Construing all facts in favor of Plaintiffs, the magnitude of the sales in May 2007, ahead of the purported disclosures in August and October and the turn around in June 2007, provides facts that may be used as motive and opportunity allegations to create a slight inference of scienter.

Even combined with Hertel's stock sales in May 2007, however, the allegations of scienter as to the accounting methods are insufficient to raise a strong inference of scienter as to the challenged patterns of alleged conduct surrounding the successful efforts accounting and recording of reserves and costs at the WA&D Division. Even if there were problems with the accounting, and it is not clear that the CWs allege that there were, neither the post-class statements nor the CWs allege that any particular Defendant knew of these problems and then fraudulently concealed them. The CWs' allegations,

even combined with the post-class statements and the stock sales do not render Plaintiffs' challenged pattern of alleged conduct as plausible as an innocent inference that Defendants did not knowingly mislead their investors. Defendants' misrepresentations as to this challenged pattern of alleged conduct will not support a § 10b-5 claim.

### B. Write off of the 2005 Maritech Properties

Although closely related to the allegations relating to the successful efforts accounting, Defendants also contend that Plaintiffs have not properly alleged securities violations claims for relief related to the reserves of the 2005 properties and their eventual write off.

Beginning with the 2006Q3 performance and guidance, TETRA issued a press release that explained that "Maritech's performance … reflects production increases derived from the acquired properties, reworking older wells and new drillings. These same factors should bode well for production into 2007."[14] (ACC ¶ 90.) The January 3, 2007 conference call included statements that Maritech's production would increase because of expenditures made in 2005 and 2006 to exploit properties. (ACC ¶ 100.) On February 28, 2007, Hertel explained that Maritech had an excellent 2006 because it increased its proven reserves to 93 Bcf after producing 16 Bcf equivalents and the new reserves should allow an increase in total profits in 2007. In addition, discussing the earnings report and 2007 guidance, Hertel explained that "the ability to generate incremental reserves out of older, mature properties is the primary reason that we are projecting improving profits for Maritech in 2007…."

---

[14] As the Court discussed above, with respect to the purportedly meaningful cautionary language related to Misstatement 2, the language cautions against uncertainties in reserve estimates, but does not warn against the behavior alleged by Plaintiffs: the purported decision to falsely tout the production capacity of properties that the Company allegedly knows it will have to soon write off.

Defendants contend that they did not make false statements as to Maritech's oil and gas properties: they claim that Plaintiffs essentially allege that reserves could not have "actually increased" when certain fields were about to be written off.  Relying on SEC filings, Defendants respond that TETRA reasonably expected 2007 production to exceed 2006 production because storm-damaged parts of the 2005 package of properties were scheduled to come back onstream. (Doc. No. 45, Ex. 7, at Ex. 99.1, p.3.) Maritech, however, experienced unexpected delays for two properties that were drilled in late 2006. (Doc. No. 45, Ex. 9, at Ex. 99.1, p.3.) Defendants allege that TETRA channeled its development expenditures into existing properties and then, after the Class Period, into new properties Maritech purchased once it determined that it no longer had sufficient capital to develop the remaining undeveloped properties among the 2005 package of properties. Plaintiffs' ACC does not explain why the statement that Maritech continued to produce more reserves from the 2005 properties is inconsistent with the fact that it was about to write them off.[15]

Plaintiffs contend that these were material misstatements because the properties had already been largely depleted, and Maritech exploited the most attractive properties first. Plaintiffs plead that, by the end of 2006, "Defendants … fully knew that" TETRA's production and profitability would drop sharply in 2007. (ACC ¶ 38.) Consequently, Defendants, including Hertel, knew that cash flows for the operation of the 2005 properties would not continue for several years, so these statements and the balance

---

[15] In their ACC, Plaintiffs provide TETRA's statements about its accounting practices. For example, TETRA explains that "the oil and gas industry is cyclical, and our estimates of the period over which futures cash flows will be generated, as well as the predictability of these cash flows, can have significant impact on the carrying value of these assets and, in periods of prolonged down cycles, may result in impairment charges." (ACC ¶ 108.) Consequently, impairments appear to address cash flow considerations rather than necessarily reflecting adjustments in reserve estimates.

statements in the 2006 10-K were false. (ACC ¶ 119(d)). Likewise, Plaintiffs contend that statements made in a May 7, 2007 press release were false: Maritech noted a potential shortfall to production, but Defendants also explained that "Maritech is now attempting to accelerate forward exploitation activities originally planned for late 2007 or early 2008." (ACC ¶ 120, *see also* ACC ¶ 122.) Plaintiffs contend that Defendants knew, at the time, that there was a permanent volumetric shortfall. (ACC ¶ 123.) Plaintiffs argue that these facts became known to the public, when, on October 16, 2007, as noted above, TETRA reported an "impairment" charge for the abandonment of the 2005 properties of more than $70 million. After the Class Period, Hertel explained that "by 2007, most exploitation projects, generated out of 2005 acquisitions, had diminishing return potential. This is one of the primary reasons that Maritech's DD&A grew more rapidly than did its operational pretax profits in 2007." (ACC ¶ 139.)

Some of the alleged misstatements are similar to those in cases in which the plaintiffs have adequately pled material misrepresentations. As to the profitability and production capacity of the 2005 properties, the Court finds that Plaintiffs have successfully pled a material misrepresentation. It finds this case similar to the facts in *Plotkin v. IP Axess, Inc.*. In *Plotkin*, the defendant company's statements regarding the likely success of agreement with another company that later failed satisfied the material misrepresentation requirement. In that case, the partner company later filed for bankruptcy such that statements about the likely success of the sales contracts supported inferences that the relationship was doomed when the defendant company made the statements. 407 F.3d 690, 697-98 (5th Cir. 2005). Like the bankruptcy of the partner

company in *Plotkin*, TETRA purportedly eventually acknowledged the problems with the fields and wrote off the 2005 acquisitions.

Per *Tellabs I*, the Court must take Plaintiffs' pleadings as true. Plaintiffs plead that Defendants knew by early 2007 that TETRA had largely exhausted the economically exploitable oil and gas properties purchased in 2005, but instead of revealing this information then, continued to tout the productive capacity of these properties, going so far as to explain that their reserves had increased by a particular number. The Court finds that these pleadings satisfy the PSLRA requirement for pleading fraud with particularity. Plaintiffs have alleged several misstatements as to this challenged pattern of alleged conduct.

Defendants contend that Plaintiffs have not sufficiently pled materiality because TETRA had already disclosed that it is difficult to predict costs or profits because of the inherently imprecise nature of oil and gas reserve estimating. Again, however, the $70 million impairment, that Plaintiffs allege was related to the misstatements regarding the written off fields, was material because it was the size of Maritech's revenues for the previous year. Drawing all inferences in favor of Plaintiffs, they do allege a plausible material misstatement related to the 2005 properties.

Defendants also argue that several of the alleged misstatements were forward-looking and protected by the PSLRA's safe harbor. For example, as to Misstatement 6, Defendants contend that cautionary language about future production estimates adequately warned of the potential shortfalls that might affect the process of bringing the new "storm damaged production" online. Plaintiffs' contention is that, like the *U.S. v. Skilling* case, 554 F.3d 529, at the time TETRA made the announcement about bringing

46

storm-damaged properties back online, it already knew that the inventory of exploitable operations from the 2005 properties had dwindled such that these properties would not be able to be profitably drilled and prepared for production.

The incorporated 2005 10-K cautionary statements regarding the inaccuracy of future production estimates warns: "actual future production, cash flows, development expenditures, operating and abandonment expenses and quantities of recoverable natural gas and oil reserves may vary substantially from those initially estimated by us." (Doc. No. 45, Ex. 3, at 15.) Again, however, while this cautionary language explains possible risks with production estimates, it does not warn about certain dangers that Plaintiffs claim had already begun to materialize. Likewise, the other statements about the anticipated production gains from the 2005 properties and Maritech's cash flow, while forward-looking, are not protected if Defendants knew that the properties were exhausted of possible exploitable or producible reserves at the time those statements were made (Misstatement 8, 9).

The Court must then address whether the CWs' testimony and other allegations of scienter supports a strong inference of scienter on the part of the individual Defendants or TETRA. CW 3's allegations relate to the challenged patterns of alleged conduct at WA&D including the write-offs of the 2005 properties and the purported successful accounting method flaws. CW 3 is described as lead operator for Maritech from 2005 through January 2008 and in charge of five Maritech platforms. (ACC ¶ 58.) Defendants also argue that the job responsibilities of this CW, including inspections, monitoring well production, reviewing costs, and overseeing repair work, (ACC ¶ 59) do not suggest that he had involvement with accounting or whether or not fields should be written off. The

Court agrees with this argument. While it appears that CW 3 had personal knowledge about the production at these wells, and he concluded that the properties "probably should have been written off sooner than they were," (ACC ¶ 60) the description of this CW is insufficient to allow the court to conclude that he spoke with personal knowledge of when a field should be written off or whether it was profitable for Maritech.  His testimony does not appear to be based on personal knowledge such that his statements may be used to establish scienter as to whether the fields were not written off when they should have been. Even if the Court had chosen to credit CW 1 (discussed above in the context of the purported manipulation of successful efforts accounting) and CW 3's testimony, they do not allege that they told Hertel or McCarroll that the fields necessarily should have been written off sooner than they were or provide allegations that would support a strong inference that Hertel or McCarroll knew of these problems and fraudulently failed to reveal them to investors.

Plaintiffs allege that Hertel's post-class statements support a strong inference of scienter.  In November 2007, Hertel stated that "[t]he inventory of exploitable operations in these older properties has dwindled during the last 29 months" and "by 2007, most exploitation projects, generated out of the 2005 acquisitions, had diminishing return potential." Consequently, Plaintiffs allege that these statements make it difficult to credit Hertel's earlier assertions that Maritech production from older properties would drive its growth. Defendants respond that these post-class disclosures only state that, in late 2007, TETRA "canceled plans for the development of some of the previously held, less attractive exploitation properties" in order "to create growth opportunities for 2008 through 2010." (ACC ¶ 139.) As noted above, Defendants argue that these statements do

not suggest that the accounting for these properties had ever been inaccurate or that it should have previously taken any impairment charges. Defendants' competing theory to defeat scienter is that Defendants had no idea that the properties would need to be written off at the time of the alleged misstatements because Maritech suffered unexpected production shortfalls from weather and rig delays, and subsequent events rendered other more-recently purchased fields more profitable, even though the 2005 properties produced profits throughout 2007.

The Court discussed the inference that may be drawn from Hertel's stock sales above. Defendants contend that McCarroll's stock sales, which occurred near the end of the Class Period, occurred five days before the options expired, and that he sold half of the shares resulting from the exercise of the stock options. In addition, McCarroll's stock ownership increased during the Class Period and, shortly thereafter, he left TETRA to start another company. *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 258 F.Supp.2d at 594 (explaining that readily available, plausible explanations for a sale, such as that the insider is leaving the company, might make a sale nonsuspicious). McCarroll's sales do not seem concentrated after any particular announcement, and he made significant sales after the August 2007 announcements when the stock fell precipitously. Even construing all facts in favor of Plaintiffs, McCarroll's stock sales do not seem to be suspicious in timing or amount such that they would substantiate strong motive and opportunity allegations to create an inference of scienter.

The Court finds that, considering the discounted value of the CWs, the only plausible inference of scienter from Hertel's stock sales, and the limited value of the post-class statements, given the plausible non-culpable inferences that can be drawn from the

word "exploitable" as discussed above, renders Plaintiffs' theory that Hertel or McCarroll knowingly or recklessly touted the production capacity of the 2005 properties while knowing that they were unproductive or largely exhausted less plausible than competing theories. The CWs have not provided testimony that there was necessarily anything wrong with the treatment of the 2005 properties. Even if they had, they do not support an inference that any of the defendants knew about these problems at the time and fraudulently concealed them. When considered together, Plaintiffs' allegations as to the write offs of the 2005 properties do not create a strong inference of scienter.

### C. Fluids Buyback Program

As for the other challenged patterns of alleged conduct, Defendants *inter alia* contend that the CWs did not possess personal knowledge as to the facts they profess to know, some of the alleged misstatements are protected by the safe harbor provisions of the PSLRA, and the post-class statements, stock sales, and other purported indicia of scienter do not support a claim.

Plaintiffs allege that Defendants altered monthly Fluids division sales estimates to reach arbitrary sales goals by manipulating sales and inventory though a "buyback program." (ACC ¶¶ 26-27.) Plaintiffs allege that TETRA's fluids customers typically purchase more CBFs than necessary as a precaution with the understanding that TETRA will repurchase the extra at 40-60 percent of the original sales price. (*Id.* at ¶ 81.) When the CBFs were returned, however, TETRA "revalued" the Fluids division's inventory rather than reduce sales or income to account for the returns. (ACC ¶¶ 27, 85.) According to a confidential witness, 80 percent of the Fluids Division's total profits were due to the inventory adjustment. (*Id.* at ¶ 84.) In addition, TETRA allegedly stored the used CBFs it

also received from customers rather than reworking and recycling them for reuse. TETRA purportedly falsely attributed the high fluids inventories to a historically high cost supplier and concealed its inventory write-ups/inflated sales. (*Id*. at ¶¶ 28, 88.)

Defendants argue that TETRA properly accounted for the Fluids buyback program as a separate transaction. They further aver that TETRA's treatment of the program was approved by TETRA's independent auditors and that CW 7's statements support Defendants' version of the facts. They complain that his statement that inventory has been "written up" lacks sufficient context. Defendants also argue that the November 2006 spreadsheet produced by CW 6 that purportedly shows a variance or revaluation that reflect improper accounting at the Fluids Division is not necessarily connected to the buyback program, and it is unclear to what the word "revaluation" refers. Finally, Defendants contend that CW 8 was not in a position to know whether re-use of CBFs occurred in the Fluids Division.  Defendants explain that TETRA's inventories rose because TETRA switched suppliers in 2006 and accelerated purchases from the old supplier to fulfill its obligations more quickly. (Doc. No. 45, Ex. 8 at Ex. 99.1 p.3; Ex. 19 at Ex. 99.1 p.3; Ex. 7 at Ex. 99.1 p.3.) Defendants contend that these inventory cost increases were properly disclosed.

Plaintiffs respond that the Fluids Division failed to report customer credits as sales returns and allowances as required by SFAS 48 and that cost of goods sold was understated because of Fluids inventory write-ups. In addition, they contend that Fluids' revenues had been recognized even though their collection was not "reasonably assured," despite the Company's agreement to provide credits pursuant to its buyback program. Specifically, the November 3, 2006 press release announced "third quarter pretax

earnings that exceeded third quarter 2005 levels by 152 percent." If the costs of goods were understated because of inventory write-ups, these earnings statements were misrepresentations of the true picture of Fluids Division sales. This statement is not forward-looking, and therefore cannot be protected by the safe harbor.

Defendants also aver that several other of the purported misstatements associated with the Fluids Division are protected by the PSLRA safe harbor. Misstatement 3, as it relates to Fluids Division earnings growth, is a statement of historical fact and not protected. Likewise, Misstatements 24, 25, and 28 are not forward looking and reflect purported distortions in past numbers because of the allegedly improper reporting of inventory returns. Misstatement 30 relates to the cost of goods for primary completion fluids: Defendants contend that the cost of goods will go down because of a new plant and a new agreement with Chemtura. In addition, TETRA explained that it purchased large inventories in 2005 and 2006 and that it will terminate its previous supply agreements. These statements are purportedly false because they misstate or omit the reasons that Fluids inventories were high—they are not forward-looking statements. In addition, Plaintiffs contend these statements are false because Defendants do not disclose the impact of the buyback program on inventories.

Defendants contend that Plaintiffs do not adequately plead materiality because they only use rough numbers such as "hundreds of storage tanks" of used brine fluids and do not explain how many customers participated in the buyback program to understand its potential impact on TETRA. Notably, Defendants do not address CW 7's allegations that much of Fluids' total profit was attributable to the inventory adjustment. (ACC ¶ 84.) The Court, however, finds that, even drawing inferences in favor of Plaintiffs, it is not

plausible that CW 7 spoke with personal knowledge of the buyback program as to the facts he alleges.

Even assuming Plaintiffs have pled material misstatements, however, Plaintiffs have not alleged a strong inference of scienter. As to allegations of scienter from the confidential witnesses, CW 6 is described as the regional Fluids sales manager. (ACC ¶ 75.) CW 6 provided a report that showed a reduction in the Fluids Division cost of goods sold for "variance/revaluation." (ACC ¶ 76.) This term is not explained, although CW 6 alleges that a person named Hank Reeves disclosed to him that sometime in mid-2006 the fluids inventory was "revalued." (*Id.*) Defendants contend that CW 6's information from Hank Reeves is a "rumor." Moreover, they argue that there is no suggestion that CW 6's job duties included accounting work or that he would have knowledge of the accounting for the Fluids Division buyback programs. CW 6 explains his understanding of the buyback program, but he admits that the actual computation of the credits was a "big secret" that was held by other people, including Hank Reeves, and he had heard that some component of the buyback program was "borderline illegal." (ACC ¶¶  81-82.) These admissions suggest that CW 6 was not in a position to know whether or not Defendants were improperly accounting for or misrepresenting the buyback credits or intentionally misstating inventories at the Division.

CW 7 is described as a general manager at the Fluids Division from August 2006 until August 2007 who met with senior executives, including the vice-president for the Fluids Division. (ACC ¶ 86.) CW 7's allegations relate to the challenged patterns of alleged conduct at the Fluids divisions including the buyback program and the purportedly artificially inflated forecast numbers discussed below. CW 7 describes the

buyback program as overstating revenues and inventories and contends that 80 percent of the Fluids Division's profits were attributable to this program. (ACC ¶¶ 84-85.) Beyond the generic term "general manager," Plaintiffs do not provide CW 7's job description, however, or his interaction with accounting or upper management such that he would know how the buyback program was run or who knew about it. Plaintiffs also fail to describe CW 7's education or employment history that would provide a basis for any statement about a buyback program, or how it should be treated for purposes of financial reporting. CW 7 averred that, rather than account for these returns against actual sales, TETRA would record this credit in inventory. As explained more below in the section describing the Fluids' forecasts challenged pattern of alleged conduct, CW 7 allegedly reported demand projection figures to Symens, but CW 7 does not allege that he had interactions with Symens regarding the buyback program. Even if the Court had chosen to credit CW 7's statements as based on personal knowledge, CW 7 alleges that much of the Fluids Division's profit was attributable to inventory adjustment, CW 7 does not contend who knew about this program and does not specifically contend that any of the individual Defendants or any officer or manager who prepared the corporate disclosures knew about the allegedly improper massaging of sales at the Fluids' Division. The testimony of CW 7 is therefore insufficient to make a strong inference of scienter as to any of the individual Defendants or as to TETRA, possible.

CW 8 is described as a TETRA contractor who worked as an engineer in the new brine production facility. He explained that he knew of the "brine buyback program" whereby TETRA would buy "dirty" brine to resell. (ACC ¶¶ 87-88.) Defendants contend that a contract engineer would not have knowledge of accounting practices at the firm.

54

The Court finds that the description provided for CW 8 is insufficiently detailed to allow his allegations to raise an inference of scienter as to any of the individual Defendants or TETRA. Plaintiffs do not provide argument on this point. The Court does not find that the details pled concerning CW 8's job duties and position at TETRA suggest that he would have personal knowledge of the way accounting was conducted for the buyback program and he does not provide support for a strong inference of scienter as to misrepresentations concerning this program. Consequently, regardless of whether Plaintiffs have pled material misrepresentations with sufficient particularity, the allegations of the CWs do not support a strong inference of scienter.

As to this challenged pattern of alleged conduct, Plaintiffs do allege that Defendants specifically violated GAAP by failing to reduce customer sales by the return credits. However, as noted above, GAAP violations do not alone support a strong inference of scienter.

Defendants contend that Symens' Class Period sales were not unusual because he could have made much more money by selling them earlier or later. In addition, Symens made his final Class-Period sale in May 2007, several months before the alleged disclosures. His stock options were also set to expire in March and September. Unlike Hertel, Symens does not appear to typically concentrate sales, but to make sales periodically, and not very frequently. Symens sold more than half his shares and exercised options that were not about to expire in May 2007. Construing all facts in favor of Plaintiffs, the magnitude of the sales in May 2007, ahead of the purported disclosures in August and October provides facts that may be used as motive and opportunity allegations to create an inference of scienter. Symens, however, was a non-speaking

Defendant and Plaintiffs have not connected him to any particular misstatement or to any particular statements in TETRA's SEC filings. Given the Fifth Circuit's rejection of group pleading, that Symens was a non-speaker is determinative of the issue.

When taken together, the lack of sufficient detail to allow an inference of personal knowledge on the part of the CWs, the non-suspicious timing of the stock sales, even with the purported GAAP violations and SOX certifications, do not support a strong inference of scienter. The Court holds that Plaintiffs have not pled facts that allow for a strong inference of scienter as to any Defendant as to the challenged pattern of alleged conduct related to the buyback program.

### D. Fluids Forecasts

Defendants contend that Plaintiffs' allegations that the Fluids Division's demand was flat are false because revenues increased from 2005 through 2007. In addition, they contend that CW 6 was not in a position to know about the overall Fluids business to the extent that his statements about forecasting can be credited. Moreover, they aver that the spreadsheet he provides, in which his superiors revise upwards sales projections for his region, only demonstrates that CW 6's superiors expected more of him that he did himself. Moreover, Defendants contend that the forecast data CW 7 allegedly provided to Symens was based on upcoming orders from current customers and did not account for projections from  future growth or new customers. Defendants aver that the Fluids Division's onshore operations suffered unexpected losses in 2007 because of flooding in Texas and Oklahoma during May-July 2007.

Plaintiffs claim that Defendants misrepresented TETRA's Fluids Division financial performance as growing rapidly when the company knew that onshore demand

was flat. Assuming that Plaintiffs' allegations that TETRA's upper management revised onshore demand upwards are true, statements that the onshore business was growing rapidly, including those in the November 3, 2006, press release could be misstatements that misled investors as to the prospects of the onshore Fluids Division business. In the January 3, 2007 TETRA further explained that there were "greater opportunities" for "domestic onshore and international growth."

As with the other challenged patterns of alleged conduct, Defendants claim that the safe harbor protects several of the alleged misstatements. For example, they respond that Misstatement 3, related to the growth in the onshore Fluids Division business, was a forward-looking statement protected by cautionary language. The specific statement that the onshore business continues to grow rapidly includes a comment on historical fact— that onshore business had grown rapidly in the past—and a statement of historical fact cannot be protected by the safe harbor. As to the continuing growth, the Court agrees that the cautionary language provided does not warn investors about the reasons that Plaintiffs contend demand turned out to be flat—that Defendants had knowingly, unreasonably inflated forecasted demand. This same analysis applies to Misstatement 7 related to the Fluids Division forecasts.

As to whether TETRA might have acted with scienter as to these statements, in *Southland Securities Corp.*, the Fifth Circuit explained that in determining whether a statement was made by a corporation with scienter "we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective

knowledge of all the corporation's officers and employees acquired in the course of their employment." 365 F.3d at 366. Likewise, scienter may not rest on the inference that the defendants must have been aware of the alleged fraud because of their position in the company. *Abrams v. Baker Hughes, Inc.*, 292 F.3d at 432. Although courts have found scenarios in which it is possible to infer corporate scienter  because of the position of the defendant, that is not the case here. Demand for CBFs onshore is, as Plaintiffs admit, only a part of the Fluids Division revenues and not significant enough to infer that the speaking Defendants would have known about the alleged manipulations of the revenue forecasts such that their statements were made recklessly or with intent to deceive. *See, e.g*, *Tellabs II*, 153 F.3d at 710 (describing a hypothetical wherein General Motors claimed that it had sold millions of SUVs when it actually sold none); *Nathenson v. Zonagen, Inc.*, 267 F.3d at 424-25.

Turning to the allegations of scienter from the CWs: CW 6 conceded that he did not know where the 2007 forecast numbers came from but that he believed they were inaccurate from the beginning. (ACC ¶ 79.) Based on the pled facts, CW 6 had personal knowledge of the proper forecasts for his region (which comprised the bulk of "onshore" sales) and the amount by which his supervisors revised them upwards, but Plaintiffs' provided job description does not indicate that he had personal knowledge of the forecasts for the overall Fluids Division, because sales primarily occurred offshore. (ACC ¶ 75.) CW 6 alleges that he informed several managers that demand was to be flat and they told him to make the numbers "work" within the set budget. The "S&OP 2007 Rev" spreadsheet produced in November 2006 supposedly reflects that his supervisors wanted him to change his forecast upward by $4 million for 2007. He does not allege that any of

the individual Defendants had knowledge of these purported forecast manipulations. Claims regarding an allegedly fraudulent scheme must fail if the complaint does not adequately identify a particular corporate officer who improperly recorded revenue or performed the challenged acts. *See, e.g.*, *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005).

Plaintiffs also allege that CW 7 provides statements that support a strong inference of scienter: CW 7 avers that he met with Symens every month and provided him and another manager with the projected Fluids demand—that Symens would then "change." (ACC ¶ 86.) Although it is probable that CW 7 had personal knowledge of parts of the forecasting process, these allegations  do not support a strong inference of scienter. It is unclear why Symens changed these numbers. CW 7 contends that demand for fluids was "not there," but he does not provide facts sufficient for the Court to infer that Symens was manipulating the numbers to make fraudulent demand projections such that the Court can draw a strong inference of fraud. Here, even if managers at TETRA and the Fluids Division knew that the Fluids forecasts were massaged, it is unclear that this information was conveyed to the speakers who made the alleged misstatements; or that Short, Pernik or Reeves (unspecified employees in the Fluids Division) were involved in drafting or signing the TETRA releases that contain the alleged misstatements such that TETRA may have had scienter of the alleged misstatements.[16]

Evaluating together all sources of scienter as to the misstatements related to the Fluids Division forecasts, including the timing and size of the individual Defendants' stock sales, the purported GAAP violations and SOX certifications, these allegations do

---

[16]  In their Response, Plaintiffs aver that CW 6 relayed the information to Fluids' management who reported to Symens. Even if this was the proper chain of command, in the ACC, CW 6 does not specifically allege that the information flowed to Symens.

not support a strong inference of scienter as to the Fluids forecasts. Misstatements with respect to this challenged pattern of alleged conduct therefore are insufficient to state a securities violation claim. The Court will not, therefore, address Defendants' arguments about Plaintiffs' failure to allege loss causation as to this challenged pattern of alleged conduct.

### E. Insurance Receivables

Defendants contend that TETRA continually disclosed ongoing negotiations with the insurance companies and that none of the CWs claimed knowledge of a final denial of insurance receivables or even knowledge of the insurance negotiation process. Defendants argue that TETRA never promised its investors that hurricane-related claims would be covered and properly disclosed the negotiation process, including that the insurers questioned whether certain well intervention costs would be covered under the policy. Citing several disclosures, Defendants contend that they continually kept investors informed of developments with the insurance company and eventually sued it in November 2007 over disputed claims. (Doc. No. 45, Ex. 4, at Ex.99.1, p. 1 (a TETRA press release).) Moreover, Defendants aver that Plaintiffs wrongly emphasize the word "repeated" in the 2007Q2 disclosure about the negotiations to suggest that TETRA had already been denied certain insurance claims. Finally, Defendants take the position that its decision to wait until 2007Q2 to write off the insurance receivables, when it decided to sue its insurer, was a conservative decision, rather than a GAAP violation.

Moreover, they aver that the statements about insurance receivables are protected by the safe harbor provisions. For example, as to statements about WA&D Services' profits related to the collection of insurance reimbursements for Maritech, TETRA

warned that "a significant factor in the fourth quarter will be the inclusion or elimination of WA&D Services profits related to work performed for Maritech which is contingent on the timing of insurance reimbursements." (Nov. 3. 2006 press release, Doc. No. 45, Ex. 8, Ex. 99.1, p. 4.) In addition, TETRA warned its investors that the press-release includes forward-looking statements that are subject to risks and uncertainties. It contends that other cautionary language from the 2005 10-K was allegedly incorporated by reference by the November 3, 2006 press release. The press release specifically incorporates the 2005 10-K language. This 2005 10-K (filed March 16, 2006) explains:

> [W]e could suffer additional losses in the future related to storm repair efforts.... We maintain insurance protection covering substantially all of the property damaged incurred; and repair costs incurred up to the amount of deductibles were charged to earnings as they were incurred during 2005. However, the amount of covered costs is subject to certain maximum amounts, depending on the policy. If actual repair costs are significantly greater than our estimates, we may exceed these maximum coverage amounts. In that event, it is possible that a portion of future repair expenditures will have to be funded with our capital resources and result in charges to our earnings. In addition, for repair expenditures that are covered by insurance, the collection of insurance claims may be delayed, resulting in the temporary use of our working capital to fund such repairs.

(Doc. No. 45, Ex. 3, at 13.) Notably, this warning explains that the protection covers "substantially all" of the property damage incurred. The warning, therefore, that "the amount of covered costs is subject to certain maximum amounts," when read in tandem with the statement that substantially all property damage is covered suggests that the company believes actual repair costs will approximate covered costs. Later, however, in a filing made March 1, 2007, TETRA explained:

> If a significant amount of well intervention costs incurred are not covered pursuant to our insurance policy, or if we incur total well intervention costs in excess of our estimates, our working capital and results of operations could be adversely affected.... In June 2006, the underwriters

> questioned whether there is additional coverage provided for the cost of the removal of … platforms in excess of the policy limit under an endorsement we obtained in August 2005 …. While we have yet to incur costs for the removal of the destroyed platforms, these costs, as well as other costs covered under the endorsement, could equal or possibly exceed the policy maximum limit under the endorsement. If all or a portion of these costs are not reimbursed, or if the total debris removal and other costs exceed the policy maximum, our working capital and results of operations could be adversely affected.

(Doc. No. 52, Ex. 1, at 13.) In that filing, TETRA also explained that "[w]hile the Company believes that all well intervention costs being questioned by the underwriters will qualify for reimbursement under its insurance policies and are probable of collection, it is possible that all or a portion of these costs may not be reimbursed." (*Id*. at 15.) TETRA specifically warned that all or a portion of the costs may not be reimbursed because insurers questioned whether a policy obtained in August 2005 provided additional coverage for the cost of removal. TETRA reiterated its position that it believes that the costs qualify for reimbursement under the endorsement. (*Id*. at 16.)

Nowhere in this cautionary language does the company explain that significant portions of the insurance receivables have already been denied. Taking all inferences in favor of Plaintiffs, this warning does not render the alleged Misstatement 1, as it relates to the insurance receivables' effect on WA&D profits, immaterial. Likewise, the other misstatements related to the payment of insurance receivables are not protected under the PSLRA because Plaintiffs have adequately alleged that Defendants knew that certain insurance payments had already been denied at or before the time that Defendants contended that "substantially all" of the insurance claims would be covered. The Misstatements that relate to the insurance receivables, notably 8, 13, 16-21, 25, 27, 29-31 are not protected by the PSLRA safe harbor.

Plaintiffs provide allegations from several confidential witnesses that, in August or September 2006, Maritech reviewed its insurance contracts and discovered that Lloyd's would only pay for the first $1 million in weather-delay expenses for the damaged wells even though WA&D had already accrued millions of costs attributable to weather delays for the East Cameron 195 project. (*Id.* at ¶¶ 50, 57.) By late 2006 Maritech received unspecified "printouts" that various claims submissions were not allowed. (*Id.* at ¶¶ 49-52; 57-58.)  In addition, Defendants allegedly admitted their failure to appropriate write off their receivables in the 2007Q2 Form 10-Q in which they stated that "during [2007Q2] … the underwriters repeated their position that certain wells did not qualify for coverage and that certain well intervention costs for covered wells do not qualify as covered costs." (*Id.* at ¶ 40.)

Plaintiffs aver that the statements in the press releases and earnings report are misstatements because Defendants expressed a belief that they would be paid on several insurance claims even though the claims had already been denied. Plaintiffs aver that the insurer had already disallowed insurance claims and, therefore, statements of January 3, 2007, in which Hertel explained that WA&D "profits" from insurance receivables were deferred until they were collected was a material omission because this statement implies that claims submitted for reimbursement were covered. Likewise, TETRA's 2006 Form 10-K explained that substantially all of the hurricane damage would be covered, apart from deductibles and a $5.2 million charge to earnings already made. Similarly, because of these misstatements as to the insurance receivables, Plaintiffs contend that Defendants misstated WA&D profits and earnings in the May 7, 2007 press release.

Defendants contend that Plaintiffs have not alleged that the purported misstatements related to insurance receivables were material. They note that TETRA disclosed its negotiations with the insurer on its hurricane repair claim, that the insurer had been slow to pay, and that it was possible that the insurer would not reimburse all TETRA's costs. If the individual Defendants or another corporate officer knew that the insurance receivables had been denied prior to the release of these statements, that fact would provide a strong inference of scienter.

As to the confidential witnesses, CW 4 reported that, beginning in December 2005, she was told to set up all claims as "receivables" whether or not they had been paid. (ACC ¶ 66.) CW 4 prepared a monthly report of insurance receivables that she delivered to McCarroll and Hertel. (*Id.* at ¶ 68.)  She avers that invoices for repair work done by outside companies were personally approved by McCarroll. (*Id.* at ¶ 67.) Defendants contend that CW 4 was not in attendance at the meetings when the participants discussed her spreadsheet, and CW 4 does not contend that the information in the spreadsheets was different than that disclosed to investors. Defendants  also aver that Plaintiffs do not provide specific dates when Defendants purportedly acquired knowledge of the denials. (*Id.* at ¶ 50.)

Based, however, on CW 4's position as a billing accountant during most of the Class Period, the Court finds it probable that she was in a position to know who was attending the meetings and that her report of insurance receivables must have at least been viewed by the participants. Defendants do not specifically argue that CW 4 lacked personal knowledge of the facts she provides but, rather, contend that nothing to which she testifies suggests that she had any knowledge the receivables she booked were not

probable of collection from the insurer. As explained above, knowledge of general wrongdoing rather than specific knowledge of particular accounting errors may support an inference of scienter. Her statements as to the insurance payments and Maritech's compliance with accounting regulations may be credited and evaluated as a basis for scienter. Although CW 4 does not specifically allege that McCarroll and Hertel knew that the insurance claims were disallowed, she does provide information that allows the inference that McCarroll and Hertel were intimately involved with the insurance process and provides support for other allegations of scienter provided by other CWs.

CW 1 averred that there were a number of days lost to weather downtime in the spring of 2006 and Maritech "quickly" learned that the insurance company would only cover the first $1 million of weather time even though the witness credibly estimated that the weather downtime at the East Cameron 195 project was $10-12 million. Defendants contend that Plaintiffs do not plead that CW 1 had personal knowledge of the negotiations with the insurers or with the accounting for the insurance claims. Plaintiffs provide details about damages to certain properties, insurance company statements about what work would be paid for, and specific issues at particular fields such as the cost of weather downtime at East Cameron 195, including the dates that they arose sufficient to support a strong inference of scienter. In contrast to the CWs provided in *Cent. Laborers' Pension Fund*, Plaintiffs do provide employment dates for this witness, aver that CW 1 directly reported to Maritech President McCarroll and provide sufficient detail, including property names; dates that suggest that it is probable he has personal knowledge of his testimony and that he is in a position to know first hand the facts he conveys as far as the disallowed "weather downtime." *See* 497 F.3d at 552. CW 1 testifies that he was

65

involved only with accounting at the fringes, but suggestions that challenged patterns of alleged conduct are fraudulent, such as allowing millions of dollars of weather downtime to accrue when "Maritech quickly learned the insurance company would only cover the first $1 million of weather time incurred" (ACC ¶ 50) may support an inference of scienter, although this inference would need to be strengthened with other evidence because it is unclear who at TETRA knew this and when. CW 1's further allegations that "there were going to be problems" with the coverage of the East Cameron 195 work are more specific. He contends that, in December 2006 or January 2007, the adjusters "balked" at paying any additional claims.[17]

CW 2 is described as an operations manager at Maritech from November 2002 to November 2006, the beginning of the Class Period. (ACC ¶ 54.) McCarroll purportedly told CW 2 that the TETRA invoices to be submitted to the insurance company, should not include references to weather downtime.  Defendants contend that Plaintiffs have provided no information to explain why CW 2 would be involved with the Company's negotiations with its insurers. CW 2, however, was involved with platform repair, and he avers that he was told by McCarroll that, with respect to Ship Shoal 269 where he was working, TETRA invoices should not include references to weather downtime. (ACC ¶ 58.) These allegations suggests that CW 2 had knowledge of the reporting for weather downtime because he was working in the field at issue and had heard the instruction directly from McCarroll. Defendants respond that neither CW 2 nor Plaintiffs provide any idea of the percentage of accrued well-intervention costs that constituted by weather

---

[17] On the other hand, his allegation that Maritech started to receive computer printouts that claims submissions were "not allowed" is too vague to be credited.[17] The existence of unspecified confidential corporate reports that reveal corporate information contrary to reported accounts will not defeat a motion to dismiss. *See, e.g.*, *Abrams v. Baker Hughes, Inc.*, 292 F.3d at 432; *Tchuruk*, 291 F.3d at 355-56.

downtime. In addition, they note that CW 2 does not allege that McCaroll knew that weather downtime was disallowed or that he knew that the costs already incurred at East Cameron 195 exceeded the weather time allowance. Plaintiffs respond that, based on CW 2's allegations "McCarroll and others at TETRA realized that the insurance policies had been misread and that the costs attributable to 'weather time' were not covered by the insurance claims for millions in costs attributable to weather delays." (ACC ¶ 58.) Plaintiffs Complaint does not appear to go this far in alleging McCarroll's knowledge of the disallowed weather down time. Instead, CW 2 describes the realization of "the Company" that "weather time" was capped at $1 million and that after August or September 2006, McCarroll told unspecified people to limit weather costs on all projects. (ACC ¶ 58.) Taking all inferences in favor of the Plaintiff, however, it is a plausible inference that McCarroll, by making the instruction that he did, knew that the weather time insurance claims were disallowed sufficient to support a strong inference of scienter.[18]

In addition, Hertel, in the 2007Q3 earnings call, explained that, as to insurance receivables, he was going to "force that issue." He also told analysis that

> a lot of the issues that you've seen this year and that could hurt us on a go-forward basis would be involved with the insurance situation and there we do have some control over that from the perspective of when we address or bright line some of these issues and we are going to bright line them this quarter and bring them to a head.

---

[18] Defendants contend that allegations that a defendant "attended meetings" is tantamount to the suggestion that the defendant knew something because he was an executive. *See Ind. Elec.*, 537 F.3d at 535. The Court finds the two suggestions distinguishable. The Court realizes that it is relying, in part on a *Nathenson*-type inference that the head of a Division would have knowledge of disallowed insurance claims that affect millions of dollars of work in his Division. It also acknowledges that the ACC does not explicitly state that McCarroll knew that the insurance claims were disallowed but uses phrases such as "the Company realized" or "the company figured this out." The *Nathenson*-inference, however, combined with McCarroll's instruction to limit weather costs around the same time that the company made the realization that weather time was not allowed enable the Court find that Plaintiffs have pled a strong inference of scienter as to McCarroll for the purportedly disallowed insurance claims.

(ACC ¶ 156.) Plaintiffs contend that Hertel's choice to reveal his decision to bright line the insurance issue was particularly suspicious in the insurance context because he had already sold his stock. Moreover, Plaintiffs aver that, in the 2007 Form 10-Q, signed by Hertel, Hertel explained that "the underwriters repeated their position that certain wells did not qualify for coverage and that certain well intervention costs for covered wells do not qualify as covered costs." (ACC ¶ 40.) Plaintiffs contend that this is Hertel's admission that the underwriters had already disallowed claims. Defendants respond that "repeated" refers to a prior disclosure that the investors had questioned whether certain well costs would be covered under the policy. Although the Court admits some skepticism, it does seem at least as plausible as any innocent inferences that may be drawn that Hertel managed the insurance situation and knew that claims were already denied prior to the time at which TETRA expensed its unreimbursable costs. The scienter analysis does not require the Court to determine the most plausible of competing inferences. *See, e.g.*, *Tellabs I*, 127 S.Ct. at 2510.

Although it is a close call, Plaintiffs have pled facts that give rise to a strong inference of scienter with respect to McCarroll and Hertel's treatment of the purportedly disallowed insurance receivables. CW 2 places  McCarroll at meetings with Lloyd's, the insurance adjusters; CW 4 describes weekly meetings involving McCarroll and Hertel to discuss insurance receivables and explains that she prepared reports for these meetings. Based on these allegations, and the inferences the Court may draw from the post-class statements, the Court finds that Plaintiffs have pled sufficient facts so as to make it plausible that McCarroll and Hertel would have been aware that weather downtime already exceeded that allowed for East Cameron 195 and that weather downtime was

managed at Ship Shoal 269. Plaintiffs' explanation of disallowance of the insurance receivables is just as compelling as Defendants' argument that TETRA and Maritech were taking a conservative approach pursuant to GAAP. Plaintiffs have pled facts sufficient to satisfy the standard enunciated in *Tellabs I*.

As explained above, the Court finds Plaintiffs' allegations sufficient to plead loss causation, or a connection between the pled fraud and Plaintiffs' injury as the truth leaks out. Defendants do not contest that Plaintiffs have suffered economic harm.

### F. Exchange Act 20(a)

Controlling person liability is derivative; it is predicated on the existence of an independent securities violation. *Rubinstein v. Collins*, 20 F.3d 160, 166 n. 15 (5th Cir. 1994). Consequently, Plaintiffs 20(a) claims remain only as to the claims based on misstatements related to the insurance receivables.

### G. Leave to Amend

"We will generally not construe unelaborated, nested requests for amendment as motions to amend." *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d at 556. If the party requests leave in response to a motion to dismiss, without indication of the grounds on which the amendment is sought, is not a motion pursuant to FED. R. CIV. P. 15(a). 497 F.3d at 556 (affirming an implicit denial of leave to amend because amending would have been futile). In *Cent. Laborers Pension Fund*, the Court construed a request for leave as a proper motion because the plaintiffs explained that they would fix infirmities with the pleadings using two deposition transcripts such that the plaintiffs request was not "devoid of any indication of the grounds for amendment." *Id.*

Here, in a footnote to their Response to Defendants' Motion to Dismiss, Plaintiffs ask for leave to amend to remedy any perceived deficiencies as well as incorporate subsequently uncovered facts.[19] In light of the Fifth Circuit's statements, and without further elaboration of the reasons for amendment, this Court is hesitant to consider this footnote a proper Motion pursuant to FED. R. CIV. P. 15(a). The Court has not dismissed the action in its entirety, and therefore, should Plaintiffs so desire, upon proper Motion, the Court will consider whether leave to amend is warranted in this case.

## V. MOTION FOR SANCTIONS

Defendants filed a Rule 11 Motion, contending that several of the allegations in the ACC have no evidentiary support or factual basis because Plaintiffs misquoted or misconstrued statements made by confidential witnesses. Defendants provide sworn affidavits from some of the confidential witnesses in which the witnesses aver that some of the information attributed to them in the ACC is not based on their personal knowledge. Plaintiffs respond that they investigated the allegations behind the ACC and based the CW allegations on the reports of their investigator.

Under Rule 11, the court must identify some federal filing in which the attorney violated the rule that claims must be well-grounded in fact and in law, and that filings not be submitted for an improper purpose. FED. R. CIV. P. 11; *Edwards v. General Motors Corp.*, 153 F.3d 242, 245 (5th Cir. 1998). The court must examine "whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Cooter*

---

[19] During the Motion hearing on Defendants' Motion to Dismiss, Plaintiffs submitted several attachments from recent state court pleadings involving TETRA and its insurer. At the time of the hearing, Defendants did not object to the Court taking judicial notice of the documents but later objected, generally, to Plaintiffs purported attempt to rely on new facts outside those alleged in the Complaint to oppose Defendants' Motion. As the Court did not base any of its holdings on these submitted documents, these objections are **DENIED AS MOOT**.

*& Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990). The court considers three issues: (1) factual questions regarding the attorney's pre-filing inquiry and factual basis of the filing (2) legal issues of whether the filing is warranted by existing law or a good faith argument, and (3) discretionary issues regarding an appropriate sanction. *See id.* at 399; *St. Amant v. Bernard*, 859 F.2d 379, 381-82 (5th Cir. 1988).  Reasonableness is measured on an objective basis. *See Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 263 (5th Cir. 2007) (holding that, in certain cases, an isolated factual misrepresentation may serve as the basis for sanctions, including when the misquoted statement could have had a serious impact on a court's summary judgment decision).

Defendants contend that CW 2 based his allegation that "work done by TETRA was costing much more than the insurance company would ever pay Maritech on the claims" on an erroneous assumption that TETRA's insurance policy had a $50 million cap. (ACC ¶ 56.) Defendants also claim that CW 2's statements related to the cost of weather downtime at East Cameron 195 were based on rumor.  Plaintiffs aver that, based on the state court litigation documents, the proper insurance limit for the insurance policy of which CW 2 speaks, allegedly based on rumor, does have a $50 million limit. Defendants note that TETRA holds many policies, and it is unclear of which policy CW 2 was speaking. Defendants claim that Plaintiffs learned of the $50 million policy after they filed the ACC, but they knew that information was not based on the CW's personal knowledge when they filed the ACC. Defendants reiterate their contention that CW 2's statements about the insurance limits, and whether the incurred expenses exceeded those limits, were based on rumor.

Moreover, Plaintiffs purportedly supplied CW 1 the $10-12 million estimate of weather downtime at East Cameron that CW 1 confirmed, although he claims he does not know where the number came from. Plaintiffs argue that CW 1's affidavit shows that statement about the $10-12 million downtime in for East Cameron 195 was a response to a leading question about an approximation—a proper investigative technique that does not render the statement inadmissible. In his affidavit, Wes Spinic (CW 1) avers: "I did not estimate that the weather downtime on the East Cameron 195 project alone was approximately $10-12 million. Rather the investigators asked me if the weather downtime was approximately $10-12 million and I indicated that the approximation was plausible even though I do not know who supplied them that estimate." (Doc. No. 61, Ex. 1 ¶ 6.) The Court does not find the inclusion of this allegation in the ACC improper or sanctionable because Plaintiffs adequately created a foundation for personal knowledge as to that allegation, and Defendants' affidavit does not specifically defeat that foundation.

In addition, Defendants claim that CW 1 never made allegations that Maritech received computer printouts from adjusters that certain claims were disallowed.  CW 1 now avers that he did not tell investigators that Maritech received printouts in 2007 indicating that claims submissions were not allowed, whereas, in the ACC, CW 1 alleged that Maritech received the printouts in December 2006. (ACC ¶ 52.) Defendants respond that CW 1 clarified that the printouts occurred in 2007 rather than 2006, an allegation that Plaintiffs aver is contrary to the statements CW 1 provided Plaintiffs' investigators and the timeline as revealed in state court pleadings. Defendants respond that, because TETRA did not sue Lloyd's until November 2007, it is plausible that the printouts he

described were received in late 2007. CW 1's explanation that he had no personal knowledge of the ACC paragraph containing the allegations about printouts is troubling. Based, however, on these discrepancies and conflicting statements, the Court does not find sanctionable behavior or that Plaintiffs failed to reasonably investigate the statements included in the Complaint. The Court notes that it did not rely on statements about the printouts in its Motion to Dismiss.

Lastly, Defendants aver that CW 6's statements that the Fluids Division's buyback program was "borderline illegal" was made in the context of how it was marketed to customers, not in the manner for which it was accounted. In the ACC, the allegations attributed to CW 6 include:

> His understanding of the program, and how it was marketed to customers, was that TETRA would contract with customers to buy-back the fluids after they were used. The customers were told that they would receive a 50% "credit" for the returned fluids.

> According to the witness, the actual computation of the buyback credits was a "big secret" and it was closely held by Hank Reeves and Paul Coombs. Reeves once told the witness (in "early" 2007), that the way TETRA did the buyback credit was "borderline illegal."

(ACC ¶¶ 81-82.)

The phrase "the way TETRA did the buyback credit" does not seem to particularly refer to either accounting or marketing, and, as Plaintiffs note, falsely described measurements of a business's accounts, in marketing or in financial reporting, may support a securities violation. Defendants respond that there are no allegations in the ACC that the buyback credit was improperly explained to customers or that these statements impacted the financial statements. The Court finds that the provided affidavit, claiming that the previous statements about the borderline illegality of the buyback credit

73

related to the marketing rather than the accounting of the buyback credit, while perhaps inartfully drafted, does not require the Court to strike these statements from the ACC or other take other measures. Moreover, the Court did not rely on this statement in the Motion to Dismiss.

## VI. CONCLUSION

Defendants' Motion to Dismiss (Doc. No. 44) is hereby **GRANTED AS TO ALL PLAINTIFFS' CLAIMS EXCEPT THOSE RELATED TO INSURANCE RECEIVABLES.** Defendants' Motion for Sanctions (Doc. No. 61) is hereby **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** this 9th day of July, 2009.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT**