UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| IN RE: TETRA TECHNOLOGIES, INC. SECURITIES LITIGATION | § § § § § § § § § | CIVIL ACTION NO. 4:08-cv-0965 |

**MEMORANDUM AND ORDER**

Pending before the Court is Defendants' Motion for an Order to Show Cause (Doc. No. 108), and Plaintiffs' Motion to Compel Discovery (Doc. No. 113). For the reasons stated below, the Court is of the opinion that these Motions should granted in part and denied in part.

**I.     BACKGROUND**

This is a Securities Exchange Act class action on behalf of purchasers of TETRA Technologies, Inc. ("TETRA") common stock between November 3, 2006 and October 16, 2007 (the "class period"). Plaintiffs are investment funds that suffered when TETRA stock dropped at the end of 2007. Individual Defendants allegedly dumped millions of dollars of stock at inflated prices during the class period. In August 2007, TETRA announced lower than expected profits for its wells abandonment and decommissioning ("WA&D") division, and its chief executive held a conference call in which he explained that Maritech Resources, Inc., a TETRA entity within the WA&D division that purchases mature oil and gas wells, would write down expected receivables from disputed insurance proceeds. TETRA's stock price dropped twenty-five (25) percent. On October 16, 2007, TETRA withdrew its previously issued 2007 earnings guidance, announced more

1

possible insurance-related write-downs, and announced impairment costs for non-productive oil and gas properties. Its stock dropped eight (8) percent.

Plaintiffs then filed this suit, alleging that Defendants made several misrepresentations during the class period which inflated the price of its stock. In July 2009, this Court denied in part and granted in part Defendants' motion to dismiss Plaintiffs' claims. More specifically, we dismissed all claims, except those "related to insurance receivables," that is, related to Plaintiffs' allegations that Defendants misrepresented TETRA's likely insurance reimbursements for hurricane-related repairs because claims had already been disallowed.

Defendants now move for an Order to Show Cause, asking that Plaintiffs provide justification for failing to submit an expert report in accordance with the current docket control order (Doc. No. 74). Plaintiffs, in turn, move to compel certain document production from Defendants.

## II. MOTION TO SHOW CAUSE

In their Motion, Defendants argue that Plaintiffs have, without justification, failed to produce an expert report on the issue of loss causation according to the now controlling docket control order. As Defendants point out, Plaintiffs must prove loss causation by a preponderance of the evidence at the anticipated class certification stage of this litigation. Defendants argue that Plaintiffs' failure to comply with the applicable deadlines for submitting their expert report was wholly unjustified, regardless of any delays in document production. According to Defendants, Plaintiffs' loss causation expert report requires no discovery from Defendants under Fifth Circuit precedent establishing that loss causation analysis is based solely on the market's reaction to *public* information.

In response, Plaintiffs point out that this Court previous ruled that setting a deadline for class certification was premature, and, further, that the Court would consider an amended docket control order when certain documents had been produced by Defendants. Accordingly, Plaintiffs argue that they had good reason to assume that existing deadlines would be extended. Plaintiffs also argue that delays in document production by Defendants have made it impossible to fully assess what, if any, additional merits discovery is necessary for them to produce an expert report and effectively move for class certification. Plaintiffs therefore request an extension of at least two months in the deadline to produce their report.

This Court acknowledges that, while it did not explicitly vacate any of the deadlines currently listed on the docket control order, in saying both that a deadline on class certification was premature, and that it would consider an amended schedule in the future may have created some ambiguity as to the reliability of the current deadlines. As such, the Court will not entirely preclude Plaintiffs from filing an expert report due to their failure to observe the deadlines listed on the existing docket control order.

Nonetheless, the question remains as to whether Plaintiffs should be required to submit such a report in the near future, or whether they are entitled to additional merits discovery before the submission. Plaintiffs rely on *Fener v. Operating Engineers Const. Indus. and Misc. Pension Fund*, 579 F.3d 401 (5th Cir. 2009) to support their argument that the Fifth Circuit standard for proving loss causation requires more than publicly available information. In *Fener*, the Fifth Circuit reaffirmed that "[p]roving loss causation requires a plaintiff to prove that the defendant's non-disclosure materially affected the market price of the security . . . . A plaintiff must show (1) that the negative

3

truthful information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it was more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline." *Fener*, 579 F.3d at 407. The court went on to find that the plaintiffs had not sufficiently proved loss causation for purposes of class certification, because plaintiffs "submitted only SEC reports, stock-price charts, analyst reports, and other similar information; they did not include expert testimony." *Id*. at 409. The Court reasoned that these items alone were "little more than informed speculation," and that "the testimony of an expert—along with some kind of analytical research or event study, is required to show loss causation." *Id*. Thus, *Fener* does not, as Plaintiffs suggest, establish that publicly available information is insufficient to prove loss causation, but only that this information alone, absent some analysis or event study offered by an expert, is too speculative. This would indicate that as long as Plaintiffs' expert is given the opportunity to review and analyze all publicly available documents regarding TETRA's allegedly fraudulent statements in generating his report, further merits discovery is not required.

However, Plaintiffs also argue that the holding in the recent case of *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330 (5th Cir. 2010) reaffirms *Fener* and further establishes why merits discovery is necessary. The Court in *Halliburton* explained that "if a company releases multiple items of negative information on the same day, the plaintiff must establish a reasonable likelihood that a subsequent decline in stock price is due to the revelation of the truth of the earlier misstatement rather than to the release of the unrelated negative information" in order to satisfy the

4

Court that "its loss likely resulted from the specific correction of the fraud and not because of an independent reason." *Id*. at 336. In other words, Plaintiffs must demonstrate a causal connection between the earlier fraudulent statement, the subsequent corrective disclosure, and a loss to Plaintiffs that cannot be otherwise explained. *Id*. As Plaintiffs rightly point out in their brief, the court there held that "the negative information constituted non-culpable changes in market conditions and the competitive environment that Halliburton faced, which [p]laintiff's expert failed to differentiate from any allegedly culpable information." *Id*. at 343.

Plaintiffs argued at the hearing held on March 30, 2010 that in order for them to identify and isolate the portion of the loss that can be attributed to corrective statements regarding insurance reimbursements in accordance with *Fener* and *Halliburton*, they need internal accounting documents that reflect the portion of the decline in stock prices that can be attributed to these statements. The Court, however finds no support for this contention in the case law. Indeed, none of the cases cited by Plaintiffs even suggests that the type of differentiation required in cases of multiple negative disclosures requires internal, non-public accounting information, and cannot be performed by an expert analyst on the basis of public documents and other economic models. The court in *Halliburton* found that the expert in that case simply did not engage in such analysis. Indeed, as Defendants point out, neither *Fener* nor *Halliburton* even considers whether internal, non-public disclosures from Defendants can provide the basis for establishing loss causation. As such, these cases do not disturb the established principle that proof of loss causation in context of a fraud-on-the-market regimen is drawn from public data and

5

public filings. *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 267 (5th Cir. 2007).

Accordingly, the Court cannot hold that Plaintiffs are entitled by law to additional merits discovery prior to submitting their expert report and seeking class certification. However, the Court acknowledges that the Fifth Circuit bar for demonstrating loss causation is a high one. Thus, in order to ensure that Plaintiffs are given adequate time to review and analyze all necessary information, the Court allows Plaintiffs thirty (30) days from entry of this Order to submit an expert report. The Court also asks that the parties confer as to an amended scheduling order reflecting all future deadlines, including a deadline for seeking class certification, and submit a proposed order within fifteen (15) days of entry of this order.

### III.  MOTION TO COMPEL

#### A.  Employee Files

Plaintiffs also file a Motion seeking to compel certain document production from Defendants. First, Plaintiffs seek the files of Neil Crawford and Brent Boudreax, two TETRA WA&D employees. Plaintiffs argue that these files may contain relevant information regarding differing estimates of the extent of hurricane-related damages sustained by the three wells relevant to this suit. Plaintiffs point to documents which suggest that an initial damage estimate of $82.9 million was generated by Neil Crawford, but that the number later provided to Defendants' auditors was $62.9 million, that is $20 million less. According to Plaintiffs, they are entitled to additional documentation that might further explain the basis on which these numbers differ. In response, Defendants

argue that these files would likely reveal no additional relevant information, and that producing these files would be extremely burdensome.

While this Court fully appreciates the burden of time and expense that Defendants must incur through additional document production, the Court nonetheless holds that Plaintiffs have sufficiently demonstrated that the files of Neil Crawford, the author of the initial $82.9 million estimate, could lead to additional relevant information as to how this initial estimate was generated. His files, therefore, are discoverable. Brent Boudreax, on the other hand, as Mr. Crawford's direct or indirect supervisor, has no apparent connection to discrepancy in the damage estimates, other than the fact that his name appears in the some of the documents already disclosed to Plaintiffs. As such, his involvement is based entirely on speculation, and the Court will not compel production of his files.

### B.    Privileged Communications

Plaintiffs also seek additional documentation regarding the privilege log submitted by Defendants listing all documents that were not turned over to Plaintiffs on the basis of an assertion of privilege. Plaintiffs first argues that the grounds for the assertion of privilege and the description of the documents contained in the log are insufficient. This Court disagrees. The log provides the type of document, the individuals involved in the communication, the date each document was sent, and a description of the grounds for assertion of privilege. (Pls. Mot., Doc. No. 115, Ex. 1.) The Court holds that this information constitutes sufficient detail to form the basis of the assertion of privilege.

Plaintiffs also identify specific entries in this log involving communications between employees of Defendants, counsel for Defendants, and their insurance brokers,

7

Lockton, Inc. ("Lockton") and NMB. Plaintiffs argue that disclosures and communications made to these insurance brokers destroys the attorney-client privilege, because these individuals are neither the attorney nor the client. Defendants argue that these insurance brokers are agents of Defendants themselves, and therefore fall within the definition of attorney-client communication for purposes of privilege.

The scope of attorney-client privilege is shaped by its purposes. *United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982) (citing *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976)). What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from a lawyer. *Id.* (citing cases). Federal district courts in this circuit have found that the attorney-client privilege extends to communications between an insurer and its insured. *See Metroflight, Inc. v. Argonaut Ins. Co.,* 403 F. Supp. 1195, 1197 (N.D. Tex. 1975); *U.S. v. Hoeffner*, 254 F.R.D. 302, 306-07 (S.D. Tex. Dec. 8, 2008). This extension of the privilege is premised on the understanding that such communications are shared with counsel for the purposes of defending the legal interest of the insured. *Hoeffner*, 254 F.R.D at 306-07.

However, in this case, as Plaintiffs point out, many of the communications at issue took place in the context of a dispute between the insured and insurer, rather than one in which the insurer and insured share a mutual interest. In this situation, argues Plaintiff, the broker is acting not as an agent of Defendants, but rather as a facilitator of a resolution to this dispute, and his inclusion therefore destroys any privilege.

As Defendants argue, courts have in the past found that, even in situations where the insured and the insurer are in dispute, an insurance broker can act as an agent when "its communications are made for the purpose of facilitating the rendition of professional

8

legal services to the client." *Navitagors Management Co., Inc. v. St. Paul Fire and Marine Ins. Co.*, 2009 WL 465584, at *4 (E.D. Mo. Feb. 24, 2009); *see also Exxon Corp. v. St. Paul Fire & Marine Ins.*, 903 F. Supp. 1007, 1009-10 (E.D. La. 1995) (holding that insurance broker acted as a representative of a client when it received "confidential communication[s] for the purpose of effectuating legal representation for a client"). In order to fall within the privilege, however, these communications must involve an attorney. *Id*.

This Court adopts the principled reasoning in *Navitagors* and *Exxon*. Thus, to the extent the communications identified by Plaintiffs between the Defendants, the insurance brokers, and the attorneys fall within this test, or were made to facilitate the rendition of legal services and involve an attorney, the Court holds that they fall within attorney-client privilege and are not subject to discovery. However, if, upon review of the privilege log, Plaintiffs can point to particular emails or documents that they suspect do not, in fact, meet these criteria, the Court invites Plaintiffs to file a supplemental motion. The Court will then conduct an *in camera* review of any contested documents to determine whether they should indeed fall within the attorney-client privilege. At this time, however, with the information now before it, the Court will not compel all communications between Defendants, counsel, and the insurance brokers to be disclosed to Plaintiffs.

### IV.   CONCLUSION

In accordance with this Memorandum, Defendants' Corrected Motion for Order to Show Cause (Doc. No. 108) is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' Motion to Compel (Doc. No. 113) is **GRANTED IN PART AND DENIED IN PART**. Defendants' original Motion to Show Cause (Doc. No. 107) is **DISMISSED**

**AS MOOT**. Plaintiffs will file their expert report within thirty (30) days of entry of this Order. The Parties will submit a proposed amended docket control order within fifteen (15) days of entry of this Order.

    **IT IS SO ORDERED**.

    **SIGNED** at Houston, Texas, on this the 5th day of April, 2010.

    _____
    KEITH P. ELLISON
    UNITED STATES DISTRICT JUDGE