UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE TETRA TECHNOLOGIES, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) | Civil Action No. 4:08-CV-00965<br><br>JUDGE KEITH P. ELLISON |

**DECLARATION OF BETH A. KASWAN IN SUPPORT OF APPLICATION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT, CLASS CERTIFICATION,
AWARD OF FEES AND EXPENSES, AND PLAN OF ALLOCATION**

**DECLARATION**

Pursuant to 28 U.S.C. § 1746, Beth A. Kaswan, under penalty of perjury, declares that the following is true and correct to the best of her knowledge and belief:

1. I am a partner at the law firm of Scott+Scott LLP, which is the Court-appointed Lead Counsel for Lead Plaintiff Fulton County Employees' Retirement System ("Fulton County" or "Lead Plaintiff"). I have personal knowledge of the matters set forth herein based on my active participation in all material aspects of the prosecution and settlement of this action.

2. This declaration is submitted in support of Lead Plaintiff's application for (a) final approval of the proposed Settlement of $8.25 million plus accrued interest (the "Settlement"); (b) the Plan of Allocation; (c) certification of a class for settlement purposes; (d) an award of attorneys' fees equal to 18% of the Gross Settlement Fund, reimbursement of Lead Counsel's out-of-pocket litigation expenses of approximately $570,568.35 (the "Fee Application"); and (e) $3,640.20 to reimburse Lead Plaintiff Fulton County for its reasonable costs and expenses directly relating to its representation of the Class. The purpose of this declaration is to set forth the background of the action and its procedural history, the factual investigation and prosecution, the negotiations that led to the Settlement, the notice process, the proposed Plan of Allocation, and to set forth Lead Counsel's time and expenses in successfully obtaining this Settlement for the Class.

**PRELIMINARY STATEMENT**

3. The substantive terms of the Settlement and method used to arrive at it are, taken as a whole, fair, reasonable, and adequate. The Settlement results in substantial tangible present recovery without the attendant risk of delay of continued litigation; has received a favorable reaction of the Class; follows an extensive investigation and substantial formal discovery into the facts; and eliminates serious risks of establishing liability (particularly with respect to loss causation) and damages. The Settlement therefore provides the best possible recovery for the Class given the litigation risks. Finally, the Settlement is the result of lengthy and hard-fought litigation and arm's-length negotiations between counsel for all parties.

1

4. Lead Plaintiff also seeks approval of the proposed Plan of Allocation as fair and reasonable. The Plan of Allocation provides for the distribution of the Net Settlement Fund on a *pro rata* basis, based on a formula tied to liability and damages. As this is a reasonable and rational distribution, the Court should approve the proposed Plan of Allocation.

5. In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is also applying to the Court for an award of attorneys' fees and payment of costs and expenses. Specifically, Lead Counsel is applying for a fee equal to 18% of the Gross Settlement Fund, an amount that provides no multiplier on its fees calculated on the basis of its hours spent times its attorneys' hourly rates (the "lodestar"), and requesting reimbursement of incurred expenses totaling approximately $570,568.35. Respectfully, Lead Counsel submits that the Fee Application should be awarded because: (a) the fee sought is supported by the amount of time expended by counsel in prosecuting the case; (b) the action was prosecuted on a contingent basis; and (c) counsels' efforts resulted in a substantial settlement favorable to the Class.

**FACTUAL BACKGROUND OF THIS LITIGATION
AS ALLEGED IN THE CONSOLIDATED COMPLAINT**

6. This is a securities class action brought on behalf of all purchasers of the publicly traded common stock of TETRA Technologies, Inc. ("TETRA" or the "Company") between May 3, 2006 and October 16, 2007 against Geoffrey M. Hertel, George M. McCarroll, Joseph M. Abell and Raymond D. Symens (the "Individual Defendants") and TETRA (collectively the "Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act").[1]

7. By this lawsuit, Plaintiff contended that Defendants misrepresented Maritech's (a TETRA subsidiary) dispute with its insurance carrier over coverage for damage to its oil and gas wells and physical property from the 2005 hurricanes, Rita and Katrina, and TETRA's reported

---

[1] Certain of the Individual Defendants were added and dismissed during different stages of the lawsuit. The Amended Complaint dated August 26, 2008 (the "Complaint") contained a class period from November 3, 2006 to October 15, 2007, which Plaintiff sought to enlarge by approximately six months in a proposed amended complaint. The enlarged period, from May 3, 2006 to October 16, 2007 is hereinafter referred to as the "Class Period," in order to include all Plaintiffs' claims within this settlement.

2

first quarter 2006 ("1Q06") through second quarter 2007 ("2Q07") earnings by failing to timely recognize expense for the non-reimbursable performed and estimated future repairs, and issued 2007 earnings guidances that were false because of the looming and yet to be expensed repair costs.

8. The Complaint alleges that the truth leaked out through disclosures made on August 3, 2007, when the Company announced its 2Q07 results and modified its 2007 earnings guidance, and then again on October 16, 2007, when the Company withdrew its 2007 earnings guidance.

9. The Complaint alleges that the above misrepresentations had the effect of artificially inflating the price of TETRA's common stock during the Class Period and that, when the truth was revealed, the Class of TETRA common stock purchasers was damaged thereby. The Court, in its decision on the motion to dismiss the Complaint, held that certain statements about the Company's other business problems included in these two disclosures were not made with scienter, so that only a portion of the stock inflation could be shown to be caused by the fraud and be recoverable in damages.

## PROCEDURAL HISTORY OF THIS ACTION

10. Beginning in March 2008, a number of related putative class actions arising under the federal securities laws were filed in this Court and were subsequently consolidated into the current lawsuit (the "Action"). On June 27, 2008, the Court appointed Fulton County Employees' Retirement System as Lead Plaintiff and appointed Scott+Scott LLP as Lead Plaintiff's Counsel.

11. Scott+Scott undertook an extensive informal investigation of the facts, obtaining information from a large number of former TETRA employees. An Amended Consolidated Complaint was filed on August 26, 2008, which alleged false and misleading statements relating to three areas of the Company's business: TETRA's Fluids Division, Maritech's oil and gas reserves, and Maritech's claims for hurricane insurance reimbursement. The Complaint alleged that, with respect to these three business areas, Defendants issued false and misleading press

3

releases and other statements regarding the financial condition and business prospects of TETRA, in an alleged scheme to artificially inflate the value of TETRA's securities.

12. Thereafter, Defendants filed motions to dismiss the Action. On July 9, 2009, the Court denied (in part) and granted (in part) the motions to dismiss. As a result of this decision, the claims involving Raymond Symens were dismissed, and he was dismissed as a party. Shortly after the July 9, 2009 decision, Plaintiff, by its counsel, began to actively pursue formal discovery from the Defendants and third parties, including from TETRA's auditor, insurance adjuster, and various stock analysts.

13. After over two years of investigating and litigating this Action, Plaintiff and its counsel developed an in-depth understanding of the strengths and weaknesses of the claims, as well as the viability of the defenses put forward by Defendants. Counsel's extensive investigation and discovery efforts have included, *inter alia*, a review and analysis of: (i) public filings by TETRA with the SEC; (ii) Defendants' conference calls and announcements; (iii) wire and press releases published by and regarding TETRA; (iv) securities analysts' reports and advisories about the Company; (v) other public documents and information regarding TETRA; (vi) testimony elicited and documents produced in Maritech's litigation with its insurers in state court (the "Insurance lawsuit"); (vii) thousands of documents produced in this case; (viii) depositions taken in this case; (ix) consultations with forensic accountants and expert economists; and (x) research of the applicable law with respect to Lead Plaintiff's claims and the potential defenses thereto.

14. Lead Counsel reviewed well over a hundred thousand pages of testimony and documents, and worked closely with its experts to develop its accounting and loss causation approaches. Plaintiff reviewed thousands of pages of testimony and documents produced in the related Insurance lawsuit filed by Maritech against its insurers for reimbursement of its hurricane repair costs. In preparation for Plaintiff's motion for class certification, Plaintiff engaged expert economists to develop detailed event studies and economic analyses concerning loss causation and market efficiency. Before the settlement was reached, Lead Counsel took depositions and/or reviewed testimony from the Insurance lawsuit for all the Individual Defendants, as well as of

4

several other critical witnesses. This testimony fully disclosed both the strengths and weaknesses in Plaintiff's case, and highlighted the many technical complexities that would be involved in explaining this case to a jury. The parties engaged in extensive settlement negotiations and a full-day mediation, utilizing the assistance of special mediator, Robert A. Meyer, Esq., to obtain a compromise and settlement of the case against Defendants with a view to settling the issues in dispute and achieving the best relief possible consistent with the interests of the Class. From the motion practice in this case, this Court knows all too well the intensity with which this case was litigated, and the factual and legal complexities which Plaintiff faced in establishing its claims.

### A. Discovery Commences

15. On July 23, 2009 the parties filed their Joint Discovery/Case Management Plan. Thereafter, Plaintiff commenced formal discovery, by serving a first set of document requests on Defendants and issuing document subpoenas to parties to the Insurance lawsuit, TETRA's auditors and consultants, and stock analysts.

16. Plaintiff also served interrogatories and engaged in motion practice to obtain the information it needed to develop the facts for this case. The case was aggressively litigated for almost 12 months before reaching a settlement. This firm diligently reviewed more than a hundred thousand pages of documents and testimony, including several boxes of technical accounting workpapers. This review also entailed travelling to TETRA's headquarters to review several storage cabinets of additional potentially responsive documents over a number of days. Ultimately, this firm received no less than 73 bankers' boxes of documents from Defendants over seven months' time. Defendants also produced a 143-page privilege log, which generated a series of motions to compel. The sheer magnitude of the production required a significant devotion of resources and time of several attorneys in this firm.

17. Defendants also produced lengthy responses and objections to Plaintiff's interrogatories, which Defendants amended a number of times as the litigation proceeded, and the parties engaged in "meet and confers" in attempts to resolve their discovery disputes.

5

18. In addition to taking discovery of the Defendants, Plaintiff subpoenaed and received several boxes of documents from one of the Defendants, Ernst & Young, TETRA's independent auditor, for the quarterly reviews and annual audits spanning the Class Period. Several hundred pages from Ryder Scott, TETRA's Oil and Gas Reserves Auditor, were also produced, in redacted form, also necessitating motion practice. This firm also reviewed roughly six bankers' boxes of documents from various third parties involved in the Insurance lawsuit, and roughly the equivalent of two bankers' boxes of documents from various non-party analysts that covered TETRA during the Class Period.

19. This firm took the depositions of three TETRA employees (Wayne Hennecke, Joseph Abell and Geoffrey Hertel), one former TETRA employee (Wesley Spincic) and the Ernst & Young audit partner, John Russell. In addition, Plaintiff reviewed approximately 12 transcripts of testimony of witnesses in the Insurance lawsuit, including the testimony of Defendants Hertel and McCarroll, as well as testimony of other TETRA officers, and employees, insurance adjusters, brokers and underwriters.

20. Virtually all of the efforts of this firm to develop this case were hotly opposed by Defendants and their counsel, resulting in numerous motions to compel before the Court. Ultimately, though, these disputes served to assist the parties' efforts to shape and refine their respective arguments, as well as to assess the respective strengths and weaknesses of their positions.

**B.   The Settlement Negotiations**

21. The proposed settlement is the result of lengthy and hard-fought litigation and arm's-length negotiations between this firm and Defendants' Counsel. Counsel on both sides are well experienced in securities fraud litigation and became thoroughly familiar with the particular factual and legal issues presented in this case. The parties engaged in lengthy discussions and arm's-length negotiations with the assistance of Robert A. Meyer, Esq., acting as special mediator, with respect to a compromise and settlement of the case with a view to settling the

issues in dispute and achieving the best relief possible consistent with the interests of the Class.

23. Additional insights into the relative strengths and weaknesses of the case were obtained through the mediation conducted with the special mediator.

23. On July 21, 2010, Lead Plaintiff moved this Court for preliminary approval of the proposed settlement of its case against Defendants for $8.25 million in cash, preliminary certification of the Class for settlement purposes and to set a schedule for notice and a fairness hearing on the proposed settlement. On July 23, 2010, the Court issued its Preliminary Approval Order.

## EVALUATION OF THE PROPOSED SETTLEMENT

24. This firm respectfully submits that the substantive terms of the Settlement and the method used to arrive at the Settlement, as well as the proposed Plan of Allocation are fair, reasonable and adequate and should be approved by the Court.

25. The factors in this Circuit to be considered in evaluating the Settlement are: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members. When assessed in light of the applicable criteria, the Settlement is fair, reasonable and adequate and should be granted final approval.

### A. The Settlement Was Not the Product of Fraud or Collusion

26. This present Settlement is clearly the result of arm's-length negotiations. Indeed, this litigation was hotly fought, and settlement negotiations were intense and took place during a day-long face-to-face mediation attended by members of this firm, representatives of the Company, including its general counsel and a financial officer, conducted before an experienced mediator. During negotiations, the parties presented their respective views regarding the merits of the Action, available defenses, the evidence and damages analyses. In support of their

7

positions, each side drafted extensive and detailed mediation statements. By this time, Plaintiff's experts had already completed accounting and economic analyses.

27. Furthermore, Counsel on both sides have had many years of experience in litigating complex litigation and class actions and have negotiated numerous other settlements. Because there is no evidence – or even a suggestion – that the Settlement is the product of collusion between the parties, the first factor supports approval of the Settlement.

### B. The Stage of Proceedings and Discovery Completed Gave the Parties Sufficient Information to Negotiate an Adequate and Reasonable Settlement

28. This factor focuses on whether the parties had sufficient information to conduct an informed negotiation for a settlement that adequately reflects the merits of the case. Courts in this jurisdiction generally recognize that it is not necessary that plaintiffs complete formal discovery in order to negotiate a fair settlement, but here the parties engaged in an in depth review and had the benefit of thousands of pages of testimony by virtually all the knowledgeable witnesses.

29. Here, Lead Counsel litigated to a stage in the proceedings where they could make a reasoned and fully informed determination that the risks of moving forward and being able to secure the amount of any potential judgment outweighed the opportunity to obtain a larger recovery, and that the Settlement provides an excellent recovery for the Class. Even prior to filing the operative Complaint, Counsel conducted an extensive informal investigation including a review of TETRA's public filings, annual reports, press releases, and other public statements, and interviews of former employees and other percipient witnesses. The information obtained from this extensive investigatory process enabled Plaintiff and this firm to set forth the allegations of fraud, including identifying specific practices and transactions alleged to be fraudulent. Notably, Counsel undertook all of the investigative efforts described above without the benefit of any formal discovery due to the Private Securities Litigation Reform Act of 1995's ("PSLRA") discovery stay. As described above, once the Complaint was sustained in part, extensive formal discovery and expert analysis ensued.

30. As a result of these efforts, Lead Plaintiff and this firm obtained a full understanding of the legal and factual issues surrounding this case, knowledge sufficient to negotiate an excellent Settlement, and to confirm that it is fair, reasonable, and adequate.

### C. The Probability of Success on the Merits, the Possible Range of Recovery and the Certainty of Damages, Support Approval of the Settlement

31. Lead Plaintiff's case against the Defendants was sufficiently strong to prevail in part over Defendants' motion to dismiss but also presented substantial risks, in terms of establishing liability, particularly with respect to establishing loss causation and proving how much of the stock losses was attributable to the fraudulent statements, *i.e.*, damages.

#### 1. Proving Liability Would Be Difficult

32. Because the Complaint was sustained only in part, Plaintiff faced substantial risks in going forward with litigating this case. In addition to the usual difficult task of establishing Defendants' fraudulent state of mind, this case involved the daunting problem of establishing which simultaneous announcements by the Company of business problems caused the losses in the price of its stock, and by how much. There were also difficult legal and evidentiary questions raised by recent and at times conflicting Fifth Circuit authorities addressing loss causation and its implications for class certification.

33. Indeed, here, Defendants had and certainly would argue that Plaintiff could not establish falsity, scienter or loss causation, and that most of the TETRA's stock losses were attributable to other factors, including with respect to the theories in the Complaint that had not been sustained on the motion to dismiss. Moreover, both the accounting and economic evidence would be difficult for a jury to grasp. And Defendants had already advised the Court to expect a vigorous evidentiary battle on loss causation at the class certification stage. Defendants would argue that Lead Plaintiff could not establish loss causation due to Defendants' assertion that neither the August 3, 2007 nor the October 16, 2007 disclosures were "corrective" in nature or revealed the alleged "truth." As became clear in the mediation, these matters are heavily contested by experts for both Plaintiff and Defendants. Were the Action to proceed, Defendants

9

would also vigorously argue that the evidence failed to demonstrate scienter, particularly with respect to the alleged accounting violations.  Indeed, Defendants argued that the insurance claims had not even been "denied," and that a later settlement of the Insurance lawsuit proved that the hurricane repairs always were reimbursable, so that the challenged statements were not false.

### 2. Proving Damages Would Be Difficult

34. Even if Lead Plaintiff succeeded on each and every one of the liability issues and could overcome Defendants' numerous defenses, Plaintiff faced risks in proving significant damages, especially considering Defendants were prepared to vigorously contest the amount of the losses attributable to the particular theory of the case that had been sustained.  Defendants likely would present alternative models to those presented by Plaintiff for any damages issues, including the appropriate economic model for determining the amounts by which TETRA common stock allegedly was artificially inflated (if at all) during the Class Period, the effect of various market forces influencing the trading prices of TETRA common stock at various times during the Class Period and the extent to which other business problems at TETRA influenced the trading prices of TETRA common stock at various times during the Class Period.

35. Although Plaintiff would present expert testimony to support its damages calculations, it is impossible to predict how a jury would weigh competing experts' testimony. The determination of damages would likely be reduced at trial to a "battle of the experts" in which the possibility exists that a jury would be swayed by Defendants' experts, who would seek to minimize or eliminate the amount of Plaintiff's and the Class's losses by showing that the losses were attributable to factors other than particular misstatements and omissions alleged in the Complaint that were sustained at the pleading stage.

36. The calculation of damages would also be constrained by the fact that the losses attributable to the non-reimbursable repair costs were "non-recurring."  In light of these obstacles and risks, the $8.25 million recovery is an excellent result.

**D.     The Complexity, Expense and Likely Duration of the Litigation All Support the Settlement**

37.     The complexity, expense and likely duration of any litigation, also favor approval of the Settlement in this Action.  The accounting issues are complex and the expert analysis incorporated many of these complexities.  Because these issues would first be litigated at the class certification stage, even if Plaintiff prevailed, Defendants would likely seek an interlocutory appeal of that result under Fed. R. Civ. P. 23(f), a time-consuming process at best.  Then there would be hard-fought motions for summary judgment and an expensive trial.  The expert fees incurred to date have already cost hundreds of thousands of dollars.  Indeed, the expense of trial would likely be staggering and carries with it the "distinct possibility" that the trial would result in no recovery.

38.     If the Class was certified and the claims survived summary judgment, preparation for trial, including the filing of motions *in limine* (*e.g.,* inevitable Daubert motions), would require significant time and attention from all parties and the Court.  The trial itself would then be potentially lengthy and surely complex, involving the presentation of evidence related to each of the elements of the claims, with respect to both liability and damages, as discussed above.

39.     Furthermore, whatever the outcome of trial, a second inevitable appeal to the Fifth Circuit would be brought by the Defendants who have spared no expense in litigating this case.  At the very least, if this case did not settle, the Class's recovery would be delayed for many, many years.  Conversely, settlement now results in a substantial and relatively immediate recovery, without the attendant risks, delay and further litigation expenses, including for expert discovery, summary judgment, trial and post-trial proceedings.  Thus, this factor weighs heavily in favor of approval of the Settlement.

**E.     The Settlement Is an Excellent Result**

40.     The range of possible recovery strongly supports the Settlement Lead Plaintiff has been able to obtain for the Class.  Pursuant to the Settlement, the Class will recover $8.25 million plus accrued interest, net of administrative costs and attorneys' fees and expenses.  This recovery

11

is an excellent result for the Class, especially when viewed in light of the risks of continued litigation.

### F. Class Counsel, Class Representatives and Absent Class Members Support the Settlement

41. Lead Counsel, the Lead Plaintiff, and the Class Members favor approval of the Settlement. Indeed, while over 45,000 Notice Packets and claim forms were issued to Class Members and/or Nominee brokerage firms to participate in the recovery, not a single Class Member submitted comment or objection with regard to any term of the Settlement (though one person unsuccessfully attempted to intervene to raise collateral matters). The Claims Administrator has not received any objections or requests for exclusion. See Declaration of Joni Brown Re: Notice Procedures (attached as Exhibit A) ("Brown Decl."). Thus, the claims response has been overwhelmingly positive, and, as stated above, the fact that the Settlement was negotiated by experienced counsel at arm's-length entitles counsels' opinion – in favor of the Settlement – to great weight. Thus, this factor should weigh particularly heavily in the Court's analysis.

## CLASS NOTICE

42. By Order dated July 23, 2010 (the "Preliminary Approval Order"), this Court ordered that notice be disseminated to the Class, and set the September 8, 2010 deadline for Class members to submit objections to the Settlement, Plan of Allocation and the request for attorneys' fees and reimbursement of expenses, or request exclusion from the Class. The Court also set a final approval hearing date of September 29, 2010.

43. Pursuant to the Preliminary Approval Order, Lead Counsel instructed Kurtzman Carson Consultants LLC ("KCC"), the Claims Administrator for this Settlement, to begin disseminating copies of the Settlement Notice. The Settlement Notice contains a thorough description of the Settlement, the Plan of Allocation and Class Members' rights to participate in and object to the Settlement, or to request exclusion from the Class. *See* Brown Decl.

44. KCC has disseminated over 45,000 copies of the Settlement Notice to potential Class Members and their nominees.

45. In addition, the Summary Notice of the Settlement ("Summary Notice") was published in the global edition of *The Wall Street Journal* on August 4, 2010.

46. Information regarding the Settlement, including downloadable copies of the Settlement Notice and a Proof of Claim form, was also posted on a dedicated Settlement website.

47. Neither the Claims Administrator nor this firm is aware of any objections.

## **PLAN OF ALLOCATION**

48. If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit (or who previously submitted) acceptable Proof of Claim forms. The Plan of Allocation is designed to achieve an equitable distribution of the Net Settlement Fund.

49. The Plan of Allocation is the product of this firm's investigation and discovery in this Action, as well as its consultation with Plaintiff's damages expert. Indeed, this firm worked closely with the damages expert in establishing the Plan of Allocation, and believes that the Plan of Allocation is a fair and reasonable method to allocate the Net Settlement Fund among Authorized Claimants.

50. The analysis performed by Plaintiff's damages expert entailed studying the market reaction to public disclosures that revealed or described the alleged misrepresentations or their effects, and calculating the reasonable percentage of artificial inflation present in the daily closing market prices for TETRA common stock for each day in the Class Period that, in its opinion, was attributable to the statements alleged to be fraudulent. Plaintiff's damages expert also measured the percentage price decline associated with the disclosure, adjusted that price reaction to eliminate the effects, if any, attributable to general market, industry conditions or TETRA's unrelated business problems, and then used standard statistical techniques to ensure that the price reaction was statistically significant.

51. KCC, as the Claims Administrator for the Settlement, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's "Recognized Claim," calculated in accordance with the Plan of Allocation. Calculation of the Recognized Claim will depend upon several factors, including when the stock was purchased or acquired, and whether the stock was held until the conclusion of the Class Period or sold during the Class Period, and if so, when it was sold.

52. In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Settlements among Authorized Claimants based on the strength of the various claims and the resulting damages. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved.

## CLASS CERTIFICATION

53. The Court preliminarily certified the Class for settlement purposes on July 23, 2010, based on the detailed and well-supported reasons why this Class should be certified and why it satisfies the requirements of Fed. R. Civ. P. 23(a) set forth in Plaintiff's Preliminary Approval Motion.

54. The Class consists of thousands of members and is therefore so numerous as to merit a class action. The Claims Administrator in this case sent over 45,000 copies of the Settlement Notice to Class members and nominee recipients which demonstrates how large the class is and how appropriate a class action is to the claims.

55. The Class members all have numerous question of law and fact in common because all claims arise out of the same exact and uniform alleged pattern of events conducted by Defendants during the Class Period.

56. Lead Plaintiff's claims are typical, indeed *identical*, to those of other Class members.

57. Finally, Lead Plaintiff has adequately represented the Class for settlement purposes because its interests are not antagonistic to those of other Class members and because,

as this firm's resume demonstrates (Exhibit B hereto), Class counsel is qualified and experienced.  Under the law, therefore, the proposed Class for settlement purposes is adequate.

## THE FEE APPLICATION

58. The Settlement Notice informed Class Members that Lead Counsel are moving for an award of attorneys' fees in an amount not to exceed **18%** of the Gross Settlement Fund, or $1,485,000, and for reimbursement of their expenses in the approximate amount of $557,928.76.[2]

59. The details of Lead and Local Counsel's fees and expenses are set forth in the Declaration of Arthur L. Shingler III in Support of Motion for Attorneys' Fees and Disbursements Filed on Behalf of Scott+Scott LLP; and Declaration of Theodore C. Anderson in Support of Motion for Attorneys' Fees and Disbursements Filed on Behalf of Kilgore & Kilgore, attached hereto as Exhibits C and D, respectively.

60. Prior to retaining Lead Counsel to serve as its Counsel in this action, Lead Plaintiff Fulton County and its outside counsel negotiated a fee schedule limiting Lead Counsel from seeking at this stage of the proceedings a fee in excess of 18%.  This cap on fees sought was negotiated at arm's length between Lead Counsel and Lead Plaintiff.

61. This firm achieved an extraordinary result for the Class at great risk and expense to itself.  Throughout this litigation, this firm was committed to the interests of the Class, and invested the time and resources necessary to resolve the Class's claims.  Moreover, this firm took the case on a contingency basis, with no assurance of success, and vigorously litigated this case against Defendants for over two years after the complaint was filed, without any compensation at all.

---

[2]   Following Notice to the Class, Lead Counsel incurred additional expenses and/or received invoices in the amount of $12,639.59, which difference is encompassed in the total of $570,568.35 sought as out-of-pocket expense reimbursement by Lead Counsel in the concurrently filed Fee Motion.

15

### A. Lead Plaintiff's Counsels' Work and Expertise

62. Scott+Scott is a national law firm that specializes in shareholder class and other representative litigation. *See* Scott+Scott Firm Résumé, attached as Exhibit B. The record in this case, along with the matters described in this declaration, demonstrates the enormous effort and expense that went into successfully resolving this litigation. The Declarations of Arthur L. Shingler III and Theodore C. Anderson, outlining the amount of time spent by each attorney and paralegal employed by Scott+Scott and Kilgore & Kilgore, and the lodestar calculations based on current billing rates, demonstrates that an 18% fee is reasonable.

63. Lead and Local Counsel expended approximately 3,621.35 hours in the prosecution and investigation of this litigation. The resulting lodestar is $2,014,762.20. The requested fee is roughly 74% of Counsel's lodestar for this case.

### B. Standing and Caliber of Opposing Counsel

64. The quality of work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants were represented by Greenberg Traurig, LLP, one of the country's most prestigious law firms. Greenberg Traurig spared no effort in the defense of its clients. In the face of this knowledgeable, formidable, and well-financed opposition, this firm was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that were favorable to the Class.

### C. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases

65. This prosecution was undertaken by this firm entirely on a contingent-fee basis. The risks assumed by this firm in bringing these claims to a successful conclusion are described above and in the Settlement Memorandum. Those risks are also relevant to an award of attorneys' fees. Here, the risks assumed by this firm, and the time and expenses incurred without any payment, were extensive, and are described in detail above and Attorneys' Fees and Expenses Memorandum.

66. From the onset, this firm understood that it was embarking on a complex and expensive litigation with no guarantee of ever being compensated for the investment of time and money the case would require. In undertaking that responsibility, Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of this litigation, and that funds were available to compensate staff and to cover the considerable out-of-pocket costs that a case such as this requires. Indeed, this firm advanced more than $457,332.93 in expert costs alone. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

67. This firm also bore the risk that no recovery would be achieved. As discussed herein and in the Settlement Memorandum, from the outset, this case presented a number of significant risks and uncertainties that could have prevented any recovery whatsoever. As discussed in detail in the Attorneys' Fees and Expenses Memorandum, despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.

68. This firm firmly believes that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

69. Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private plaintiffs, particularly institutional investors, take an active role in protecting the interests of shareholders. Here the fact that pre-suit fee discussions limited this firm's compensation to 18% of the recovery demonstrates that Fulton County clearly did its job effectively, both with respect to bringing this case and its fee negotiations with its counsel.

70. As a result of this firm's extensive and persistent efforts in the face of substantial risks, Counsel achieved a significant recovery for the benefit of the Class. In circumstances such

as these, and in consideration of this firm's hard work and the extraordinary result achieved, the requested 18% fee is reasonable and should be approved.

## REIMBURSEMENT OF THE REQUESTED EXPENSES AND COSTS IS FAIR AND REASONABLE

71. This firm is also moving for reimbursement of $570,568.35 in litigation expenses reasonably and actually incurred in connection with commencing and prosecuting the claims against the Defendants. Most of these costs were spent for expert costs or transcripts for testimony taken in discovery. *See* Shingler Declaration, Ex. 2. This firm advanced all of the litigation expenses.

72. From the beginning of the case, this firm was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until the Action was successfully resolved. This firm also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them to prosecute this action. Thus, this firm was motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

73. In addition, pursuant to the PSLRA (15 U.S.C. §78u-4(a)(4)), Lead Plaintiff Fulton County should be fully reimbursed for the expenses it incurred in leading this litigation. Here, the Fulton County trustees utilized the services of Fulton County's usual outside counsel to monitor the litigation and advise them on decisions to be made in the course of their oversight of the litigation and dedicated specific time of its Investment Manager to advance the Class's interests. These amounts are set forth in the Declaration of Tammy Goebeler in Support of Lead Plaintiff Fulton County Employees' Retirement System for Reimbursement of Costs and Expenses, ¶¶3-4.

74. In view of the complex nature of the Action, the litigation expenses incurred were reasonable and necessary to pursue the interests of the Class. Accordingly, this firm respectfully

18

submits that the expenses incurred by this firm and Fulton County are reasonable in amount and should be reimbursed in full.

### **CONCLUSION**

75. In the view of the substantial recovery to the Class, the extraordinary risks of this litigation, the diligent efforts of this firm, the high quality of work performed, the contingent nature of the fee, and the technical complexity of the case, Counsel respectfully submits that the settlement with Defendants should be approved as fair, reasonable and adequate; that the Plan of Allocation should be approved; that a fee in the amount of 18% of the Gross Settlement Fund should be awarded; that this firm's litigation expenses in the amount of $570,568.35 should be reimbursed; and that Lead Plaintiff Fulton County's request under the PSLRA for $3,640.20 for its reasonable costs and expenses (including lost wages) directly relating to its representation of the Class should similarly be granted.

 I declare under penalty of perjury that the foregoing is true and correct.

 Executed on September 20, 2010.

          /s/ Beth A. Kaswan
           Beth A. Kaswan